# UNITED STATES
# COURT OF FEDERAL CLAIMS

---

| | |
|---|---|
| Sioux half-breed lineal descendants, an identifiable association or group of Indians residing within the territorial limits of the United States, and the class representatives, Thomas Eugene Smith, Sheldon Peters Wolfchild, Gayle Cecile Harmon, Sharrie Lynn Roper, Patricia Ann Branden-Adan, Timothy LaBatte, and Damon Knight, individually and on behalf of all others similarly situated,<br><br>                          Plaintiffs,<br><br>v.<br><br>United States,<br><br>                        Defendant. | Civil Action No. __25-1718 L__<br><br><br><br><br>**Complaint for Damages and Equitable Remedies (Class Action)** |

---

The above-referenced class representatives, Thomas Eugene Smith, Sheldon Peters Wolfchild, Gayle Cecile Harmon, Sharrie Lynn Roper, Patricia Ann Branden-Adan, Timothy LaBatte, and Damon Knight individually and on behalf of all others similarly situated, constituting the Sioux half-breed lineal descendants, an identifiable association or group of Indians residing within the territorial limits of the United States, file this complaint against the United States.

## INTRODUCTION

1.      The Sioux half-breed lineal descendants seek a peaceful adjudication of their legal claims against the United States regarding the Lake Pepin Reservation—their 500 square mile permanent home in southeastern Minnesota along the Mississippi River and Wisconsin border. *See* Treaty of July 15, 1830, 7 Stat. 330, art. IX; Act of July 17, 1854, 10 Stat. 304, Act of May 19, 1858, 11 Stat. 292,

## JURISDICTION

2.      Jurisdiction is founded upon 28 U.S.C. §§ 1491, 1505, also known as the Tucker Act and Indian Tucker Act, respectively.

3.      The above-referenced class representatives are Sioux half-breed lineal descendants who are beneficiaries under the 1830 Treaty, the 1854 Act and 1858 Act regarding the Lake Pepin Reservation.

4.      Copies of the Treaty of July 15, 1830 (1830 treaty and U.S Senate ratification), 7 Stat. 330, art. IX, Act of July 17, 1854 (1854 Law), 10 Stat. 304, Act of May 19, 1858 (1858 Law), 11 Stat. 292, are attached hereto as exhibits numbered 1 through 3, respectively.

5.      The Sioux half-breed lineal descendants is an identifiable association or group of Indians residing within the territorial limits of the United States. The Sioux half-breed lineal descendants is "a claimant group …unable to bring suit in this Court as a tribe, [but] they can still bring suit under the Indian Tucker Act as an 'identifiable group' [because] they were once part of— or are lineal descendants of someone who was once part of—an organized tribe that no longer exists or represents the interests of the claimant group." *Navajo Nation v. United States*, 2025 WL 495325, at *10 (Fed. Cl. 2025). *See Chippewa Cree Tribe of the Rocky Boy's Rsrv. v. United States*, 69 Fed. Cl. 639, 673 (2006); *Wolfchild v. United States*, 62 Fed. Cl. 521, 540 (2004).

6.      The plaintiffs have been and are economically injured by the United States' continuing legal violations, detailed below, causing the plaintiffs to have standing to bring their claims in this Court. 28 U.S.C. §§ 1491, 1505.

7.      Venue is proper in the U.S. Court of Federal Claims as there are no related cases pending in district court.

8.      Jurisdictionally, the Defendant's violations of money-mandating duties have damaged the Sioux half-breed lineal descendants as detailed below.

9.     Jurisdictionally, the six-year statute of limitations under 28 U.S.C. § 2501 is no bar to the claims in this case as detailed below.

10.     There has been prior litigation regarding the Lake Pepin Reservation in Minnesota, but none of these cases have adjudicated the legal claims presented herein. First, the Circuit Court decision in *Larriviere v. Madegan*, 1 Dill. 455, 14 F.Cas. 1160 (C.C. Minn. 1870) dealt with a related issue regarding the superiority of Sioux scrip land patents within the Lake Pepin Reservation, but did not adjudicate the legal issues presented herein. Second, the three U.S. Supreme Court decisions regarding Lake Pepin Reservation Sioux scrip land patents redeemed outside the Lake Pepin Reservation did not adjudicate the Lake Pepin Reservation land claims presented herein: *Midway Co. v. Eaton*, 183 U.S. 602 (1902); *Felix v. Patrick*, 145 U.S. 317 (1892); *Myrick v. Thompson*, 99 U.S. 291 (1878).

## PARTIES

11.     The Plaintiff Sioux half-breed lineal descendants is an identifiable association or group of Indians residing within the territorial limits of the United States.

12.     The above-named proposed class representatives are Sioux half-breed lineal descendants who are beneficiaries under the 1830 Treaty, the 1854 Act and 1858 Act regarding the Lake Pepin Reservation. Treaty of July 15, 1830 (1830 Treaty), 7 Stat. 330, art. IX, Act of July 17, 1854 (1854 Law), 10 Stat. 304; Act of May 19, 1858 (1858 Law), 11 Stat. 292.

13.     Plaintiffs and proposed class representatives Thomas Eugene Smith, Sheldon Peters Wolfchild, Gayle Cecile Harmon, Sharrie Lynn Roper, Patricia Ann Branden-Adan, Timothy LaBatte, and Damon Knight are lineal descendants of persons on the United States 1855 Sioux half-breed descendant roll. Ex. 12.

14.     The United States is the defendant.

## CLASS ALLEGATIONS

15.     The United States has failed and continues to fail to properly protect the beneficiary rights of the Sioux half-breed lineal descendants, the intended beneficiaries of the 1830 Treaty, 1854 Law and 1858 Law.

16.     The result of the United States' failures is that the Sioux half-breed lineal descendants are dispossessed of their Lake Pepin Reservation and boundaries, right of occupancy, Indian title and income therefrom.

17.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated, comprising a proposed class defined as:

> All mixed-blood lineal descendants of the Eastern Sioux Bands (the Mdewakanton, Sisseton, Wahpeton and Wahpekute Bands) who are listed on the April 10, 1855 Lake Pepin Reservation census or entitled to be thereon, as beneficiaries of the Lake Pepin Reservation gifted by the said Bands, under the 1830 Treaty, the 1854 Law and the 1858 Law, to and for the benefit of said Sioux mixed-blood lineal descendants, with the United States as trustee

Exs. 1-3, 12.

18.     The members within this class definition are so numerous that joinder of all members is impracticable. The potential claimants are expected to exceed 30,000.

19.     Additionally, for illustration purposes only, in the previous *Wolfchild* case, a case involving a different group of beneficiaries and different lands, Judge Charles F. Lettow of the U.S. Court of Federal Claims granted intervention motions by claimants claiming beneficiary rights under 1888-1890 appropriation laws. In his 2006 decision, Judge Lettow allowed all 36 groups of claimants totaling thousands of Sioux lineal descendants to intervene as plaintiffs. *Wolfchild,* 72 Fed.Cl. 511, 520 (2006). Judge Lettow subsequently granted additional intervention motions in 2007, ultimately allowing over 20,000 claimants to participate in the litigation as intervening plaintiff. *Wolfchild,* 77 Fed.Cl. 22, 24, 35-36 (2007).

20.     Individual lawsuits would also be impracticable for another reason. Due to the lack of federal records of the beneficiaries, the identities of beneficiaries are not readily ascertainable from federal records alone and, consequently, may be disputed by the United States or other purported beneficiaries. Therefore, the costs of individual lawsuits would be prohibitive. Therefore, a class action is the only practicable method to litigate the numerous claims.

21.     There are questions of law and fact common to the class. These common questions include, but are not limited to: (a) interpretation of the 1830 Treaty, 1854 Law and 1858 Law; (b) the identification of the beneficiary class; (c) claims of United States' misconduct regarding the Lake Pepin Reservation; (d) claims of United States' misconduct regarding trust funds; (e) responding to the government's defenses including lack of money-mandating duty and statute of limitations; (f) damages; and (g) equitable remedies restoring the legal Indian title status of the Lake Pepin Reservation and the legal beneficiary status of the Sioux half-breed lineal descendants.

22.     The claims of the representative parties are typical of the class. The proposed class is the beneficiary class under the 1830 Treaty, 1854 Law and 1858 Law. The named plaintiffs, as lineal descendants, assert identical claims arising from the same course of conduct by the United States that gave rise to the claims of all other class members who are also members of the beneficiary class under the 1830 Treaty, 1854 Law and 1858 Law. All class members' claims are based on the same factual and legal theories arising from the 1830 Treaty, 1854 Law and 1858 Law.

23.     The representative parties will fairly and adequately protect the interests of the class. The named plaintiffs have a direct and personal stake in the outcome of this litigation, have experience in these matters, and have retained competent counsel who was lead counsel in the above-referenced *Wolfchild* litigation and who has over 30 years of experience in successful complex litigation against the government, including the United States. *See, e.g., Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018); *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002); *LaBatte v. United*

5

*States*, 899 F.3d 1373 (Fed. Cir. 2018). Specifically, in the *LaBatte* case, proposed class representative Timothy LaBatte, through lead counsel, prevailed by settlement in a lawsuit suing the United States in this Court for breaching a class action settlement agreement in the *Keepseagle* case involving claims based on U.S. Department of Agriculture loan discrimination against American Indian farmers. *See Keepseagle v. Veneman*, No. 99-3119, 2001 WL 34676944, at *15 (D.D.C. Dec. 12, 2001) (certifying class of American Indian farmers).

24.     The interests of the named plaintiffs are not antagonistic to, but rather are coextensive with the interests of the absent class members.

25.     The United States has acted or refused to act on grounds generally applicable to the class.

26.     The alleged breaches of treaty, statutory, trustee and fiduciary obligations and the failure to justly compensate are not isolated events, but are the result of a single, uniform series of actions and omissions by the United States government concerning the entire Lake Pepin Reservation and all of its intended beneficiaries.

27.     Common questions of law and fact predominate over any questions affecting only individual class members, and a class action is the superior method for the fair and efficient adjudication of this controversy.

28.     The core legal and factual issues—such as the interpretation of the 1830 Treaty, the 1854 Law and the 1858 Law, the government's treaty, statutory, trustee and fiduciary duties, and the nature of the alleged breaches of fiduciary and trust duties—are common to all class members.

29.     While individual issues may exist regarding the specific entitlement or damages owed to each descendant (e.g., damages may vary based on the age of a particular beneficiary), these questions are minor in comparison to the overarching legal and factual questions that unite the class.

30.    Adjudicating these claims through a class action is superior to other available methods. (1) It prevents inconsistent adjudications of the United States' liability. (2) It provides a more efficient and economical method of resolving the claims of a large number of plaintiffs who might otherwise be unable to pursue individual litigation. (3) It concentrates the litigation in one forum, conserving judicial resources.

31.    The class action format is also superior because it provides a mechanism for the United States to address, in a dignified way, a historical wrong on a class-wide basis, ensuring a just, equal and comprehensive resolution for a large, dispersed group of claimants.

32.    Denying the class action would perhaps dig an additional, yet deeper, yet more complicated legal hole for the United States to climb out of.

## FACTUAL AND LEGAL ALLEGATIONS

**The Sioux (Dakota) Indians occupied Southeastern Minnesota for hundreds of years before European contact.**

33.    The Sioux (Dakota) Indians occupied the upper Midwest, including Southeastern Minnesota, which includes the Lake Pepin Reservation, for hundreds of years before European contact.

34.    The historic locations of significant Sioux villages along the Mississippi River between present-day Winona and Hastings, Minnesota, were concentrated around the modern cities of Red Wing and the area near Hastings.

35.    The major historical Sioux villages located along this stretch of the Mississippi River, Lake Pepin, or near to it, include:

- Chief Red Wing's Village

    o   This Sioux village was located at site of the present-day City of Red Wing

- Chief Wabasha's Village

- o This Sioux village was located downriver from Red Wing, generally in the area near Lake Pepin.

- Chief Iron Cloud's Village

  - o This Sioux village was located upstream from Red Wing on the west side of the Mississippi River, above the mouth of the St. Croix River, near the present-day City of Hastings, Minnesota. =

36.     European contact with the Sioux Indians began in the 1600's.

37.     In 1805, the United States and its so-called "Louisiana Purchase" included the purchase of lands on the western shore of the Mississippi River including the Lake Pepin Reservation.

38.     Minnesota became a United States territory in 1849.

39.     Minnesota became a state in 1858.

40.     The United States settlement of Minnesota happened rapidly between 1850 and 1870. The population censuses for 1850 to 1870 show exponential growth in settlers.

- 1850: 6,077
- 1860: 172,023
- 1870: 439,706

See https://www2.census.gov/library/publications/decennial/1940/population-volume-1/33973538v1ch06.pdf (Minnesota).

41.     The rapid settlement of Minnesota in the 1850 to 1870 period impacted the Sioux Indian population in many ways. *Id.*

**In 1830, Chief Wabasha II, Chief Red Wing and other Sioux leaders wanted to gift a portion of the Sioux Bands' land near Lake Pepin to the Sioux half-breed lineal descendants in trust as a permanent home.**

42.      Chief Wabasha II or La Feuille (The Leaf) was born in the 1760s and became the highly skilled diplomatic leader of the Sioux Nation from the late 1790s through 1836. The son of the greatest hero of the Sioux Nation, he was recognized by the Americans as the "first chief" of his

tribe and as such had contacts with Spanish, American, and British officials. After the Americans made the Louisiana Purchase, he aided Tecumthe in the formation of a British-Indian confederacy to fight in the war of 1812 against the Americans. He afterward established his village below the bluff known as "Wapasha's Cap" (now known as Sugarloaf) at present day Winona, Minnesota. He adjusted uneasily to the rapid inroad with the government into the affairs of his nation. He signed a number of treaties with the government and was also constantly involved in affairs with the Ojibway, Ho-Chunk, and Sac and Fox tribes. His long life ended when he caught smallpox in 1836. In 1843 the settlers at Rocque's Landing changed the name of their town to "Wabasha" in honor of the chief. See: https://www.hmdb.org/m.asp?m=66959 (historical marker). Wabasha II was a strict abstainer from whiskey, enjoyed the arts of the white man's culture and tried to bring them to his people. See: https://www.wikitree.com/wiki/Wapasha-3 (family tree of Wabasha II).

43.     The 1830 treaty was one of several signed by Wabasha II. Ex. 1. He was also a signatory of the 1825 Treaty of Prairie du Chien. Treaty of Aug. 19, 1825, 7 Stat. 272, (proclamation Feb. 6, 1826).

44.     The 1830 Treaty of Prairie du Chien, signed by various tribes including the Sioux (Dakota), Sac and Fox, Iowa, and others, ceded land in present-day western Iowa and northwestern Missouri. Ex. 1. A significant and specific provision of this treaty was Article IX, which created a reserved tract of land for "half-breeds" or Sioux half-breed lineal descendants as referred to in this case. *Id.*

45.     This 1830 Treaty provision, the 1854 Law, the 1858 Law and the subsequent land certificates, scrip, and land patents issued to the Sioux half-breed lineal descendants played a crucial role in the early history and settlement of the area in Goodhue, Wabasha and Winona Counties in Minnesota. Exs. 1-3.

46.     While the Sioux, and the Wabasha dynasty in particular, ranged throughout southeastern Minnesota, their principal village was in the Mississippi River Valley. See: https://www.wabasha.org/community-resources/about/wabashas-chronological-history-heritage/#:~:text=WABASHA'S%20CHRONOLOGICAL%20HISTORY%20AND%20HERITAGE,with%20the%20Northwest%20Indian%20tribes. The exact location of the village of Wabasha II is often cited as being near Lake Pepin. *Id.* This area was a key location for fur trading and was considered a significant settlement. *Id.*

47.     The city of Wabasha, Minnesota, is officially recognized as the oldest continuously inhabited town in the state, with its establishment officially recognized by the 1830 Treaty:



(See: https://www.wabasha.org/community-resources/). The city and county of Wabasha are named in honor of the successive chiefs of this name—including Wabasha II. *Id.*

48.     Another Sioux Chief in the area who supported the Lake Pepin Reservation for Sioux half-breed lineal descendants was Chief Red Wing. Chief Red Wing signed the 1825 Treaty. Treaty of Aug. 19, 1825, 7 Stat. 272. Historical records indicate that Chief Red Wing (Tatankamani) did not sign the 1830 Treaty of Prairie du Chien because he died in March 1829.

See https://www3.mnhs.org/mnopedia/search/index/person/tatanka-mani-walking-buffalo-red-wing-ca-1755-1829#:~:text=Henry%20Lewis's%201855%20lithograph%20shows,region%20due%20to%20his%20prominence.

49.     The 1830 Treaty did, however, establish the "Lake Pepin Half-Breed Tract" for the "half-breed" relatives of the Sioux. Ex. 1. This tract of land began near Chief Red Wing's village. *Id.*

50.     The current city of Red Wing, Minnesota, is named after Chief Red Wing. It has a mural depicting Chief Red Wing:



(See: https://www.honoringdakota.org/the-mural).

51.     Currently, the Lake Pepin Reservation is sparsely-populated, agriculturally-farmed land principally in Wabasha County and also includes small parts of Goodhue County and Winona County. For example, the current total population of Wabasha County, the bulk of the reservation, is about 21,000. See: https://data.census.gov/profile/Wabasha_County,_Minnesota?g=050XX00US27157

52.     A 10-foot tall bronze sculpture of Wabasha II, an American Indian after whom the city of Wabasha is named, stands atop a fountain next to the Riverside eagle center.



(See https://mnprairieroots.com/tag/national-eagle-center/).

53. Chief Wabasha's son, Wabasha III, would later be a key figure in the U.S.-Sioux War of 1862. He opposed the United States-Sioux War of 1862 and afterward suffered the humiliating removal to Crow Creek, Dakota Territory, where 300 people died from lack of food and medical care. See: https://www.hmdb.org/m.asp?m=66959.

54. In Article IX of the 1830 Treaty of Prairie du Chien, Chief Wabasha and the other Sioux leaders' intention was to secure a permanent home and a means of economic support for the mixed-race (or "half-breed") members of their nation. Ex. 1.

55. The key points of Chief Wabasha's and other Sioux leaders' intention and the context surrounding it: securing a permanent home; providing for their descendants; a form of trust; a reflection of changing times; and a desire for the Sioux cultural and religious traditions to follow through the bloodlines. Ex. 1.

56. As to securing a permanent home, the treaty explicitly states that the Sioux bands "earnestly solicited that they might have permission to bestow upon the half-breeds of their nation" a specific tract of land. This demonstrates a desire to ensure a secure and stable home for these individuals, many of whom were the children of white fur traders and Sioux women. *Id.*

57. As to providing for their lineal descendants, the Sioux leaders, including Wabasha II, were concerned about the future of their mixed-race relatives. The traditional nomadic hunting

lifestyle was becoming increasingly difficult due to encroaching white settlement and the decline of game. By gifting land, they were providing a resource base for their descendants to live on and potentially adopt a more agrarian lifestyle. *Id.*

58.     As to a form of trust, the 1830 Treaty provided that the land gifted by the Sioux Bands to the Sioux half-breed lineal descendants would be held "in the same manner" as other Indian titles were held, meaning it was a gift in the legal form of an irrevocable trust for the Sioux half-breed lineal descendants with the United States as trustee. *Id.*

59.     Such an irrevocable trust where the United States agrees to be trustee for a gift of a reservation, including Indian title, from a tribe to a group of lineal descendants is not a bare trust, but a comprehensive fiduciary relationship that requires the government to protect, preserve and manage the trust property for the trust beneficiary. *Id.*

60.     As to a reflection of the changing times, the creation of this Lake Pepin Reservation reflects the complex social and economic changes occurring in the region. The Sioux leaders were adapting to the new reality of American expansion and the growing number of people with mixed American Indian and European ancestry. Chief Wabasha and other Sioux leaders sought to use the treaty process to protect a vulnerable population within their community. *Id.*

61.     As a desire for the Sioux cultural and religious traditions to follow through the bloodlines, the creation of this "half-breed tract" allows the Sioux half-breed lineal descendants to live in proximity to each other in order to communally carry on Sioux cultural and religious traditions and imprint the Sioux cultural and religious traditions and customs on the next seven generations. *Id.*

**The U.S. agreed in the 1830 Treaty with Wabasha II and other Sioux leaders; so, the Sioux Bands gifted the Lake Pepin Reservation to the Sioux half-breed lineal descendants with the U.S. as trustee for the benefit of the Sioux half-breed lineal descendants.**

62.     In the 1830 Treaty, as to the Lake Pepin Reservation, the United States and Wabasha II and the other Sioux leaders came to a meeting of the minds on the following: the Sioux Bands gifting the Lake Pepin Reservation to the Sioux half-breed lineal descendants as beneficiaries in an irrevocable trust with the United States as trustee. Ex. 1.

63.     To confirm this meeting of the minds in writing, Article IX of the 1830 Treaty incorporated a gift from the Sioux Bands of the Lake Pepin Reservation to the Sioux half-breed lineal descendants to be held by the United States in an irrevocable trust for the permanent benefit of the Sioux half-breed lineal descendants. Ex. 1.

64.     The United States entered into the Prairie du Chien Treaty of July 15, 1830 (1830 Treaty), 7 Stat. 330.

65.     The 1830 Treaty was ratified by the U.S. Senate and proclaimed on February 24, 1831.

66.     In Article IX of the 1830 Treaty, the United States agreed to be trustee for a gift of Lake Pepin Reservation land from the Sioux Bands to the Sioux half-breed lineal descendants.

67.     By receiving the gift in trust from the Sioux Bands, the United States agreed to the irrevocability of the trust, that the United States is trustee, and that the Sioux half-breed lineal descendants are the beneficiaries.

68.     As beneficiaries of the irrevocable trust under the 1830 Treaty, the Sioux half-breed lineal descendants are an identifiable group of American Indians residing within the territorial limits of the United States.

69.     The 1830 Treaty is between the United States and the Sacs and Foxes, the Medawah-Kanton, Wahpacoota, Wahpeton and Sissetong Bands or Tribes of Sioux; the Omahas, Iwoays,

Ottoes, and Missourias Bands of Indians, and identified the Sioux half-breed lineal descendants. Ex. 1.

70.     In the 1830 Treaty, Article IX, it is explicitly stated, as accurately quoted in part that, "[t]he Sioux Bands in Council having earnestly solicited that they might have permission to bestow upon the half breeds of their Nation," lands of which would become known as the Lake Pepin Reservation. 7 Stat. 330, art. IX. *Id.*

71.     The 1830 Treaty established the boundaries of what would be known as the Lake Pepin Reservation as follows, the quote of which is accurately stated as follows:

> Beginning at a place called the barn, below and near the village of the Red Wing Chief, and running back fifteen miles; thence in a parallel line with Lake Pepin and the Mississippi, about thirty-two miles to a point opposite Beef or O-Boeuf River; thence fifteen miles to the Grand Encampment opposite the River aforesaid.

*Id.* See Act of July 17, 1854 (1854 law), 10 Stat. 304 and Act of May 19, 1858 (1858 law), 11 Stat. 292 for references to 1830 Treaty legal description.

72.     The following is the United States map of the Lake Pepin Reservation under the 1830 Treaty:



(See: https://commons.wikimedia.org/wiki/File:Lake_Pepin_Half-Breed.png).

73.     The Lake Pepin Reservation consists of approximately 515 square miles, approximately 320,000 acres, of land located in Southeastern Minnesota along the west shore of the Mississippi River as described in the 1830 Treaty's legal description.

74.     The phrase "half breeds of their Nation," refers to the group of Indians identified in this complaint as "Sioux half-breed lineal descendants."

75.     The name, "Sioux half-breed lineal descendants" is accurately derived from "half breeds of their Nation."

76.     The word "Nation" of which refers to the identified Sioux Tribes in the 1830 Treaty: "the Mdewakanton, Wahpacoota, Wahpeton and Sissetong Bands or Tribes of Sioux." Prairie du Chien Treaty of July 15, 1830 (1830 treaty), 7 Stat. 330.

77.     The United States, by the U.S. Senate ratifying the 1830 Treaty, accepted, as trustee, an Indian reservation, that is the identified lands in the 1830 Treaty, for the benefit of the Sioux half-breed lineal descendants which is referred to in this complaint and known as the Lake Pepin Reservation. 7 Stat. 330, art. IX.

78.     In addition, the 1830 Treaty, as ratified by the U.S. Senate, stated that the United States agreed to the rights of the Sioux half-breed lineal descendants to title and occupancy of the Lake Pepin Reservation as other Indian Titles are held by tribes, as accurately quoted from the 1830 Treaty as follows:

> The United States agree to suffer said half Breeds to occupy said tract of country; they holding by the same title, and in the same manner that other Indian Titles are held.

7 Stat. 330, art. IX.

79.     The 1830 Treaty, as ratified by the U.S. Senate, acknowledged, recognized and confirmed the gift of the Lake Pepin Reservation and its boundaries, Indian Title and the right of occupancy to the Sioux half-breed lineal descendants as the trust beneficiaries in an irrevocable trust with the United States as trustee.

80.     Specifically, by the 1830 Treaty, the Sioux Bands gifted the Lake Pepin Reservation, and all the property rights that entails, to their Sioux half-breed lineal descendants so that they could live there forever.

81.     To its credit, the government in the 1830 Treaty, recognized that the Sioux Bands owned the Lake Pepin Reservation and could gift the Lake Pepin Reservation to the Sioux half-breed lineal descendants.

82.     On this basis, according to the 1830 Treaty, "[t]he Sioux Bands in Council having earnestly solicited that they might have permission to bestow upon the half breeds of their Nation" the Lake Pepin Reservation. 7 Stat. 330, art. IX.

83.     The United States agreed to this gift transfer in trust with the United States as trustee

for the benefit of the Sioux half-breed lineal descendants:

> The United States agree to suffer said half Breeds to occupy said tract of country; they
> holding by the same title, and in the same manner that other Indian Titles are held.

7 Stat. 330, art. IX.

84.     By doing so, the United States is the trustee of an irrevocable trust to benefit the

Sioux half-breed lineal descendants who are trust beneficiaries.

85.     The trust corpus is the Lake Pepin Reservation and any income therefrom.

**Many grounds exist for the Sioux half-breed lineal descendants to be considered an identifiable group of Indians within the territorial limits of the United States.**

86.     The Sioux half-breed lineal descendants are an identifiable group of Indians within

the territorial limits of the United States for many reasons.

87.     First, the Sioux half-breed lineal descendants are an identifiable group of Indians

within the territorial limits of the United States because the 1830 Treaty, the 1854 Law and 1858

Law establishes the Sioux half-breed lineal descendants' Lake Pepin Reservation.

88.     Second, the Sioux half-breed lineal descendants are identified in the 1830 Treaty,

1854 Law and 1858 Law as an identifiable group of American Indians. Exs. 1-3.

89.     Third, the Department acknowledged that, after the 1830 Treaty, the Lake Pepin

Reservation is "vested" in the Sioux half-breed lineal descendants. Sioux lands or reservation in

Minnesota Territory. 78 H.R. Rep. No.138, 33d Cong., 1st Sess. (1854), at 7, attached as Ex. 6.

90.     Fourth, under 18 U.S. Code § 1151, the Sioux half-breed lineal descendants' Lake

Pepin Reservation is "Indian country" under the definition provided in the statute:

> 18 U.S. Code § 1151 - Indian country defined
> Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian
> country", as used in this chapter, means (a) all land within the limits of any Indian
> reservation under the jurisdiction of the United States Government, notwithstanding the
> issuance of any patent, and, including rights-of-way running through the reservation, (b) all

dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

91.     Fifth, the Sioux half-breed lineal descendants are a group of Indians. For example, the Sioux half-breed lineal descendants even satisfy the definitions of "tribe" in the 1828 Webster Dictionary:

> TRIBE, *noun* [Latin tribus.]
> 1. A family, race or series of generations, descending from the same progenitor and kept distinct, as in the case of the twelve tribes of Israel, descended from the twelve sons of Jacob…
> 5. A nation of savages; a body of rude people united under one leader or government; as the tribes of the six nations; the Seneca *tribe* in America.

Webster, Noah, An *American Dictionary of the English Language* (1828). The Sioux half-breed lineal descendant history is "civilized," not "a nation of savages" or "body of rude people."

92.     Sixth, at least one Department of Interior decisions refers to the Sioux half-breed lineal descendants as a tribe:

> The Pepin half-breed Sioux were a tribe of Indians for whom a reservation was provided…

*Albert A. Coursolle, et al.*, 44 Pub. Lands Dec. 188, 191, 1915 WL 1184, at *3.

93.     Seventh, in Article IX of the 1830 Treaty, the United States "agree to suffer said half Breeds to occupy said tract of country" which confirms Sioux half-breed lineal descendants' "right to occupancy" in the Lake Pepin Reservation. Ex. 1.

94.     Eighth, in Article IX of the 1830 Treaty, the United States "agree to suffer said half Breeds … they holding by the same title, and in the same manner that other Indian titles are held" which confirms Sioux half-breed lineal descendants' "Indian title" in the Lake Pepin Reservation. *Id.*

95.     Ninth, the word "suffer" in this context means:

> suffer *vb.* (14c) … 2. To allow or permit (an act, etc.) <to suffer a default>

SUFFER, Black's Law Dictionary (12th ed. 2024). So, the United State agrees in the 1830 Treaty by using the word "suffer" to allow and permit Sioux half-breed lineal descendants, its Lake Pepin Reservation, its right of occupancy and its Indian title. Ex. 1.

96.     Tenth, the government's on-and-off-again claims that the Sioux half-breed lineal descendants are not a tribe with a reservation are, in themselves, evidence of the Sioux half-breed lineal descendants being an identifiable group of American Indians. *See* 1854 and 1858 Laws, *Albert A. Coursolle, et al.*, 1915 WL 1184, at *3.

97.     Eleventh, the Sioux half-breed lineal descendants are groups of families of Indians that are acknowledged under the 1830 Treaty, 1854 Law and 1858 Law, to exist by the Secretary of the Interior and currently by Congress under its plenary authority continuing until this day. Exs. 1-3.

98.     Twelfth, Article X of the 1830 Treaty has a sentence fragment which refers to Article IX's cession to the Sioux half-breed lineal descendants, "this provision shall extend to the cession made by the Sioux in the preceding Article." 7 Stat. 330, art. X. "Cession" means the formal giving up of rights, property, or territory by a state—here the Sioux's cession of the Lake Pepin Reservation to Sioux half-breed lineal descendants. Ex. 1.

99.     Thirteenth, to be sure, at the time of the 1830 Treaty, the Sioux "half breeds" did not have a tribal name. After all, in 1830, it was "[t]he Sioux Bands in Council" who earnestly solicited that "the half breeds of their Nation" receive the Lake Pepin Reservation. 7 Stat. 330, art. IX. Over time, after the "half breeds" received and occupied the Lake Pepin Reservation in 1830, the "half breeds" became known, over time, as the Sioux half-breed lineal descendants. Exs. 1-3.

100.     Fourteenth, Article IX of the 1830 Treaty has 121 words confirming the Sioux Bands' cession to the Sioux half-breed lineal descendants, their reservation, their reservation boundaries, their right of occupancy and their Indian Title:

ARTICLE IX.
The Sioux Bands in Council having earnestly solicited that they might have permission to
bestow upon the half breeds of their Nation, the tract of land within the following limits, to
wit: Beginning at a place called the barn, below and near the village of the Red Wing Chief,
and running back fifteen miles; thence in a parallel line with Lake Pepin and the Mississippi,
about thirty-two miles to a point opposite Beef or O-Boeuf River; thence fifteen miles to the
Grand Encampment opposite the River aforesaid; The United States agree to suffer said half
Breeds to occupy said tract of country; they holding by the same title, and in the same
manner that other Indian Titles are held.

Ex. 1.

101.      Fifteenth, Article X of the 1830 Treaty grants a power to the President of the United

States over the Sioux half-breed lineal descendants' tribal reservation, never exercised, to "assign to

any of the said half-breeds, to be held by him or them in fee simple, any portion of said tract not

exceeding a section, of six hundred and forty acres to each individual":

ARTICLE X.
Reservation for other half-breeds.
… but the President of the United States may hereafter assign to any of the said half-breeds,
to be held by him or them in fee simple, any portion of said tract not exceeding a section, of
six hundred and forty acres to each individual. And this provision shall extend to the cession
made by the Sioux in the preceding Article.

Ex. 1.

102.      Sixteenth, under the 1854 Law, the government conducted a census process and

published an 1855 census of the Sioux half-breed lineal descendants which the government admitted

was incomplete. Ex. 12.

103.      Seventeenth, under the 1854 Law, the government printed, issued and delivered over

six hundred 1857 land certificates provided to each Sioux half-breed lineal descendant individual on

the 2855 census which was titled, "Sioux Half-Breed Reserve at Lake Pepin." Ex. 7.

104.     Eighteenth, under the 1854 Law, 290 Sioux half-breed lineal descendants, using the certificates, received Sioux scrip land patents within the Lake Pepin Reservation and occupied the land there. Exs. 2, 17.

105.     Nineteenth, the Department, under the 1854 Law, surveyed and mapped the Lake Pepin Reservation. Exs. 2, 4. In surveying and mapping the Lake Pepin Reservation, the United States affirmed the Sioux half-breed lineal descendants' right of occupancy and Indian title to the Lake Pepin Reservation under the 1830 Treaty. *Id.*

106.     Twentieth, the Sioux half-breed lineal descendants' Lake Pepin Reservation has never been abrogated, terminated or repudiated by the United States. Exs. 1-3.

**All of the elements of a third-party-created irrevocable trust with the United States as trustee and the Sioux half-breed lineal descendants as trust beneficiaries exist in this case—and there has been no abrogation, termination or repudiation.**

107.     Under the 1830 Treaty, an irrevocable trust was created by the gift of the third-party Sioux Bands with the United States as trustee for the Sioux half-breed lineal descendants as trust beneficiaries. Ex. 1.

108.     The trustee is the United States. *Id.*

109.     The trust corpus is the Lake Pepin Reservation, the Lake Pepin Reservation boundaries, the right of occupancy, Indian title, and any income from the trust corpus. *Id.*

110.     The trust beneficiary is the Sioux half-breed lineal descendants. *Id.*

111.     Once the United States in the 1830 Treaty agreed to the Sioux Bands' gift of the Lake Pepin Reservation to the Sioux half-breed lineal descendants, the United States did not have the power to withdraw or annul the gift of the Lake Pepin Reservation which was made part of the irrevocable trust by the Sioux Bands' gift transfer.

112.     In the 1830 Treaty, the United States, as trustee of an irrevocable trust, received the

Lake Pepin Reservation gift from the Sioux Bands for the permanent benefit of the Sioux half-breed

lineal descendants.

113.     The U.S. trust relationship with Sioux half-breed lineal descendants under the 1830

Treaty can only be abrogated, terminated or repudiated by Congress and only then with: (1) clear

and unequivocal language of abrogation, termination or repudiated; (2) constitutionally-required

consent of the Sioux half-breed lineal descendants because of the nature of the 1830 Treaty

irrevocable trust and (3) constitutionally-required just compensation.

114.     Congress has not enacted legislation which purports even to accomplish 1 of the 3

required criteria for abrogation, termination or repudiation.

**The core general legal principle, applicable here, is that the United States, like an individual, has no power to withdraw or annul its grants of land; this legal principle provides a foundation for protecting Indian title against subsequent conflicting governmental actions.**

115.     The United States, in its development westward, acquired millions of acres of land,

and disposed of it by land grants, land patents, public sales and otherwise.

116.     The core general legal principle, applicable here, is that the United States, like an

individual, has no power to withdraw or annul its previous land grants.

117.     The Supreme Court established the foundational principle protecting previous land

grants in *Fletcher v. Peck*, 10 U.S. 87, 6 Cranch 87, 1810 WL 1558 (1810), holding that a grant is a

contract executed and that a party is, therefore, always estopped by his own grant. The Court

explained that a contract executed, as well as one which is executory, contains obligations binding on

the parties and that a grant, in its own nature, amounts to an extinguishment of the right of the

grantor, and implies a contract not to reassert that right. 1810 WL 1558, at *1. This constitutional

protection derives from the Contract Clause, which the Supreme Court held applies to land grants

because the constitution uses the general term contract, without distinguishing between those which are executory and those which are executed:

> Where a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights. A party to a contract cannot pronounce its own deed invalid, although that party be a sovereign state. A *grant* is a *contract*, executed. A law, annulling conveyances, is unconstitutional, because it is a law impairing the obligation of contracts, within the meaning of the constitution of the United States.

*Id.* The Supreme Court further held that if an act be done under a law, a succeeding legislature cannot undo it because the past cannot be recalled by the most absolute power and conveyances have been made, those conveyances have vested legal estate. *Id.*

118.    No discussion of Indian title would be complete without discussion of the "so-called doctrine of discovery":

> The law of Indian land tenure has its origins in the so-called doctrine of discovery, a legal fiction developed by the United States Supreme Court in the early nineteenth century to reflect European policy toward the Indians and to explain the relative rights of the discovering nations and the Indians to Indian land. *See Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 543–44, 8 L.Ed. 483 (1832); *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 572–74, 5 L.Ed. 681 (1823). Under the doctrine of discovery, the discovering European nations held fee title to Indian land, subject to the Indians' right of occupancy and use, sometimes called Indian title or aboriginal title. *County of Oneida v. Oneida Indian Nation of New York,* 470 U.S. 226, 234, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *Oneida Indian Nation of New York v. County of Oneida,* 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). As a consequence, no one could purchase Indian land or otherwise terminate aboriginal title without the consent of the discovering nation's sovereign. *County of Oneida,* 470 U.S. at 234, 105 S.Ct. 1245 (citation omitted).

*Seneca Nation of Indians v. New York*, 206 F.Supp.2d 448, 502–03 (W.D.N.Y. 2002). *See* Cohen, Felix S., "Original Indian Title" (1947), 32 *Minnesota Law Review* 28 (1947) (https://scholarship.law.umn.edu/mlr/1296); Cain, Gordon, "Indian Land Titles in Minnesota" Minnesota Law Review 177 (1918) (https://scholarship.law.umn.edu/mlr/1395).

119.     The general rule is sometimes expressed as "nemo dat quod non habet," which means "no one can give what he does not have."

120.     As to American Indians, this principle provides a legal foundation for protecting Indian title against subsequent conflicting governmental actions.

121.     Based on these legal principles, the federal courts have consistently applied strict standards to protect established Indian title from arbitrary extinguishment by the government.

122.     Additionally, the Supreme Court has held that congressional intent to extinguish aboriginal title must be plain and unambiguous and will not be lightly implied. *U.S. v. Santa Fe Pac. R. Co.,* 314 U.S. 339 (1941); *Pueblo of Jemez v. United States,* 350 F.Supp.3d 1052 (2018). As the Supreme Court stated in *United States v. Santa Fe Pacific Railroad,* "an extinguishment cannot be lightly implied in view of the avowed solicitude of the United States for the welfare of its Indian wards." 314 U.S. at 354.

123.     The Supreme Court in *McGirt v. Oklahoma,* 591 U.S. 894 (2020) specifically held that Congress, to abrogate, terminate or repudiate an existing reservation, must enact a law with an explicit reference to cession or similar language evidencing the present and total surrender of all tribal interest.

> Disestablishment has "never required any particular form of words," *Hagen,* 510 U.S., at 411, 114 S.Ct. 958. But it does require that Congress clearly express its intent to do so, "[c]ommon[ly with an] '[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests.' " *Nebraska* v. *Parker,* 577 U. S. 481, ⸻ – ⸻, 136 S.Ct. 1072, 1079, 194 L.Ed.2d 152 (2016).

591 U.S. at 903–04.

124.     Even providing more protection to reservations, the Indian Nonintercourse Act, codified at 25 U.S.C. § 177, provides that no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law

or equity, unless the same be made by treaty or convention entered into pursuant to the

Constitution.

125.     These protective legal standards—namely (1) government can't convey what it does

not own, (2) explicit language required for abrogation, termination and repudiation of Indian title,

and (3) the Indian non-Intercourse Act—are to be applied by the Courts to protect Indian Title.

**The United States in the period of 1849 through 1851 entered into two treaties with treaty provisions to purchase the Sioux half-breed lineal descendants' Lake Pepin Reservation, but neither of them were ratified by the U.S. Senate principally because of the expense.**

126.     The United States from 1849 through 1851 entered into two treaties with provisions

purchasing the Sioux half-breed lineal descendants' Lake Pepin Reservation, but neither of them

were ratified by the United States Senate.  Exs. 7-8.

127.     The United States wanted to purchase these and other Indian lands, but never

completed the purchase of the Sioux half-breed lineal descendants' Lake Pepin Reservation for

many reasons, including it was too expensive. *Id.*

128.     In this way, both treaties between 1849 and 1851 were unsuccessful at purchasing

the Sioux half-breed lineal descendants' Lake Pepin Reservation because the U.S. Senate did not

ratify the treaty provisions purchasing Sioux half-breed lineal descendants' Lake Pepin Reservation.

*Id.*

129.     First, the federal government agreed to a treaty with Sioux half-breed lineal

descendants on October 8, 1849. Ex. 7.

130.     In the 1849 treaty, the United States negotiated directly with the Sioux half-breed

lineal descendants on or near the Lake Pepin Reservation. *Id.*

131.     The 1849 treaty provided that Sioux half-breed lineal descendants would be paid

$200,000 by the United States for the Sioux half-breed lineal descendants' reservation:

Article I

The said half-breeds hereby cede and convey to the United States the same tract of land above described, with all their title and claim to the same.

Article II

In consideration of the said cession the United States agrees to pay to the said half-breeds, on the ratification of this treaty, the sum of two hundred thousand dollars.

*Id.*

132.    The United States and the Sioux half-breed lineal descendants agreed to the 1849 Treaty subject to U.S. Senate ratification.

133.    But, on September 9, 1850, the Senate voted not to ratify the treaty with Sioux half-breed lineal descendants by a vote of 28 for and 17 against. *Id.* The motion to ratify the treaty failed in the Senate because Article II, Section 2, Clause 2 of the Constitution requires a two-thirds vote requirement for the Senate to ratify treaties. U.S. Const., Art. II, s. 2., cl. 2.

134.    Second, the U.S. entered into 1851 treaties—dated July 23, 1851 and August 5, 1851—with the four Minnesota Sioux bands (Wahpeton, Sisseton, Mdewakanton and Wahpekute. These treaties included ceding over millions of acres of land in Southern Minnesota—including the Sioux half-breed lineal descendants' Lake Pepin Reservation. Ex. 8.

135.    The eighth article of the Treaty of August 5, 1851, between Commissioners Lee and Ramsey and the Sioux Indians, provided for a payment of $150,000 to the Sioux half-breed lineal descendants in lieu of the Sioux half-breed lineal descendants reservation:

Article 8. The half-breeds of the Sioux nation having failed and refused to avail themselves of the provisions for their benefit in the ninth and tenth articles of the treaty concluded at Prairie du Chien on the 15th of July, 1830, it is hereby agreed, at their request, that in lieu of the tract of land set apart of the occupancy of said half-breeds, there shall be paid to them by the United States, under the direction of the President, the sum of one hundred and fifty thousand dollars, ($150,000): Provided, That the non-ratification of this article shall in no manner affect the other provisions of the treaty.

*Id.*

136.    The United States and the Sioux bands, but not the Sioux half-breed lineal descendants, agreed to the 1851 Treaty provision selling the Lake Pepin Reservation for $150,000, subject to U.S. Senate ratification.

137.    "This article [8] was, however, stricken by the Senate, in executive session on 22d of June, 1852" before the treaty was ratified because the Sioux half-breed lineal descendants had not approved it. U.S. House Committee on Indian Affairs Report, No. 138 at 10. Ex. 6

138.    So, the United States, despite two treaties in 1849 and 1851 to do so, never purchased the Lake Pepin Reservation because the U.S. Senate never ratified the 1849 and 1851 treaty provisions purchasing the Lake Pepin Reservation. Exs. 7-8.

**Instead of purchasing the Lake Pepin Reservation in 1849 and 1851, the United States enacted 1854 and 1858 laws, codifying the Lake Pepin Reservation and providing an additional benefits mechanism to the Sioux half-breed lineal descendants—not to abrogate, terminate or repudiate the 1830 Treaty Indian title for Sioux half-breed lineal descendants.**

139.    Instead of purchasing the Lake Pepin Reservation in 1849 and 1851, the United States enacted 1854 and 1858 laws, codifying the Lake Pepin Reservation, and providing an additional benefits mechanism to the Sioux half-breed lineal descendants.

140.    As to collective Indian Title, Indian Title is communal. Indian Title is a collective right held by the community, not a divisible, individual right. For it to be extinguished, Congress generally must obtain consent of the all the trust beneficiaries relinquishing collective Indian title or make a clear and plain declaration of extinguishment affecting the entire collective's rights. *See Restatement (Third) of Trusts* § 65 (2003) ("[I]f all of the beneficiaries of an irrevocable trust consent, they can compel the termination or modification of the trust.").

141.    The 1854 Law did not terminate the Lake Pepin Reservation because it neither required all the Sioux half-breed lineal descendants to consent to relinquishment, nor contained a clear and plain declaration of extinguishment terminating the entire collective's rights.

142.    In 1854, after the 1849 and 1851 treaties to purchase Sioux half-breed lineal descendants' Lake Pepin Reservation were not ratified by the U.S. Senate, Congress enacted the 1854 Law, amended later by the 1858 Law, which caused a Sioux half-breed lineal descendants roll of half breeds to be created, caused surveying and subdividing of Sioux half-breed lineal descendants' reservation, and caused issuance of "Sioux Scrip Patents" to Sioux half-breed lineal descendants and land patents to settlers and others within Sioux half-breed lineal descendants' Lake Pepin Reservation. Exs. 2-3.

143.    The 1854 and 1858 Laws relating to the Lake Pepin Reservation created additional benefits and rights for the Sioux half-breed lineal descendants, and did not abrogate, terminate or repudiate the Sioux half-breed lineal descendants' 1830 treaty rights, including the reservation, reservation boundaries, Indian title, right of occupancy, right to income therefrom, and other beneficiary rights. Exs. 2-3.

144.    To be sure, the 1854 Act did authorize the President to issue certificates or scrip to Sioux half-breed lineal descendants in exchange for their individual relinquishment of their rights to other portions of the reservation. *See Midway Co. v. Eaton*, 183 U.S. 602 (1902). *See Felix v. Patrick*, 145 U.S. 317, 318 (1892). Under this certificate-scrip-patent system, each Sioux half-breed lineal descendant was eligible to receive certificates or scrip for the same amount of land each would be entitled to in case of a division of the reservation, pro rata, among the claimants, upon a full and complete relinquishment to the United States of each individual's right, title, and interest to any other portion of the Lake Pepin Reservation. *See Larriviere v. Madegan*, 1 Dill. 455, 14 F.Cas. 1160, 1160 (C.C. Minn. 1870).

145.    The Supreme Court stated in *Myrick v. Thompson*, 99 U.S. 291, 295 (1878) that the Sioux half-breeds' rights to the Lake Pepin Reservation were "doubtless guaranteed to the half-breeds by the article of the treaty":

By the ninth article of the treaty a certain tract of land was set apart for the half-breeds of the Sioux nation, and the United States agreed to suffer said half-breeds to occupy said tract of country, they holding by the same title and in the same manner that other Indian titles are held. 7 Stat. 330. Certain rights of occupancy were doubtless guaranteed to the half-breeds by that article of the treaty…

*Id.*

146.    Importantly, the 1854 Act provided that no transfer or conveyance of any said certificates or scrip within the Lake Pepin Reservation shall be valid, indicating Congressional intent to protect the half-breed beneficiaries from dispossession of the Lake Pepin Reservation:

And provided further, That no transfer or conveyance of any of said certificate or scrip shall be valid.

Act of July 17, 1854, 10 Stat. 304.

147.    Importantly, the 1858 Act provided that Sioux half-breed lineal descendants who had "Sioux Scrip Patents" within the reservation would need no additional documents to occupy their lands within the reservation and that such documents were "declared to be subject to no other disposition than location by the 'certificates' or 'scrip' authorized to be issued by the said [1854] act…":

Sec. 2. And be if further enacted, That the provisions of this act shall not extend to said tract or subdivision, within the body of land aforesaid, which shall have been settled upon in good faith by, and is in the occupancy of, any of the said half-breeds, or mixed bloods; which lands, so settled upon and occupied by the half-breeds, are hereby expressly declared to be subject to no other disposition than location by the "certificates" or "scrip" authorized to be issued by the said act of eighteen hundred and fifty-four for the benefit of said Indians. Nor shall the provisions of this act extend to any lands which may have been located prior to its passage with half-breed scrip, with the consent of the settlers thereon.

148.    Under this section, the 1858 Law legally established that the 1854 Law certificates and scrips issued to the Sioux half-breed lineal descendants within the Lake Pepin Reservation were "declared to be subject to no other disposition than location"—meaning the certificates and scrip,

and subsequent Sioux scrip land patents, were subject to the 1830 Treaty Indian title encumbrances and conveyed no new title to the certificate, scrip or patent holder.

149.    This 1858 Law provision is a repudiation of the government's dispossession of the Sioux half-breed lineal descendants' Indian title to the Lake Pepin Reservation because the certificates and scrips that the Sioux half-breed lineal descendants signed did not "relinquish" their Indian title because Congress declared that such certificates and scrip were "subject to no other disposition than location."

150.    So, the intent of the 1854 Act is not to abrogate, terminate or repudiate the 1830 Treaty Lake Pepin Reservation, but to provide a further benefit—"location" on a particular parcel—to the Sioux half-breed lineal descendants as beneficiaries.

151.    To be sure, the Circuit Court held in *Larriviere* that the location of land with scrip under the 1854 Act passed the fee out of the United States, and vested it in the plaintiff as grantee. The scrip and application became the "instruments of title," and conferred upon him the legal title as effectually as could have been done by the issuing of a patent. *Larriviere v. Madegan*, 1 Dill. 455 (1870).

152.    However, neither the U.S. Supreme Court in *Felix, Myrick* and *Midway Co.,* nor the Circuit Court in *Larriviere.* considered the legal question of whether the 1854 and 1858 laws codified the Sioux half-breed lineal descendants' Lake Pepin Reservation, reservation boundaries, Indian title, right of occupancy and other trust beneficiary rights—and did not abrogate, terminate or repudiate the 1830 Treaty nor the United States' obligations as trustee thereunder.

153.    The federal courts in *Felix, Myrick* and *Midway Co.,* and *Larriviere* were never presented with the 1830 Indian title land claims presented here.

154.    The United States is subject to the core general legal principle, like an individual, that no one has the power to withdraw or annul its previous land grants.

155. And, here, since the original cession under the 1830 Treaty was a gift of the Lake Pepin Reservation from the Sioux Bands to the Sioux half-breed lineal descendants, the United States didn't even have its own previous land grant under the 1830 Treaty to withdraw or annul.

156. Instead, the United States, under the 1830 Treaty, agreed to receive the Lake Pepin Reservation gift from the Sioux Bands in trust for the Sioux half-breed lineal descendants.

157. In hindsight, the United States' failure to purchase the Lake Pepin Reservation under the 1849 and 1851 treaties, because it was too expensive, forecloses the United States granting land patents in fee under the 1854 Law and 1858 Law on the Lake Pepin Reservation because the Sioux half-breed lineal descendants' beneficiary rights continue under the 1830 Treaty because their beneficiary rights thereunder were not abrogated, terminated or repudiated by Congress.

158. In other words, the 1830 Treaty is still good law creating an Indian title encumbrance on the Lake Pepin Reservation.

159. The United States land patents issued for the Lake Pepin Reservation are invalid because the United States, like an individual, has no power to withdraw or annul its previous land grants.

160. The United States' land patents are subject to the Sioux half-breed lineal descendants' Indian Title.

161. Furthermore, it was to preserve the Lake Pepin Reservation for the Sioux half-breed lineal descendants, that Congress codified the 1830 Treaty trust by enacting the 1854 Law, amended by an 1858 Law, which caused a roll of Sioux half-breed lineal descendants to be created, caused surveying and subdividing of Sioux half-breed lineal descendants' reservation for "location" purposes, and caused issuance of "Sioux Scrip Patents" to Sioux half-breed lineal descendants and land patents to settlers and others within the Lake Pepin Reservation.

162.     On this legal foundation, the Sioux half-breed lineal descendants dispute any interpretation of the 1854 and 1858 Laws as abrogating, terminating or repudiating the 1830 treaty, the Sioux half-breed lineal descendants, their Lake Pepin Reservation, their right of occupancy, their Indian title, and their right to income therefrom.

163.     In this case, because of the irrevocable trust based on a gift from the Sioux bands to the Sioux half-breed lineal descendants, Congressional abrogation, termination or repudiation of a treaty-recognized Indian reservation requires clear and unequivocal language of abrogation, termination and repudiation, consent of the Sioux half-breed lineal descendants and just compensation.

164.     The 1854 and 1858 Laws do not have any of the three required elements: the constitutionally-required clear and unequivocal language of abrogation, termination and repudiation, Sioux half-breed lineal descendants' consent, and just compensation.

165.     The title of the 1854 law was "An Act to authorize the President of the United States to cause to be surveyed the tract of land in the Territory of Minnesota, belonging to the half-breeds or mixed-bloods of the Dacotah or Sioux nation of Indians, and for other purposes."

166.     The title of the 1854 Act affirms Sioux half-breed lineal descendants' Lake Pepin Reservation because it states the Act is to cause the Lake Pepin Reservation belonging to "the half-breeds or mixed-bloods of the Dacotah or Sioux nation of Indians" to be surveyed.

167.     The 1854 Act has three sections—all of which affirm the Sioux half-breed lineal descendants' Lake Pepin Reservation, reservation boundaries, right of occupancy and Indian title.

168.     The three sections of the 1854 Act affirm Sioux half-breed lineal descendants' Lake Pepin Reservation by causing a Sioux half-breed lineal descendants census and roll of half breeds to be created, causing surveying of Sioux half-breed lineal descendants' reservation, and causing

issuance of "Sioux Scrip Patents" to Sioux half-breed lineal descendants and land patents to settlers and others within the Lake Pepin Reservation.

169.     As to the Sioux half-breed lineal descendants census and roll of half breeds being created, section two of the Act provided for a census of the Sioux half-breed lineal descendants "who are entitled to participate in the benefits of the said…reservation":

> Sec. 2. And be it further enacted, That the President be, and he is hereby authorized, to cause to be ascertained the number and names of issue, the half-breeds or mixed-bloods who are entitled to participate in the benefits of the said grant or reservation as aforesaid, before the issue of the certificates or scrip provided for in the preceding section.

Ex. 2.

170.     Section two affirms Sioux half-breed lineal descendants' Lake Pepin Reservation, reservation boundaries, right of occupancy and Indian title by causing a census or roll of Sioux half-breed lineal descendants "entitled to participate in the benefits of said grant or reservation."

171.     None of the text of section two of the 1854 law contains a clear expression of abrogation, termination or repudiation.

172.     As to the surveying of the Sioux half-breed lineal descendants reservation, section three of the Act provides authorization for the President "to have the lands within the reserve surveyed and exposed to public sale… in the same manner as other public lands":

> Sec. 3. And be it further enacted, That from and after the passage of this act, the President is authorized to have the lands within the reserve surveyed and exposed to public sale at the Land-Offices for the districts in which said lands may lie, according to the boundaries of the several land districts recently established by Congress, in the same manner as other public lands.

*Id.*

173.     The fact that the President is authorized to "have the lands within the reserve surveyed and exposed to public sale" confirms the codification of the Sioux half-breed lineal descendants' Lake Pepin Reservation in the 1854 Act.

174.     The President's statutory authorization to publicly sell the lands within the Sioux half-breed lineal descendants' Lake Pepin Reservation, alone, does not disestablish or diminish the Sioux half-breed lineal descendants' Lake Pepin Reservation.

175.     None of the text of section two of the Act contains a clear expression of abrogation, termination or repudiation.

176.     As to causing issuance of "Sioux Scrip Patents" to Sioux half-breed lineal descendants and land patents to settlers and others the Lake Pepin Reservation, section one authorizes the President to exchange a subdivided part of Sioux half-breed lineal descendants' reservation to each Sioux half-breed lineal descendant who relinquishes his or her individual's (but not the group's) right, title and interest to any other portion of the Lake Pepin Reservation.

177.     Although section one references individuals' right, title and interest in the land within Lake Pepin Reservation, section one omits reference to the Sioux half-breed lineal descendants' right of occupancy and Indian title to Lake Pepin Reservation under the 1830 treaty as detailed above.

178.     Because section one only references individuals' right, title and interest in the land within Lake Pepin Reservation and omits reference to the Sioux half-breed lineal descendants' rights of occupancy and Indian title to Lake Pepin Reservation under the 1830 treaty, section one does not constitute language of abrogation, termination or repudiation.

179.     Specifically, section one of the Act can be broken into two parts.

180.     The first part of section one states:

That the President be, and he is hereby, authorized, to exchange with the half-breeds or mixed-bloods of the Dacotah or Sioux nation of Indians, who are entitled to an interest therein, for the tract of land lying on the west side of Lake Pepin and the Mississippi River, in the Territory of Minnesota, which was set apart and granted for their use and benefit, by the ninth article of the Treaty of Prairie du Chien, of the fifteenth day of July, one thousand eight hundred and thirty…

Ex. 2.

181.     The first part of section one affirms Sioux half-breed lineal descendants' Lake Pepin Reservation, reservation boundaries, right of occupancy and Indian title by affirming "the ninth article of the Treaty of Prairie du Chien, of the fifteenth day of July, one thousand eight hundred and thirty" "set apart and granted for their use and benefit" the Lake Pepin Reservation "who are entitled to an interest therein."

182.     None of the text of the first part of section one of the Act constitutes a clear expression of abrogation, termination or repudiation.

183.     The second part authorizes the President to "exchange" scrip with an individual Sioux half-breed lineal descendants member, up to 640 acres of the reservation or elsewhere, in exchange for the individual's (but not the group's) relinquishment of any other right, title and interest to any other portion of the Lake Pepin Reservation:

> and for that purpose he [the President] is hereby authorized to cause to be issued to said persons, on the execution by them, or by the legal representatives of such as may be minors, of a full and complete relinquishment by them to the United States of all their right, title, and interest, according to such form as shall be prescribed by the Commissioner of the General Land-Office, in and to said tract of land or reservation, certificates or scrip for the same amount of land to which each individual would be entitled in case of a division of the said grant or reservation pro rata among the claimants -which said certificates or scrip may be located upon any of the lands within said reservation not now occupied by actual and bond fide settlers of the half-breeds or mixed-bloods, or such other persons as have gone into said Territory by authority of law, or upon any other unoccupied lands subject to preemption or private sale, or upon any other unsurveyed lands, not reserved by Government, upon which they have respectively made improvements: Provided, That said certificates or scrip shall not embrace more than six hundred and forty, nor less than forty acres each, and provided that the same shall be equally apportioned, as nearly as practicable, among those entitled to an interest in said reservation: And provided further, That no transfer or conveyance of any of said certificates or scrip shall be valid.

Ex. 2.

184.     The second part references only an "exchange" between the United States and an individual Sioux half-breed lineal descendant, not an "exchange" between the United States and the Sioux half-breed lineal descendants as a group.

185.     So, the United States, in exchange, only received the individual's, but not the Sioux half-breed lineal descendant group's relinquishment of right, title and interest to the Lake Pepin Reservation.

186.     The government's certificates, scrip and patents issued to the Sioux half-breed lineal descendants were to be non-transferable and non-conveyable under the 1854 Law.

187.     None of the text of the second part of section one of the Act constitutes a clear expression of abrogation, termination or repudiation.

188.     Comparing the 1854 law to the 1849 treaty shows that the 1854 Law does not contain the language of cession, abrogation, termination or repudiation. Ex. 2 (1854 Law); Ex. 7 (1849 treaty).

189.     First, the 1849 treaty provided that Sioux half-breed lineal descendants would be paid $200,000 by the United States for the Sioux half-breed lineal descendants' reservation. Ex. 7. The 1854 law provides no payment to the Sioux half-breed lineal descendants for the Sioux half-breed lineal descendants' reservation. Ex. 2.

190.     Second, Article I of the 1849 treaty provided that the Sioux half-breed lineal descendants "hereby cede and convey to the United States the same tract of land above described, with all their title and claim to the same." Ex. 7. The 1854 has no similar provision where Sioux half-breed lineal descendants make a cession of the Lake Pepin Reservation to the United States. Ex. 2.

191.     Third, Article II of the 1849 treaty provides $200,000 payment for the Sioux half-breed lineal descendants cession of the Lake Pepin Reservation, "In consideration of the said cession the United States agrees to pay to the said half-breeds, on the ratification of this treaty, the

sum of two hundred thousand dollars." Ex. 7. The 1854 law has no similar provision where the Sioux half-breed lineal descendants are being paid for the cession of the Lake Pepin Reservation. Ex. 2.

192.     Finally, if Congress wanted the 1854 Act to abrogate the 1830 treaty and terminate the Sioux half-breed lineal descendants' right of occupancy and Indian title, Congress knew the language to use as it did so nine years later in the Act of February 16, 1863. regarding the abrogation of the Sioux reservations in Minnesota, but not the Sioux half-breed lineal descendants' Lake Pepin Reservation:

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all treaties heretofore made and entered into by the Sisseton, Wahpaton, Medawakanton, and Wahpakoota bands of Sioux or Dakota Indians, or any of them, with the United States, are hereby declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States, and all lands and rights of occupancy within the State of Minnesota, and all annuities and claims heretofore accorded to said Indians, or any of them, to be forfeited to the United States.

Act of Feb. 16, 1863, 37th Cong., 3rd Sess., p. 652. Ex. 9. The February 1863 Act contains the action words "are hereby declared to be abrogated and annulled" and "to be forfeited" in direct reference to the Sioux Bands' "treaties," "lands" and "rights of occupancy."

193.     To the contrary, the 1854 Law does not have action words like "are hereby declared to be abrogated and annulled" and "to be forfeited" and does not have a direct reference to the Sioux half-breed lineal descendants' 1830 treaty, their Lake Pepin Reservation, their rights of occupancy, and their Indian title. *Id.* The 1854 law, unlike the February 1863 Act, did not abrogate, terminate or repudiate a treaty, reservation, right of occupancy, nor Indian title. Exs. 2, 9.

194.     The government has never taken the legal position that the Act of February 16, 1863, abrogated, terminated or repudiated the Sioux half-breed lineal descendants' Lake Pepin Reservation.

195.     The Department under the 1854 law conducted a census process. Ex. 11.

196. The Department required testimony and affidavits showing a Sioux ancestor before an individual would be added to the 1854 Sioux half-breed lineal descendants census roll. Ex. 11.

197. The Department under the 1854 law published a census of Sioux half-breed lineal descendants. Ex. 12.

198. The 1857 Sioux half-breed lineal descendants census roll contained only 642 Sioux half-breed lineal descendants. Ex. 12.

199. As background, according to Minnesota History Society estimates the pre-1862 war Sioux population in Minnesota as 7,000—which included "full-bloods." See https://www3.mnhs.org/mnopedia/search/index/event/us-dakota-war-1862# :~:text=By%20the%20summer%20of%201862,traders%20refused%20to%20extend%20credit.

200. The United States acknowledges the published census's incompleteness.

201. First, the Department's affidavit requirement alone precluded some Sioux half-breed lineal descendants from the census roll for many different reasons—making the census of the Sioux half-breed lineal descendants incomplete. Exs. 11-12.

202. Second, the census had a supplemental list of 38 Sioux half-breed lineal descendants which the United States noted were not on the census. Ex. 12 (schedule A).

203. Third, a U.S. Senate bill was introduced in 1864, but never enacted, to include three omitted Sioux half-breed lineal descendants from the Sioux half-breed lineal descendants census: Mary Wacoutah; Martha Wacoutah and Lucy Caron. Ex. 13.

204. Fourth, the census roll is unfinished and incomplete because there are many Sioux half-breed lineal descendants, eligible under the 1830 treaty, who were left off the census list. Ex. 12.

205. Fifth, the government is legally required under the 1854 Law to complete the census because it is admittedly unfinished and incomplete. Exs. 2, 12.

206. Each Sioux half-breed lineal descendant listed on the 1855 Sioux half-breed lineal descendants roll was eligible to receive a certificate of their Sioux Half Breed Reservation beneficiary status. Ex. 14 (U.S. General Land Office Circular dated March 21, 1857).

207. The government maintained an index of the certificates or scrip issued to the Sioux half-breed lineal descendants. Ex. 15.

208. The certificates issued under the 1854 Law were headlined as "Sioux Half-Breed Reserve at Lake Pepin":



See:https://www.google.com/search?sca_esv=5b71cfa89013eb9f&rlz=1C1VDKB_enUS1129US11 29&udm=2&fbs=AIIjpHxU7SXXniUZfeShr2fp4giZ1Y6MJ25_tmWITc7uy4KIemkjk18Cn72Gp24 fGkjjh6w0Scodj_KwyDDcIrPkvfwXhoeFCV9NzJe4zUr2gAxjy39sCvJYfyuOnq-a2jzNFcAumOJtsW6AW-kcvUe9KTlmkoIY-iawM0Spuzk1MlyzUC7GNf8EguNTToGicjI7lf4Yeixve_H1h3YeS9bbydpnQ82DeA&q=lake+pepi n+reservation+land+certificate&sa=X&ved=2ahUKEwiPiLDp79qPAxWjG9AFHRV1A2oQtKgL egQIGBAB&biw=1422&bih=725&dpr=2#vhid=oqHFvUvfXEhxiM&vssid=mosaic. Ex. 16 (additional examples of Sioux half-breed reserve at Lake Pepin certificates).

209.     The title of the document "Sioux Half-Breed Reserve at Lake Pepin" would never have been used if the 1854 Law abrogated, terminated or repudiated the Lake Pepin Reservation. *Id.*

210.     Under the 1854 Law, 290 individuals of the 642 individuals on the Sioux half-breed lineal descendants census roll were issued Sioux scrip land patents for land within the Lake Pepin Reservation. Ex. 17.

211.     The government issued Sioux scrip land patents to the 290 Sioux half-breed lineal descendants totaling 107,432.5 acres, about one-third of the 320,000 acres in the Lake Pepin Reservation. Ex. 17.

212.     The government issued land patents, including different forms, to settlers and others for 212,567.5 acres, about the remaining two-thirds of the 320,000 acres in the Lake Pepin Reservation. Exs. 5, 15-17.

213.     After the 1854 Law, at least 290 Sioux Scrip Patent holders lived on the Lake Pepin Reservation. *Id.*

214.     Amongst them were many more Sioux half-breed lineal descendants. *Id.*

215.     In summary, under the 1854 Law, the government, after collecting affidavits confirming ancestry, conducted a Sioux half-breed lineal descendant census of 642 Sioux half-breed lineal descendant individuals, albeit incomplete, and issued "Sioux scrip patents" to 290 Sioux half-breed lineal descendants to occupy land on the Lake Pepin Reservation. Exs. 15-17.

216.     The Department's post-1854 Law documents show a continuing reservation with about 290 Sioux half-breed lineal descendants living on a surveyed and censused Lake Pepin Reservation after the 1854 Act. Exs. 15-17.

217.     The Act of May 19, 1858 amended the 1854 Law. Ex. 3. The 1858 Law made the Sioux half-breed lineal descendant reservation subject to the laws relating to sales and preemption. But, there was an exception for those Sioux half-breed lineal descendants who had "Sioux Scrip

Patents" within the reservation that they would need no additional documents to occupy their lands within the reservation and that such documents were "declared to be subject to no other disposition than location by the 'certificates' or 'scrip' authorized to be issued by the said [1854] act…":

> Sec. 2. And be if further enacted, That the provisions of this act shall not extend to said tract or subdivision, within the body of land aforesaid, which shall have been settled upon in good faith by, and is in the occupancy of, any of the said half-breeds, or mixed bloods; which lands, so settled upon and occupied by the half-breeds, are hereby expressly declared to be subject to no other disposition than location by the "certificates" or "scrip" authorized to be issued by the said act of eighteen hundred and fifty-four for the benefit of said Indians. Nor shall the provisions of this act extend to any lands which may have been located prior to its passage with half-breed scrip, with the consent of the settlers thereon.

*Id.*

218.     Importantly, the 1858 Law indicated that the 1854 Law certificates and scrips issued to the Sioux half-breed lineal descendants within the Lake Pepin Reservation were "declared to be subject to no other disposition than location"—meaning they were subject to the 1830 Treaty Indian title and right of occupancy and conveyed no new title to the certificate and scrip holder. Exs. 2-3.

219.     Moreover, after the 1854 Law and 1858 Law, the Department is legally required to continue to federally maintain the property records for the lands within the Lake Pepin Reservation. The Sioux half-breed lineal descendants with Sioux Scrip patents with the Lake Pepin Reservation did not need to record their Sioux Scrip Patents with the local county property recorder's office for record of title. These lands continued, as well as all Lake Pepin Reservation lands, to be subject to Sioux half-breed lineal descendants' 1830 Treaty rights, their Lake Pepin Reservation, reservation boundaries, Indian title, right of occupancy, and any income therefrom. So, the Lake Pepin Reservation lands remained within the federal property system. Exs. 2-3.

220.     Under the 1854 and 1858 acts, as well as the 1830 treaty, the Department has an irrevocable trust relationship, with the Lake Pepin Reservation as trust corpus, for the benefit of the Sioux half-breed lineal descendants. Exs. 1-3.

221. The 1830 treaty and the 1854 and 1858 laws have not been abrogated, terminated or repudiated. Exs. 1-3.

222. The Department's 1857 so-called "relinquishment roll" and the related certificates, scrip and patents are legally unauthorized and are legally null and void under the 1858 Law's location-not disposition provision, as well as the 1830 Treaty's and 1854 Law's protective provisions--as these laws protected the Sioux half-breed lineal descendants' Lake Pepin Reservation from dispossession by anybody. Ex. 18 (relinquishment roll).

**The 1830 Treaty, 1854 Law and 1858 Law triply protects the Lake Pepin Reservation for the Sioux half-breed lineal descendants to avoid dispossession.**

223. The Sioux half-breed lineal descendants' Lake Pepin Reservation is thrice-protected.

224. First, the 1830 Treaty created an irrevocable trust, consisting of the Lake Pepin Reservation as the trust corpus, with the Sioux half-breed lineal descendants as trust beneficiaries and the United States as trustee. Ex. 1.

225. The 1854 Law, which provided additional benefits to the Sioux half-breed lineal descendants, had a provision ensuring non-transferability to protect the Sioux half-breed lineal descendants from being dispossessed of their Lake Pepin Reservation certificates or scrip. Ex. 2.

226. The 1858 Law, contained a provision indicating any Lake Pepin Reservation certificates or scrip issued to Sioux half-breed lineal descendants were for location only, not disposition of title, confirming that Sioux half-breed lineal descendants' Indian Title and right of occupancy continues as the Lake Pepin Reservation, regardless of what any certificate, scrip, or other legal document (e.g., land patent) states. Ex. 3.

**The "location, but not disposition" provision of the 1858 Act is a repudiation of the federal agencies' implementation of the certificate-scrip-patent system without the continuing encumbrance of 1830 Treaty Indian Title.**

227.     In this lawsuit, the Sioux half-breed lineal descendants seek to enforce their continuing and non-extinguished Indian title to the Lake Pepin Reservation. The Act of July 15, 1830, secured a permanent land grant for the plaintiffs, their ancestors, and their lineal descendants. Ex. 1.

228.     The subsequent Act of Congress of July 17, 1854, created the Lake Pepin Reservation specifically to fulfill these treaty obligations and provide a homeland for the Sioux half-breeds and their children. Ex. 2.

229.     However, the federal agencies tasked with implementing the 1854 Act—including the Department of the Interior and the General Land Office—adopted a system that illegally subverted this congressional intent. Exs. 2, 12-18.

230.     Through the issuance of "scrip" and "certificates" that were subsequently patented, these agencies facilitated a de facto exchange that purported to extinguish the original Indian title in favor of fee simple patents, resulting in the widespread alienation of the Lake Pepin Reservation lands--dispossession. Exs. 15-18.

231.     Plaintiff alleges that this agency-level implementation was an unauthorized and unlawful disposition of Indian title, which was directly and unequivocally repudiated by Congress four years later in the 1858 Law. Exs. 3, 15-18.

232.     The subsequent Act of Congress of June 1, 1858, which clarified and regulated the disposition of the Lake Pepin Reservation lands, contained critical provisions preserving the Indian title of the Sioux half-breed lineal descendants:

> Sec. 2. And be if further enacted, That the provisions of this act shall not extend to said tract or subdivision, within the body of land aforesaid, which shall have been settled upon in good faith by, and is in the occupancy of, any of the said half-breeds, or mixed bloods; which

lands, so settled upon and occupied by the half-breeds, are hereby expressly declared to be subject to no other disposition than location by the "certificates" or "scrip" authorized to be issued by the said act of eighteen hundred and fifty-four for the benefit of said Indians. Nor shall the provisions of this act extend to any lands which may have been located prior to its passage with half-breed scrip, with the consent of the settlers thereon.

Ex. 3. The Act explicitly prohibited any "disposition of title" to the Lake Pepin Reservation, stating that the certificates were for "location only"—preserving the Sioux half-breed lineal descendants' Indian title in the Lake Pepin Reservation. *Id.*

233.     Accordingly, the Act of 1858 serves as a clear and unambiguous congressional repudiation of the administrative patenting scheme that federal agencies had unlawfully implemented under the 1854 Act conveying title the government did not have. *Id.*

234.     By expressly forbidding the "disposition of title," Congress signaled its legislative intent to prevent the very mechanism—the Department's certificate-scrip-patent exchange—that had been used to extinguish Indian title:

Sec. 2. … which lands, so settled upon and occupied by the half-breeds, are hereby expressly declared to be subject to no other disposition than location by the "certificates" or "scrip" authorized to be issued by the said act of eighteen hundred and fifty-four for the benefit of said Indians…

*Id.*

235.     These congressional actions repeatedly codified and solidified the perpetual nature of the Sioux half-breed lineal descendants' Indian title and were clear legal commands to protect the inalienable nature of the Lake Pepin Reservation Indian title for the Sioux half-breed lineal descendants. *Id.*

236.     Therefore, any prior or subsequent agency action that purported to alienate this Indian title was null and void as a matter of law, and the Indian title to the Lake Pepin Reservation lands remains in the perpetual possession of Sioux half-breed lineal descendants. *Id.*

**The United States' land patents, which purported to convey a clear, fee simple title, were issued on land that was legally encumbered by a superior and unextinguished Indian Title, a fact the highest legal officer in the executive branch acknowledged in 1864 with the U.S. Attorney General's title opinion letter titled "Sioux Half-breed Reservation in Minnesota," 11 U.S. Op. Atty. Gen. 59, 1–62, 1864 WL 1465 (1864), which confirmed the Sioux half-breeds' Lake Pepin Reservation, Indian title and right of occupancy continued under the 1830 treaty and the 1854 Law and the 1858 Law in trust with the United States as trustee.**

237.     The Enabling Act of Minnesota and six letters of correspondence provide the chronological background to the U.S. Attorney General's title opinion letter titled "Sioux Half-breed Reservation in Minnesota," 11 U.S. Op. Atty. Gen. 59, 1–62, 1864 WL 1465 (1864) (Exs. 19, 38).

238.     The Enabling Act of Minnesota, Act of February 26, 1857 (ch. 31, p. 286), provided that the State of Minnesota is transferred certain land for schools:

> Sec. 5. And be it further enacted, That the following propositions be, and the same are hereby offered to the said convention of the people of Minnesota for their free acceptance or rejection, which, if accepted by the convention, shall be obligatory on the United States and upon the said State of Minnesota, to wit:
> First, That section numbered sixteen and thirty-six in every township of public lands in said State, and where either of said section, or any part thereof, has been sold or otherwise disposed of, other lands, equivalent thereto and as contiguous as may be, shall be granted to said State for the use of schools.

Ex. 37.

239.     The six letters of correspondence concerning Minnesota's claim to sections numbered sixteen and thirty-six in every township within the Lake Pepin Reservation are:

- Minnesota Governor Alexander Ramsey to Commissioner J.W. Edmunds, General Land Office dated February 15, 1862 (claim) (Ex. 38)
- Commissioner J.W. Edmunds, General Land Office to Minnesota Governor Alexander Ramsey dated April 10, 1862 (rejection of claim) (Ex. 38)
- Minnesota Attorney General G.E. Cole to Commissioner J.W. Edmunds, General Land Office dated July 3, 1862 (appeal) (Ex. 38)
- Commissioner J.W. Edmunds, General Land Office to Secretary Caleb B. Smith, Department of the Interior, forwarding the appeal with comments dated August 15, 1862 (Ex. 38)
- The U.S. Attorney General's title opinion letter titled "Sioux Half-breed Reservation in Minnesota," 11 U.S. Op. Atty. Gen. 59, 1–62, 1864 WL 1465 (1864) (appeal rejected) (Ex. 19)

- Commissioner Joseph S. Wilson to Department of the Interior, General Land Office dated December 19, 1870 (forwarding the appeal to the Secretary of the Interior) (Ex. 38)

240.    The correspondence of Minnesota Governor Alexander Ramsey to Commissioner J.W. Edmunds, General Land Office dated February 15, 1862 makes a claim under the Act of February 26, 1857 (the Enabling Act of Minnesota) that the State of Minnesota is entitled to sections 16 and 36 of every township within the "Sioux Half-Breed Reservation." Ex. 38.

241.    The correspondence of Commissioner J.W. Edmunds, General Land Office to Minnesota Governor Alexander Ramsey dated April 10, 1862 rejects Minnesota's claim:

> Your letter of the 13th February last, requesting the vacating of the scrip locations on sections 16 and 36 within the Sioux Half-Breed Reserve, and that hereafter the State may have notice of all such locations for the purpose of contesting the same under the grant to Minnesota on February 26, 1857, for schools, has been received…
>
> ***
>
> Subsequently, the act of May 19, 1858 (vol. 11, p. 292), was passed, throwing this tract of land open to preemption settlement, but declaring that no tract settled or improved by a half breed should be subject to any other disposition than location by this scrip, nor should its provisions extend to any lands which had been located *prior to its passage* with half-breed scrip with the consent of the settlers thereon…
>
> ***
>
> It therefore follows, (1) That this office can not recognize the governor's caveat against the Indian scrip location on sections 16 and 36, as no right is admitted to vest in the State, under the school grant, within the limits of said reserve…

Ex. 38.

242.    The correspondence of Minnesota Attorney General G.E. Cole to Commissioner J.W. Edmunds, General Land Office, dated July 3, 1862, appealed the decision to the Secretary of the Interior:

> Your communication of April 11, 1862, declining to recognize the rights of the States, in school lands, upon the Lake Pepin Reservation, has been referred to me by the commissioner of the State land office. I desire to appeal, on behalf of the State, from that decision to the Secretary of the Interior.

Ex. 38.

243. The correspondence of Commissioner J.W. Edmunds, General Land Office, to Secretary Caleb B. Smith, Department of the Interior, dated August 15, 1862, forwarded the appeal upward, with comments:

> I have the honor to submit herewith, on an appeal by Hon. G.E. Cole, attorney-general for the State of Minnesota, the papers in the case of the claim of said State to the sixteenth and thirty-sixth sections for school purposes, lying within the limits of the Lake Pepin Reservation…
>
> ***
>
> This tract of land was reserved by the ninth article of the Indian treaty at Prairie du Chien of July 15, 1830 (Stat. 7, p. 330) for the half-breeds or mixed-bloods of the Dakota or Sioux nation of Indians, "they holding by the same title and in the same manner that other Indian titles are held."
>
> ***
>
> The act of May 19, 1858 (vo.11, p. 292), throws this tract of land open to preemptions settlement, but at the same time declares that no tract settled or improved by a half-breed should be subject to any other disposition than location by this scrip, nor should its provisions extend to any lands which had been located prior to its passage with scrip, with the consent of the settlers thereon.
>
> The act of 1854 makes no limit to the time when the scrip could be located in the reservation, but expressly declares it may be located upon any of the lands to which there should be no adverse rights of half-breeds, settlers, or persons who had gone into such reservation by authority of law.

Ex. 38.

244. The 1864 Attorney General's opinion, in rejecting Minnesota's claim to the Lake Pepin Reservation, confirms this key point: the U.S. government's legal interpretation was that the 1830 Treaty of Prairie du Chien did indeed grant the Lake Pepin Reservation to the Sioux half-breed lineal descendants, and that the certificates and scrip issued under the 1854 Law and 1858 Law were intended to be a mechanism to fulfill that trust, not to abrogate, terminate or repudiate it. Sioux Half-breed Reservation in Minnesota., 11 U.S. Op. Atty. Gen. 59, 1–62, 1864 WL 1465 (July 21, 1864), at *1–3. Ex. 19.

245.     The 1864 Attorney General's opinion states that between the two claimants in the dispute to portions of the Lake Pepin Reservation, the Sioux half-breed lineal descendants and the State of Minnesota, "that the Sioux title is the best" because "[t]he Government, like an individual, has no power to withdraw or annul its grant of land":

SIOUX HALF-BREED RESERVATION IN MINNESOTA

July 21, 1864.

1. The State of Minnesota, by the grant to her of sections 16 and 36 in every township of public lands in the State, acquired no title to township sections 16 and 36 within the Sioux Half-breed Reservation, west of Lake Pepin, as against the holders of scrip issued to the Half-breeds of the Sioux Nation in exchange for their interest in the said reservation under the act of July 17, 1854, chap. 83.2. The Government, like an individual, has no power to withdraw or annul its grant of land. The first lawful grant must stand; and the second cannot operate as a conveyance, for the reason that the grantor, when he made it, had no estate to convey.

Hon. J. P. USHER
Secretary of the Interior.
SIR:
I have the honor now to give you my views upon the questions stated in Mr. Otto's communication of the 15th of February last, and which were submitted to me, by your direction, for my consideration and opinion.

The statement of facts contained in this communication presents the following case: Under the 9th article of the treaty of July 15, 1830, with certain tribes of Indians, (7 Stats., 330,) a large tract of land lying west of Lake Pepin and the Mississippi river was set apart for the occupancy of the half-breeds of the Sioux nation, and by an act of Congress, approved July 17, 1854, (10 Stats., 304,) the President was authorized to cause land scrip to be issued to the said half-breeds, to exchange with them for their interest in the said tract of land.

The act of July 17, 1854, provided for the location of the said scrip in these words: 'Which said certificates or scrip may be located upon any of the lands within said reservation not now occupied by actual and *bona fide* settlers of the half-breeds or mixed bloods, or such other persons as have gone into said Territory by authority of law, or upon any other unoccupied lands of the United States subject to pre-emption or private sale, or upon any other unsurveyed lands not reserved by Government, upon which they have respectively made improvements.'

A quantity of scrip equal to the area of the said tract of land was prepared, which was issued and delivered to the individuals entitled in equal shares, and receipted for by them, principally in the spring of 1857, though some small portions were not delivered for two or three years afterwards. Upon the receipt of the scrip, the several individuals executed a formal relinquishment of their right, title, and interest in the said tract, pursuant to the said act of July 17, 1854.

On the 26th day of February, 1857, sundry propositions were made by the United States (11 Stats., 167) to the convention of the people of Minnesota, among which is the following:

> 'That sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections, or any part thereof, has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools.'

On the 29th of August, 1857, a State government was formed, which was ratified by the people of Minnesota at an election held October 13, 1857. The State of Minnesota was declared to be fully admitted into the Union by act of Congress approved May 11, 1858, (11 Stats., 285.)

Upon the foregoing facts, you say, the subjoined questions arise:

1st. Did the grant to Minnesota for school purposes pass to the State the title to those portions of sections 16 and 36, within the tract known as the Sioux half-breed reservation, west of Lake Pepin, whereto no inchoate right had attached, or did the provisions of the treaty of July 15, 1830, art. 9, (Stats., vol. 7, p. 330,) and of the act of Congress of July 17, 1854, withdraw the entire tract from the operation of said grant?

2d. If the title of the State to said sections is valid, at what date did it vest to the exclusion of subsequent claims?

Upon this statement of the case, it seems to me that the substance of your inquiry can be easily answered. I say the *substance*, because I may not correctly understand some of the phraseology of the first question. For instance, I am asked, 'Did the grant to Minnesota for school purposes pass to the State the title to those portions of sections 16 and 36, within the track known as the Sioux half-breed reservation, west of Lake Pepin, *whereto no inchoate right had attached*?' I do not understand what is meant, in this connection, by *inchoate right*. Both the parties, *i. e.*, this State of Minnesota and the half-breed Sioux, claim the land by statutory grant; the titles are of equal dignity, and if one be *inchoate* so is the other.

Again, I am asked, did the provisions of the said treaty of 1830, and the said act of Congress of 1854, 'withdraw the entire tract from the operation of said grant, (*i. e.*, the grant to Minnesota?) Both the treaty and the act are direct, affirmative grants to the half-breeds. The treaty grants to them the tract designated, to hold the same 'by the same title and in the same manner that other Indian titles are held.' And the act of Congress of 1854, (declaring, in its first section, that the land had been 'set apart and *granted*' for the use of the half-breeds by the 9th article of the treaty,) grants only to the half-breeds a change in the form and character of their title; that is, from an aggregate, common title to the whole tract, (after the manner of Indian titles,) to a personal title, in each individual, to a definite part of the same tract—this share, upon a fair division, to be held in severalty.

And thus, the treaty and the act of Congress do plainly dispose of the whole tract, subject only to the possible contingency, stated in the act, that the half-breeds, or some of them, may have located their scrip outside of the reservation. And you do not state the happening of any such contingency. Moreover, it is not stated that there are any conflicting claims of pre-emptors, or of any 'other persons who have gone into the said Territory by authority of law.'

I assume, therefore, that there are but two claimants—the half-breed Sioux and the State of Minnesota—to the 'sections 16 and 36, within the track known as the Sioux half-breed reservation;' and, as between these two claimants, I am clearly of opinion that the Sioux title is the best.

The Government, like an individual, has no power to withdraw or annul its grants of land. The first lawful grant must stand; and the second cannot operate as a conveyance, for the simple reason that the grantor, when he made it, had no estate to convey.

Being of opinion that the State of Minnesota has no title to the said sections of land, there is no occasion to answer your second question, which is only hypothetical.
I am, sir, very respectfully, Your obedient servant,

EDWARD BATES.

Ex. 19.

246.    The 1864 Attorney General opinion provides support for the Plaintiffs' enumerated

legal points. *Id.*

247.     First, the 1864 Attorney General opinion provides strong support for the 1854 Act and 1858 Laws as additional benefits mechanisms for the Sioux half-breed lineal descendants, not as an abrogation, termination or repudiation of the Lake Pepin Reservation, its reservation boundaries, underlying Indian title, right of occupancy, etc. The opinion explicitly states:

> And the act of Congress of 1854, (declaring, in its first section, that the land had been 'set apart and *granted*' for the use of the half-breeds by the 9th article of the treaty,) grants only to the half-breeds a change in the form and character of their title; that is, from an aggregate, common title to the whole tract, (after the manner of Indian titles,) to a personal title, in each individual, to a definite part of the same tract—this share, upon a fair division, to be held in severalty.

*Id.* This language clearly characterizes the 1854 Act as providing additional benefits to existing beneficiaries instead of modifying or terminating the 1830 Treaty. *Id.* The Attorney General describes both the treaty and the 1854 Act as direct, affirmative grants to the half-breeds, emphasizing that the later legislation built upon rather than replaced the 1830 treaty Indian title provisions. *Id.*

248.     Second, the 1864 Attorney General opinion provides strong support for superior Indian Title under the 1854 Law and 1858 Law because the United States had nothing left to convey in land patents to third parties. The Attorney General opinion makes this point the central holding of the opinion. The Attorney General concludes:

> I assume, therefore, that there are but two claimants—the half-breed Sioux and the State of Minnesota—to the 'sections 16 and 36, within the track known as the Sioux half-breed reservation;' and, as between these two claimants, I am clearly of opinion that the Sioux title is the best.

*Id.* The legal reasoning supporting the Attorney General's conclusion is a fundamental principle that once the United States consented to the Sioux Bands' transfer of the Lake Pepin Reservation to the Sioux half-breed lineal descendants in trust by the 1830 Treaty, codified by the 1854 Law and the

1858 Law, the United States had nothing left to convey to the State of Minnesota and had nothing

left to convey to individuals:

> The Government, like an individual, has no power to withdraw or annul its grant of land.
> The first lawful grant must stand; and the second cannot operate as a conveyance, for the
> reason that the grantor, when he made it, had no estate to convey.

*Id.* Applying this principle, the Attorney General determined that the State of Minnesota, by the

United States' grant to the State of Minesota of sections 16 and 36 in every township of public lands

in the State, acquired no title to township sections 16 and 36 within the Lake Pepin Reservation

because the United States had no estate to convey after the 1830 Treaty, 1854 Law and 1858 Law. *Id.*

249.    Similarly, the recipients of Lake Pepin Reservation land patents received nothing, like

the State of Minnesota under Minnesota's Enabling Act, because the United States had no estate to

convey in the land patents.

250.    Third, the 1864 Attorney opinion provides support for the 1830 Treaty, 1854 Law

and 1858 Law creating an irrevocable trust with United States as trustee and the Sioux half-breed

lineal descendants as trust beneficiaries. The opinion recognizes that:

> Under the 9th article of the treaty of July 15, 1830, with certain tribes of Indians, (7 Stats.,
> 330,) a large tract of land lying west of Lake Pepin and the Mississippi river was set apart for
> the occupancy of the half-breeds of the Sioux nation, and by an act of Congress, approved
> July 17, 1854, (10 Stats., 304,)…

*Id.* The Attorney General also describes the treaty as granting the half-breeds the designated tract to

hold the same "by the same title and in the same manner that other Indian titles are held." *Id.* To be

sure, the opinion does not explicitly use the term "irrevocable trust" or analyze the arrangement as a

gift from Sioux bands to their lineal descendants. Instead, the Attorney General focuses on the legal

consequences of the federal grant rather than characterizing the underlying nature of the Sioux half-

breed lineal descendants' property interests. *Id.* While the opinion's holding that the government

cannot withdraw or annul its prior land grants supports the existence of a gift and an irrevocable

trust, it does not provide explicit textual support for the gift and irrevocable trust characterizations. *Id.* But, nonetheless, the Attorney General's opinion does provide support for the gift and the irrevocable trust characterizations. *Id.*

251.    Fourth, the 1864 Attorney opinion provides support for the absence of abrogating, terminating or repudiating language in the 1854 Law and 1858 Law. *Id.* The Attorney General opinion provides support for this point through its treatment of the relationship between the 1830 treaty and subsequent 1854 and 1858 Laws. *Id.* To be sure, the opinion does not explicitly discuss the absence of abrogating, terminating or repudiating language in the 1854 and 1858 Laws, but the Attorney General consistently treats the 1854 and 1858 Laws as building upon rather than terminating the 1830 Treaty arrangements. *Id.* The Attorney General describes the 1854 and 1858 Laws as acknowledging that the Lake Pepin Reservation has been set apart and granted by the original treaty and characterizes the laws as providing only to the Sioux half-breed lineal descendants a change in the form and character of their title (i.e., location on the reservation, but not disposition of title). *Id.* Thus, the Attorney General's legal analysis supports the argument that the 1854 Law and 1858 Law contained no language abrogating, terminating or repudiating the 1830 treaty, the Lake Pepin Reservation, Indian title, right of occupancy, or irrevocable trust arrangements, as the opinion treats these elements as continuing on after the subsequent 1854 and 1858 Laws. *Id.*

252.    Fifth, the Attorney General's opinion is significant in how it relates to the original intention of Chief Wabasha and the other Sioux leaders in the 1830 Treaty. The Attorney General's opinion confirms the trust. *Id.* The Attorney General's opinion directly supports the idea that the Sioux leaders' intention was to create a permanent land base for their mixed-race relatives. *Id.* The opinion affirms that the "Sioux title" to the land was the "best" and was a valid, legal trust. *Id.* This is a powerful statement against the claims of white settlers who had moved onto the land. The

Attorney General's opinion affirms the fundamental nature of the 1830 Treaty, the 1854 and 1858 Laws, and the irrevocable trust thereunder. *Id.*

253.    Sixth, the 1864 Attorney General's opinion provides a strong legal validation of Chief Wabasha's and other Sioux leaders' original intention in gifting the Lake Pepin Reservation to the Sioux half-breed lineal descendants as a permanent home. *Id.*

254.    Seventh, the Attorney General's opinion views the scrip as a means to fulfill the United States' trust obligations, not as an abrogation, termination or repudiation of the trust. *Id.* The opinion's understanding of scrip is vital. *Id.* The government had a difficult time managing the Lake Pepin Reservation as a communal reservation. *Id.* The provision in the treaty for "locating" individual 640-acre sections was seen as a way to transition the beneficiaries to a more-settled, individual land ownership model. *Id.* The scrip was a paper certificate that represented a Sioux half-breed lineal descendant's right to be "located" on a specific parcel of land within the Lake Pepin Reservation—like a land assignment. *Id.* The Attorney General's position, based on the 1830 Treaty, 1854 and 1858 Laws, was that the scrip was a way for the government to make good on the trust, by locating Sioux half-breed lineal descendants on the Lake Pepin Reservation, not to end the trust. *Id.*

255.    Eighth, the 1864 Attorney General's opinion provides support that the 1830 treaty, 1854 Law and 1858 Law created an irrevocable trust, and that Congress in the 1854 and 1858 Laws ensured that the certificates, scrip and patents as a legitimate way to fulfill the government's obligations under that irrevocable trust, not to end the irrevocable trust. *Id.*

**The Commissioner's 1870 Letter to the General Land Office erroneously contradicts the Attorney General's 1864 opinion letter—and is part of an active concealment of the beneficiary rights.**

256.    Following the 1864 Attorney General's opinion, the correspondence of Commissioner Joseph S. Wilson to Department of the Interior, General Land Office dated December 19, 1870, confirms the earlier rejection of Minnesota's appeal for Lake Pepin Reservation

land, noting that the State is entitled to "equivalent" lands outside the Lake Pepin Reservation. Exs. 19, 38.

257.    Importantly, however, Commissioner Wilson, with substantial nuance, shifted the reasoning for Minnesota's "equivalent lands" from the existence of the Lake Pepin Reservation to the prior issuance of the land patents within the Lake Pepin Reservation after public sale:

> Upon examination of the several treaties bearing upon these reserves I find, in the case of the Lake Pepin Reservation, that the same is relinquished to the United States under act of July 17, 1854, and were directed to be sold as other public lands, with proviso for the location of scrip issued to the Indians on any of the lands.

> The land in this reserve were public at the date of the organic act and the State thereby obtained a beneficial interest in the sixteenth and thirty-sixth sections. Since, however, the same were disposed of by the Government, the State is entitled to equivalent therefor. This principle is fully set forth in a communication to the governor dated April 10, 1862, wherein whilst rejecting the claim of the State to the sixteenth and thirty-sixth sections in this reserve, we admit her right to other lands in lieu thereof.

Ex. 38.

258.    The issuance of the Commissioner's letter to the General Land Office in the year 1870 raises suspicions. *Id.*

259.    First, the legal issue presented in the 1870 letter had already been resolved by the Attorney General's opinion in 1864 and the Attorney General had stated that because of the Lake Pepin Reservation, the State of Minnesota would receive equivalent land elsewhere. Exs. 19-38.

260.    Second, the Commissioner's letter contradicts the Attorney General's 1864 opinion that the reason for Minnesota receiving equivalent land elsewhere was not the existence of the Lake Pepin Reservation, but that the land patents for the Lake Pepin Reservation had been issued:

The Conflicts of Official Legal Positions

| Document | Date | Legal Position on Lake Pepin Reservation | Consequence for Land Patents |
|---|---|---|---|
| Attorney General Opinion (Edward Bates) | 1864 | Reservation Existed. Confirmed the Sioux Half-breeds' title/right of | Any land patents issued by the General Land Office on this land were issued on land |

56

| Document | Date | Legal Position on Lake Pepin Reservation | Consequence for Land Patents |
|----------|------|------------------------------------------|------------------------------|
| | | occupancy continued under the 1830 Treaty, 1854 Law, and 1858 Law. Stated that the Sioux title was the "best." | the government had "no estate to convey" because of the 1830 Treaty Indian title and 1854/1858 Laws' protective provisions. |
| Commissioner's Letter (J.S. Wilson) | 1870 | Reservation Did Not Exist. Argued the land was "disposed of" by the issuance of the land patents and there was "no reservation" after the 1854 Act and issuance of land patents. | This position retroactively validated the invalid land patents, allowing the government to argue it *did* have the clear fee simple title to grant in the land patents. |

Exs. 19, 38.

261.    Because the 1870 letter did not change the fact that the State of Minnesota would receive equivalent lands outside the Lake Pepin Reservation, the only possible reason for the Commissioner's letter to the General Land Office was to subtly shift the reasoning for the State of Minnesota receiving equivalent land from the existence of the Lake Pepin Reservation to the land patents having been issued effectively (de facto) terminating the Lake Pepin Reservation. Ex. 38.

262.    The local General Land Office in Minnesota, then, took the Commissioner's 1870 letter as a message from the Commissioner to stand behind the issued land patents, transfer the lands from the federal property system to the state/local property system, and to adopt the legal theory, debunked by the Attorney General in the 1864 opinion letter, that there was no Lake Pepin Reservation notwithstanding: (1) that the government's Lake Pepin Reservation land patents are invalid because the United States had no title to convey; (2) that the 1830 Treaty's, 1854 Law's and 1858 Law's protective provisions invalidated the land patents issued within the Lake Pepin Reservation; and (3) that there was no Congressional Act abrogating, terminating or repudiating the 1830 Treaty Lake Pepin Reservation, the Indian title and right of occupancy continued therein. Ex. 38.

263.     The Commissioner's 1870 letter is classic bureaucratic subterfuge. *Id.* The Commissioner's 1870 move was intended to validate the issued invalid land patents ex post facto, ignoring the prior Attorney General legal opinion (1864) that those patents were issued on land the government had "no estate to convey." *Id.*

264.     This General Land Office's shift of legal position essentially protected the non-Indian settlers who had received the invalid land patents by asserting that the *issuance of the patents itself* had cleared the Indian title, rather than acknowledging that the prior Indian Title should have prevented the patents from being validly issued in the first place. *Id.*

265.     To the contrary, at the very least, the land patents should have contained a written notation of the 1830 Treaty, 1854 Law and 1858 Law Indian title encumbrances and protective provisions.

266.     By doing so, the Commissioner denied the Sioux half-breed lineal descendants of their Lake Pepin Reservation without providing them specific notice of their beneficiary rights and how the government's legal decision—in violation of the 1830 Treaty, 1854 Law and 1858 protective provisions—would affect their beneficiary rights. *Id.*

267.     The Commissioner's 1870 letter is an active concealment of the beneficiaries' rights. *Id.* The Department, as the time and now, is obligated to amend the land patents to display the Sioux half-breed lineal descendants' Indian title and right of occupancy and protect it through the federal property system as the Lake Pepin Reservation. Ex. 19.

268.     Instead, since the Commissioner's 1870 letter, the Department has actively concealed the beneficiaries' rights. Ex. 38.

269.     The State of Minnesota eventually received its equivalent land outside the Lake Pepin Reservation. Ex. 37.

270. Meanwhile, in the 1880's, the United States directed Sioux lineal descendants to about three square miles of land in three different areas far from each other: Redwood County (e.g., Lower Sioux Indian Community); Scott County (e.g., Shakopee Mdewakanton Sioux Community); and Goodhue County (e.g., Prairie Island Indian Community). Ex. 39.

271. The three square miles were outside of the Lake Pepin Reservation. *Id.*

272. The three square miles in those locations is less than one percent of the 500 square miles of the Lake Pepin Reservation.

273. The United States has never explained to the Sioux lineal descendants why their Minnesota ancestors in the 1880's were not directed to their permanent home at the Lake Pepin Reservation, but instead directed elsewhere in Minnesota.

**The 1858 Law's key provision—that the scrip and certificates were for "location, not disposition"—is directly supported by a close reading of the relevant legislation and the historical context of the Lake Pepin Reservation.**

274. In land law, particularly concerning Indian affairs, the distinction between "location" and "disposition" is crucial. "Location" means the act of *identifying* a specific piece of land for a claimant. In this case, the scrip allowed the half-breed or their assignee to *locate* a certain number of acres within the Lake Pepin Reservation. Whereas disposition of title (i.e., extinguishment), means the act of the sovereign (the United States) *transferring* its interest and thereby *extinguishing* the underlying Indian Title.

275. The 1854 Scrip Act required the Sioux half-breed lineal descendant to execute a relinquishment of their interest in the original tract in exchange for the scrip. However, the subsequent 1858 Act (11 Stat. 292), which opened the rest of the land to pre-emption, included a critical protective clause for the Sioux half-breed lineal descendants who received Sioux scrip land patents within the Lake Pepin Reservation.

276.    As indicated in administrative records, the 1858 Act declared that the land occupied by a Sioux half-breed lineal descendant: "...shall be subject to no other disposition than location by the 'certificates or 'scrip' authorized to be issued by the said act of eighteen hundred and fifty-four, for the benefit of said Indians."

277.    The 1858 law's text supports the Sioux half-breed lineal descendants' Lake Pepin Reservation.

278.    The 1858 law restricted the land's use to *location* by scrip.

279.    Crucially, this restriction preserved the original intent of the 1830 Treaty—to protect the half-breeds' possessory rights—because it meant the land was reserved from the public domain and was not subject to general sale or "disposition" to third parties (like settlers using pre-emption).

**The individual act of a Sioux half-breed lineal descendant receiving scrip and signing a relinquishment roll does not extinguish their collective Indian Title interest to the entire reservation, especially when Congress later passed a protective law ensuring Indian Title for the Lake Pepin Reservation continues.**

280.    The 1858 Act's "location, not disposition" provision unravels the Commissioner's 1870 theory of extinguishment based on individual relinquishment for the following reasons.

281.    As to collective Indian Title, Indian Title is communal. Indian Title is a collective right held by the community, not a divisible, individual right. For it to be extinguished, Congress must obtain consent of the all the trust beneficiaries relinquishing collective Indian title or make a clear and plain declaration of extinguishment affecting the entire collective's rights. *See Restatement (Third) of Trusts* § 65 (2003) ("[I]f all of the beneficiaries of an irrevocable trust consent, they can compel the termination or modification of the trust.").

282.    Partial relinquishment is insufficient. In this case, under the 1854 Law, about 290 Sioux half-breed lineal descendants received Sioux scrip land patents on the Lake Pepin Reservation and occupied the Lake Pepin Reservation, maintaining their collective Indian title and right of occupancy, which was the foundation of the 1830 Treaty gift from the Sioux bands, which could not

be extinguished by the individual, speculative actions of others who traded their scrip away to settlers or took their scrip elsewhere.

283.    The United States as trustee of an irrevocable trust had a fiduciary duty to the Sioux half-breed lineal descendants. The government held the Lake Pepin Reservation land in an irrevocable trust for all the Sioux half-breed lineal descendant beneficiaries. Allowing a few individuals to sell their interest (or be defrauded of it) does not fulfill the government's fiduciary duty to the entire collective interest unless a clear act of Congress expressly terminates the entire community's collective right.

284.    Furthermore, the 1858 Law nullifies the relinquishment for remaining occupants. To be sure, the 1854 Law required a "full and complete relinquishment" of the Half-breed's interest in the tract. Based on that statutory provision, the Department erroneously argues the collective title was being dismantled piece-by-piece. But, the 1858 Law's provision stating that land occupied by Sioux half-breed lineal descendants shall be subject to "no other disposition than location" acts as a statutory protection and a congressional reservation of Indian title for the entire Lake Pepin Reservation lands. The effect of the 1858 Law's provision is to legally declare that for the Lake Pepin Reservation, the half-breed lineal descendants' Indian Title still controls. If the land is reserved for "location" by scrip, then the Indian title is logically reserved from being disposed of by any other means, including the prior settlers' pre-emption or the State of Minnesota's school grants.

285.    Therefore, the 1858 Act essentially rendered any individual relinquishment a nullity, creating an additional statutory encumbrance on Lake Pepin Reservation land that protects the prior, superior Indian Title.

286.    In conclusion, the United States' land patents, which purported to convey a clear, fee simple title, were issued on land that was legally encumbered by a superior and unextinguished

Indian Title, a fact the highest legal officer in the executive branch, the U.S. Attorney General, acknowledged in 1864.

287.     Specifically, the Sioux scrip patents and other land patents the government issued did not transfer fee simple title to the recipients—as the documents say they did—because the Sioux half-breed lineal descendants' Lake Pepin Reservation, Indian title and right of occupancy therein continued after the 1858 Act as to each and every parcel within the Lake Pepin Reservation.

**Based on the established legal principles of the federal Indian trust responsibility, the United States, acting as a trustee, had a series of specific duties and obligations regarding the land granted in an irrevocable trust to the Sioux half-breed lineal descendants under the 1830 Treaty and codified in the 1854 and 1858 Acts with additional benefit mechanism and protective provisions.**

288.     Based on the established legal principles of the federal Indian trust responsibility, the United States, acting as a trustee of an irrevocable trust, had a series of specific duties and obligations regarding the land gifted by the Sioux bands to the Sioux half-breed lineal descendants under the 1830 Treaty and codified in the 1854 and 1858 Acts. Exs. 1-3.

289.     The United States' duties as trustee of this irrevocable trust go beyond simply holding the land in a bare trust and include what are known as a "fiduciary duties" which are legal and moral obligations to act in the best interests of the beneficiary. Exs. 1-3.

290.     The United States, as a trustee, has a legal obligation to do the following, based on established legal principles.

291.     First, the United States, as trustee, must protect the trust property. The most fundamental duty of a trustee is to protect the trust's assets. In this case, the asset was the Lake Pepin Reservation. The U.S. government has a legal obligation to take affirmative steps to prevent non-beneficiaries from settling on, claiming, or otherwise encroaching upon the Lake Pepin Reservation. This includes preventing non-beneficiaries from legally unauthorized acquisition of lands within the Lake Pepin Reservation.

292.     Second, the United States, as trustee, must act with care and loyalty. The United States has a legal duty to administer the irrevocable trust for the exclusive benefit of the Sioux half-breed lineal descendants as beneficiaries, free from conflicts of interest. The government must act with a high degree of care, prudence, and loyalty.

293.     The United States, as trustee, has a duty to prevent misconduct and misappropriation. The government has a fiduciary duty to ensure that the beneficiaries are not swindled out of their Lake Pepin Reservation land rights. Given that many of the Sioux half-breed lineal descendants were not fully literate in English or familiar with the complex legal and commercial systems of the U.S., the government has a heightened duty to protect them. For example, the United States had a duty to prevent the widespread practice of speculators buying the Sioux certificates, scrips or patents for pennies on the dollar or in exchange for goods and alcohol.

294.     The United States, as trustee, has a duty to manage the property to be productive. Under an irrevocable trust, a trustee is expected to manage trust property to make it productive for the beneficiary. While the Lake Pepin Reservation was intended as a permanent home for the Sioux half-breed lineal descendants, the government's administration should have supported the beneficiaries' ability to live on and use the land effectively, which would have been a more direct fulfillment of the 1830 Treaty's, 1854 Law's and 1858 Law's purposes.

295.     The United States, as trustee, has a duty to preserve the trust. The United States government should have taken action to ensure the long-term viability of the trust. Instead, by establishing a certificate-scrip-patent system that was so easily exploited and by allowing land to be sold off to non-beneficiaries, the government effectively undermined the very trust it was legally required to be upholding. The end result was that the Sioux half-breed lineal descendants were completely dispossessed of their home—the Lake Pepin Reservation.

296. Alternatively, the United States could have leased the Lake Pepin Reservatio for fair market value rent as it leases the Indian trust lands Agua Caliente Indian Reservation for the benefit of the Agua Caliente Band of Cahuilla Indians. See: https://www.bia.gov/regional-offices/pacific/palm-springs-agency. The rent proceeds are placed for the Indian beneficiary.

297. The United States, as trustee, has a fiduciary duty, after it clouds Indian title, to clear Indian title.

298. Here, after the United States issued the invalid land patents, which were invalid because they did not contain notations of the Indian title encumbrance, the United States, as trustee, had a fiduciary duty to amend the land patents to clear Indian title.

299. Still, today, the United States, as trustee, has a continuing fiduciary duty to clear Indian title to the Lake Pepin Reservation in favor of the Sioux half-breed lineal descendants and their Indian title and right of occupancy.

**The federal government allowed the manipulation of the Sioux half-breed lineal descendants' trust, consisting of the Lake Pepin Reservation, through a combination of intentional policy choices, systemic negligence, and outright complicity.**

300. The federal government allowed the manipulation of the Sioux half-breeds' trust through a combination of intentional policy choices, systemic negligence, and outright complicity. This was not a single event but a sustained process of failure that ultimately dispossessed the Sioux half-breed lineal descendants of the Lake Pepin Reservation.

301. The following is a breakdown of how this manipulation was allowed by the United States.

302. First, the United States created a flawed certificate-scrip-patent system. D. Rees, "Scrip and the Taking of the Minnesota Half-Breed Tract" in *The Half-Breed Tracts in Early National America,* at 77 (2019), Ex. 21; W. Milliken, "The Great Treasure of the Fort Snelling Prison Camp, *Minnesota History*, vol. 62/1, p. 4 (Spring 2010). Ex. 22. The government established a system that

was, from the outset, ill-suited to protect the interests of the Sioux half-breed lineal descendants and their Lake Pepin Reservation. *Id.*

303.     The government's certificates, scrip and land patents did not incorporate in writing necessary encumbrances: (1) the 1830 Treaty's Indian Title trust encumbrances on the Lake Pepin Reservation land; (2) the 1854 Act's non-transferability provision; and, (3) the 1858 Act's provision limiting the certificates and scrip to location, not disposition of title. *Id.*

304.     The government used scrip—essentially a form of paper currency reflecting an interest in land, not title itself. The alternative was simple land assignments directly to a Sioux half-breed lineal descendant. For each land assignment, the government would locate a Sioux half-breed lineal descendant on a particular Lake Pepin Reservation. Instead, the government issued scrip which was vulnerable to potential trade to non-beneficiaries. *Id.* For the Sioux half-breed lineal descendants, the abstract concept of a right to land, underlying the scrip, was easily detached from its real-world value, making it susceptible to settler misconduct. *Id.* The Sioux half-breed lineal descendants, many of whom did not operate in a cash economy and had no experience with such documents, were easily confused, manipulated and subject to settler misconduct based on the scrip being used instead of land assignments. *Id.*

305.     Although the Lake Pepin Reservation lands were non-transferable and subject to the Sioux half breed lineal descendants' reservation, reservation boundaries, Indian title, right of occupancy, etc., the government's scheme resulted in the land being transferred to the non-beneficiaries anyway. Despite Congress in the 1854 Law and 1858 Law enacting statutory protective provisions for the certificates and scrip, the government failed to enforce the protective provisions. *Id.* The irrevocable trust created by the 1830 Treaty, and codified by the 1854 Law and 1858 Law meant nothing without a federal system to verify the Sioux half-breed lineal descendant identity of the person using the certificates, scrips and land patents and a willingness to prosecute those non-

beneficiaries who violated the law. *Id.* The government's negligence was a direct invitation by the federal government for speculators to exploit the system. *Id.*

306.    Second, the government allowed a power of attorney loophole to avoid the protective provisions of the 1830 Treaty, the 1854 Law and the 1858 Law. *Id.* The government allowed speculators to use legal documents like "powers of attorney" to gain control of the certificates, scrip and patents. *Id.* This was a legalistic charade that everyone involved—from the speculators to the federal land office agents in Minnesota—understood was a way to bypass the non-transferability provisions of the 1830 Treaty, 1854 Law and 1858 Law. *Id.*

307.    The government's printing and issuance of these real estate documents <u>without the encumbrances</u> and the government's recording of these real estate documents <u>without the encumbrances</u> was the key catalyst for the misconduct. *Id.*

308.    Third, local land office agents, who were federal employees, were often complicit. They would turn a blind eye to the questionable transactions or, in some cases, were directly bribed by speculators to validate invalid scrip redemptions. This breakdown of internal controls meant that the very people tasked with protecting the trust were instead facilitating its destruction.

309.    The government was not ignorant that the 1830 Treaty, 1854 Law and 1858 required the printing of the Indian title encumbrances on the land patents issued within the Lake Pepin Reservation. *Id.*

310.    The government ignored the warnings. *Id.*

311.    Even internal legal opinions existed that the United States had fiduciary responsibilities to the Sioux half-breed lineal descendants under the 1830 Treaty, 1854 Law and 1858 Law. Ex. 1, 2, 3, 19.

312.    As detailed above., the U.S. Attorney General in 1864 issued a clear opinion stating that the Indian title and right of occupancy continued and had not been abrogated, terminated or repudiated. Ex. 19.

313.    The Attorney General's 1864 letter was a high-level legal warning to the federal government. *Id.*

314.    Reports of widespread misconduct were common in the media and in official channels. See, e.g., Ex. 23.

315.    Yet, despite these warnings from the government's own legal team and from the public, the government took no decisive action to halt the non-beneficiary land transactions or prosecute the perpetrators. *Id.*

316.    The government failed to secure the Lake Pepin Reservation for the Sioux half-breed lineal descendants. *Id.*

317.    The government's actions dispossessed the Sioux half-breed lineal descendants' Lake Pepin Reservation. *Id.*

318.    The government acted, without legal authority, in dispossessing the Sioux half-breed lineal descendants' Lake Pepin Reservation. *Id.*

319.    The government proceeded with public sales and homesteading on portions of the reservation, even though its own legal opinion stated that the Indian title and right to occupancy remained. *Id.* This created legal conflicts and confusion, which further benefited speculators who could acquire the land at low cost and with no regard for the rightful beneficiaries. *Id.*

320.    The government failed to record the 1830 Treaty, 1854 Law and 1858 Law encumbrances on the certificates, scrip and patents relating to the Lake Pepin Reservation. *Id.*

321.     By not noting the Indian title on the land patents issued at public sale, the government gave a clear signal that the land was free and clear of any prior Indian title—when actually it was encumbered by the 1830 Treaty, 1854 Law and 1858 Law Indian Title restrictions. *Id.*

322.     In this way, the government's Indian title omission on the land patents made the land more attractive to buyers and made it much more difficult for the beneficiaries to ever reclaim it. *Id.*

323.     Fourth, since the government-sponsored dispossession of the Sioux half-breed lineal descendants' Lake Pepin Reservation, the government has failed to clear title for the Sioux half-breed lineal descendants so that they can make the Lake Pepin Reservation their permanent home—as Congress intended in the 1830 Treaty, 1854 Law and 1858 Law. *Id.*

324.     Fifth, the government failed to put the proceeds from land sales in trust for the Sioux half-breed lineal descendants. This amount could exceed $265,709. About one-third of the 320,000 acres in the Lake Pepin Reservation was distributed by Sioux scrip land patents totaling 107,432.5 acres. Ex. 17. The rest of the Lake Pepin Reservation, or 212,567.5 acres, sold, effectively sold or transferred at $1.25 per acre, would equal $265,709. *Id.*

325.     Statutory and case law support exists for a specific interest rate application in determining damages in an Indian trust mismanagement case. Specific Indian trust fund statutes like 25 U.S.C. § 161b expressly provide for 4% compounding interest on qualifying tribal funds, creating a clear statutory basis for interest awards under 28 U.S.C. § 2516(a) 25 USCA §  161b 28 USCA § 2516. The Federal Circuit in the *Short* case recognized that these statutes provide a basis for the award of interest as part of the plaintiffs' damages when combined with the government's fiduciary duties. *Short v. U.S.,* 50 F.3d 994, 998-1000 (1995). Courts have found that trust fund statutes combined with the government's fiduciary duty create a substantive right to damages, including interest that goes beyond mere administrative interest requirements. *Id.* The Indian Trust Fund

Management Reform Act of 1994, Public Law 103-412 (1994), imposed enhanced fiduciary duties that strengthen the argument for interest awards in breach of trust cases.

326.     For example, to calculate the future value of $284,000 in 1857 at 4% interest compounded annually, one must determine the total number of years and use the compound interest formula. According to the formula, at a 4% annual interest rate, $284,000 in 1857 would be worth approximately $259.1 million in 2025.

327.     Regardless, at this point in the proceedings, the Plaintiffs do not have an accounting or equivalent information so they cannot prepare a complete presentation of their damages claim.

328.     Sixth, the government's role went beyond mere negligence.

329.     In many cases, the government actively enabled non-beneficiaries to take possession of the Lake Pepin Reservation.  *See* J. Woods Hancock, *History of Goodhue County: Past and Present, By an Old Settler,* 119-124 (1893). Ex. 23.

330.     After 1851, the federal government failed to prosecute a "committee of vigilance" which prevented Sioux half-breeds from settling on the Lake Pepin Reservation. *Id.*

331.     This committee was not an official government body but a group of angry settlers, often referred to as a "committee of vigilance," who illegally occupied the land. *Id.*

332.     Here's a timeline of events for the committee of vigilance. *Id.*

333.     As detailed above, the 1830 Treaty set aside the Lake Pepin Reservation for the Sioux half-breed lineal descendants. *Id.*

334.     The federal government for about two decades, at least in policy, prohibited settler encroachments on the Lake Pepin Reservation because Sioux half-breed lineal descendants lived there. *Id.*

335.     However, after new treaties in 1851 opened up Minnesota Territory to white settlement, the federal government permitted a wave of eager settlers to illegally move into the Lake Pepin Reservation and began to claim the land as their own. *Id.*

336.     When the U.S. government, through the 1854 Law, authorized the use of "scrip" (certificates that could be exchanged for land) to allow the Sioux half-breed lineal descendants to get their promised land, the settlers already living there became enraged. *Id.*

337.     The settler formed a "committee of vigilance" and used armed guards to intimidate scrip holders, preventing them from registering their claims at the U.S. Land Office in Red Wing. *Id.*

338.     One Sioux half-breed lineal descendant was brought to a spearing hole in a frozen Lake Pepin and threatened by drowning if he persisted on his claim for Lake Pepin Reservation land. *Id.*

339.     The government did not immediately intervene to stop the committee of vigilance. *Id.*

340.     The government eventually stepped in to resolve the dangerous situation by choosing to favor the settlers. In so doing, the settlers who had illegally occupied the land were given the rights to the acreage they had been living on, effectively validating their illegal claims and dispossessing the Sioux half-breed lineal descendants of large portions of the Lake Pepin Reservation. *Id.*

341.     In summary, the government did not just fail to protect the Sioux half-breed lineal descendants; the government created the conditions for the manipulation of the Sioux half-breed lineal descendants, allowed the manipulation to flourish, and refused to intervene even when its own fiduciary duties were clearly outlined and legally required. *Id.*

342.     The result of the government's actions and inactions was the systematic dispossession of the Sioux half-breed lineal descendants' Lake Pepin Reservation, a direct betrayal of the trust established by Chief Wabasha and the other Sioux leaders in the 1830 Treaty. *Id.*

343.     The following paragraphs break down each of the points above in the context of the federal trust responsibility.

344.     The government failed to enforce the 1830 Treaty Indian title, the 1854 Law's non-transferability provisions and the 1858's Law's location, not disposition of title, provision.

345.     Failure of Protection: The core of the federal trust responsibility is a duty to protect American Indian assets, resources, and rights. The 1830 Treaty Indian title restrictions, the 1854 Law's non-transferability clause, and the 1858's location, not disposition of title, provision were direct attempts to provide protection so that the Sioux half-breed lineal descendants' Lake Pepin Reservation would be their home.

346.     The government, by failing to enforce these statutory protective provisions, failed in its most fundamental duties. The United States knew that this was happening on a massive scale, yet it did not intervene effectively. Instead of being a guardian, the government was a passive spectator to the exploitation of its wards. The government's failure to enforce the protective provisions of the 1830 Treaty, 1854 Law and 1858 Law is one of the most glaring examples of the U.S. government's breach of its trust duties to American Indians. It shows that even when Congress enacted protective laws, the government's combination of administrative negligence, complicity, and a systemic prioritization of settler interests over American Indians rights led to the failure of the Indian title and the dispossession of the Sioux half-breed lineal descendants.

347.     Failure of Care and Loyalty: The trust relationship demands the highest degree of care and loyalty from the trustee to the beneficiary. The government's actions, or lack thereof, demonstrate a lack of both. By allowing a system that was easily manipulated and by not taking

affirmative steps to prevent dispossession of the Sioux half-breed lineal descendants' Lake Pepin Reservation, the government acted with a level of negligence that is incompatible with a fiduciary duty. The loyalty of the government should have been to the Sioux half-breed lineal descendants, not to the settlers and speculators who sought to profit from their land.

348.     Failure to Act in the Beneficiaries' Best Interest: The trust was created to provide a permanent home and economic base for the Sioux half-breed lineal descendants. The certificates, scrip and patents were supposed to be a tool to achieve that, not assets to be liquidated by others. The government's failure to prevent the widespread sale of certificates, scrip and patents to non-beneficiaries for a fraction of their value meant that the beneficiaries did not receive the full benefit of their trust. The ultimate outcome of the certificate-scrip-patent program was the dispossession of the Sioux half-breed lineal descendants from their Lake Pepin Reservation home, which was the opposite of Chief Wabasha's and other Sioux leaders' original intentions in the 1830 Treaty and a direct failure of the irrevocable trust's purpose.

349.     Failure of Implementation: The 1830 Treaty, with its Indian title provisions, the 1854 Act, with its non-transferability clause, and the 1858 Act, with its location, not disposition of title, provision, show that Congress had the intention to preserve the Sioux half-breed lineal descendants' Lake Pepin Reservation.

350.     But, the government's failure to create a robust and secure system for issuing and redeeming the certificates, scrip, and patents, and its failure to prosecute the misconduct that was rampant, led to the collapse of the Indian title and the failure of the protective measures ensured by the 1830 Treaty, the 1854 Law and 1858 Law.

351.     The government's design of the certificate-scrip-patent system itself, which made it difficult for Sioux half-breed lineal descendants to redeem their certificates, scrip and patents and easy for speculators to acquire them, was a further failure of its duty.

352.     Failure to print on the land patents the Indian title encumbrance of the 1830 Treaty, 1854 Law and 1858 Law: This is a critical point. A fundamental duty of a trustee is to maintain clear title to Indian title and to ensure that any transfer of that property is done legally and with a clear understanding of the existing encumbrances. The 1830 treaty granted the land to the Sioux half-breeds with a unique form of "Indian title," a communal trust. When the land was subsequently opened up for public sale or settled by non-beneficiaries, the U.S. government should have ensured that any land patents issued had printed on them the Indian title encumbrance.

353.     By failing to do so, the government allowed non-beneficiaries to believe they were acquiring unencumbered land, which breached the 1830 Treaty rights of the Sioux half-breed lineal descendant beneficiaries.

354.     This failure was a breach of the government's duty to protect the trust's assets.

355.     Failure to print on the Sioux scrip land patents the encumbrance of the 1830 Treaty, the 1854 Law and the 1858 Law: This point is related to the previous one but refers specifically to the land claimed by the beneficiaries themselves through the Sioux scrip patents. The certificate-scrip-patent system was supposed to be a way for the beneficiaries to "locate" a specific piece of land—not to obtain disposition of title to the land.

356.     However, even when a Sioux half-breed lineal descendant used scrip to claim a parcel, the resulting Sioux scrip land patent failed to acknowledge the Indian title encumbrances from the 1830 Treaty, the 1854 Law and the 1858 Law. This made it easier for speculators to acquire the land, as the unique protections associated with Indian title under the 1830 Treaty, 1854 Law and 1858 Law were not printed on the Sioux scrip land patents issued for land within the Lake Pepin Reservation.

357. The government's failure to maintain a clear legal record of these legal encumbrances meant it failed in its fiduciary duty to protect the beneficiaries from exploitation and to uphold the integrity of the trust.

358. Failure in the "continuing duty" to clear Indian title: Because the government failed it fiduciary duty to print on the land patents the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law, the United State has a continuing duty to clear Indian title for the Sioux half-breed lineal descendant beneficiaries.

359. The government's continuing failure to clear Indian title is an ongoing breach of its trust responsibility.

360. The government's duty to clear the legal title is not extinguished by a simple statute of limitations, especially given the centuries-old and complex nature of the trust relationship.

361. Failure to put the money proceeds from the public sale of lands in a trust account for the Sioux half-breed lineal descendants: This is another profound breach of trust. A trustee has a duty to manage and account for all trust assets, which includes the proceeds from the sale of trust property. When the government opened up portions of the Lake Pepin Reservation to public sale at $1.25 per acre, it should have, as a matter of fiduciary duty, placed the revenue from those land sales into a trust account for the benefit of the Sioux half-breed lineal descendants. The trust account would have provided a monetary benefit to the beneficiaries in lieu of the land that was being sold, thus fulfilling the original purpose of the trust in a different form. This amount could exceed $265,709. About one-third of the 320,000 acres in the Lake Pepin Reservation was distributed by Sioux scrip land patents totaling 107,432.5 acres. Ex. 17. The rest of the Lake Pepin Reservation, or 212,567.5 acres, sold, effectively sold, or transferred at $1.25 per acre, would equal $265,709. *Id.*

362. The proceeds from these sales were managed in a way that the United States profited, which is a government failure, as trustee, to account for and properly use the trust's land resources for the beneficiaries.

363. This is a classic example of a trustee failing to act in the best financial interest of the beneficiaries.

364. The United States as trustee engaged in conversion of the trust assets when it kept the money proceeds from the Lake Pepin Reservation land sales instead of depositing the money proceeds in a trust account for the Sioux half-breed lineal descendant beneficiaries.

365. In summary, these facts identify specific government actions and inactions that constitute breach of the government's fiduciary duties as trustee for the Sioux half-breed lineal descendants' Lake Pepin Reservation. These facts highlight how a combination of government legal oversights, administrative failures, and a lack of protective measures allowed for the systematic dismantling of the Lake Pepin Reservation Indian title and the legally-unauthorized dispossession of the people it was intended to benefit.

**Illiteracy and significant and dangerous conditions for the Sioux half-breed lineal descendants in Minnesota in the 1860's and 1870's made it practically impossible and life-threatening for Sioux mixed-race individuals to sue the United States on their claims.**

366. The 1864 Attorney General's opinion confirms that the Sioux half-breed lineal descendants' Lake Pepin Reservation.

367. As the beneficiaries were dispossessed by the government in a legally-unauthorized way, there were significant and dangerous reasons in Minnesota in 1860's and thereafter that would have made it practically impossible and life-threatening for Sioux half-breed lineal descendants to sue the United States for their claims.

368. The overall literacy rate among the Sioux in the 1864 was low compared to the Euro-American population. There was a growing number of Sioux who had become literate, mainly

through the efforts of missionaries. This literacy was not always in English and was often used by Sioux people to navigate the changing world and to advocate for themselves and their communities.

369.     However, the pertinent point here is that the 1854 Law and the 1858 Law, as implemented, required literacy from every Sioux half-breed lineal descendant who received a certificate or scrip which was clearly unrealistic because of high rates of illiteracy—and the government knew it at the time.

370.     Moreover, the context of post-U.S.-Sioux War of 1862 Minnesota was one of extreme racial animosity and violence. The legal pronouncements of the government were often at odds with the de facto reality on the ground.

371.     1863 Sioux Removal Acts: Following the U.S.-Sioux War, Congress passed acts in early 1863 that abrogated all treaties with the Sioux bands and ordered their forced removal from Minnesota. Act of February 16, 1863, ch. 37, 12 Stat. 652, and the Act of March 3, 1863, ch. 119, 12 Stat. 819 (together, "the 1863 Removal Acts"). *See* Vogel, Howard J. "Rethinking the Effect of the Abrogation of the Dakota Treaties and the Authority for the Removal of the Dakota People from Their Homeland," *William Mitchell Law Review* 39, no. 2 (2013): 538–81. Ex. 24. While the legal status of the Sioux half-breed lineal descendants' Lake Pepin Reservation was secure, the 1863 Acts created a climate where any person identified as Sioux, regardless of their specific band or lineage, was subject to forced exile from the state. The Sioux half-breed lineal descendants attempting to assert a Lake Pepin Reservation land claim in a state that had legally banished the Sioux would have been a perilous and likely futile endeavor.

372.     1862-1863 Fort Snelling Concentration Camp and Deportation to Dakota Territory: The Sioux non-combatants arrived at Fort Snelling on November 13, 1862, and encamped on the bluff of the Minnesota River about a mile west of the fort. https://www.mnhs.org/fortsnelling/learn/us-dakota-war. Shortly after, Marshall and his soldiers

moved the Sioux to the river bottom directly below the fort. *Id.* In December, soldiers built a concentration camp, a wooden stockade more than 12 feet high enclosing an area of two or three acres, on the river bottom. *Id.* More than 1,600 Sioux people were moved inside:



*Id.* A warehouse just outside the camp was used as a hospital and mission station. Throughout the camp's existence, soldiers of the Sixth, Seventh, and Tenth Minnesota Volunteer Infantry Regiments guarded the stockade, controlling movement in and out. *Id.* It is estimated that between 130 and 300 Sioux people died over the winter of 1862–63, mainly due to measles, other diseases, and harsh conditions. *Id.* The concentration camp at Fort Snelling was not a death camp, and Sioux people were not systematically exterminated there. *Id.* The camp was, however, a part of the genocidal policies pursued against indigenous people throughout the US. Colonists and soldiers hunted down

and killed Sioux people, abused them physically and mentally, imprisoned them, and subjected them to a campaign calculated to make them stop being Sioux. *Id.* In early May, 1863, the army put the Sioux captives from the Fort Snelling camp aboard steamers and took them to a desolate reservation at Crow Creek, Dakota Territory. *Id.*

373. Notably, despite the government's disregard for their Lake Pepin Reservation rights, the presence of Sioux half-breed lineal descendants was noted in many ways—including in a 1863 Fort Snelling "Indian Camp" report *See,* Report No. 156 in the Report of the [U.S.] Commissioner of Indian Affairs, for the year 1863 (William McKusick, superintendent of the "Indian Camp" at Fort Snelling conducted a census of the Indians under surveillance of the United States military, including the "half-breeds" as a separate category)(Ex. 25); Williamson, John P., Minnesota History Bulletin, Vol. 2, No. 6 (May 1918), at 420-42 (Letter to his Mother Mary referring to Sioux half-breeds friendly and loyal to United States) (Ex. 26).

374. Violence Against Sioux "Half-Breeds" and Fear of Lynchings: The 1862 United States-Sioux war created a deeply hostile environment for anyone of Sioux ancestry. While many mixed-race individuals had sided with white settlers or tried to remain neutral during the conflict, this did not protect them from the widespread hatred and fear. Violence against Sioux people, including mixed-race individuals, was not uncommon. There are historical accounts of lynchings and mob violence against American Indians in Minnesota, including mixed-race individuals, both before and after the U.S.-Sioux War. The legal system was not a safe or reliable avenue for redress for Sioux half-breed lineal descendants when extra-legal violence was a constant threat.

375. 1862 Executions at Mankato: The hanging of 38 Sioux men in Mankato on December 26, 1862, was the largest mass execution in U.S. history:



The above illustration is copied from a sketch by W.H. Childs in Frank Leslie's Illustrated Newspaper, January 24, 1863, page 285 (Minnesota Historical Society). See: https://www.mprnews.org/story/2017/06/08/mankato-hangings-an-uneasy-topic-for-minnesota-schools. The public execution of 38 Sioux Indians by federal authorities in Mankato, Minn., on Dec. 26, 1862. Approximately 4,000 people came to witness the event. This event was a stark and highly public display of the state's retribution against the Sioux people. It sent a clear message that Sioux life was considered expendable and that the rule of law was not a guarantee of justice. The trials themselves were hurried and flawed, further demonstrating the lack of a fair legal process for those of Sioux heritage.

376.    Additionally, on November 11, 1865, the government executed Sioux leaders Sakpedan (Little Six) and Wakan Ozanzan (Medicine Bottle) outside the walls of Fort Snelling. *Id.*

377.    These events would have been a recent and terrifying memory for any Sioux half-breed lineal descendant if any of them even considered a lawsuit for the Lake Pepin Reservation in the late 1860's.

378.    Bounty on Sioux Scalps: In the aftermath of the 1862 United States-Sioux war, Minnesota's governor and adjutant general issued orders offering bounties for the killing of Sioux men found within the state. Routel, Colette, "Minnesota Bounties On Dakota Men During The U.S.-Dakota War" (2013), Faculty Scholarship. Paper 260 (http://open.mitchellhamline.edu/facsch/260). Ex. 27. The rewards were significant, with some reaching up to $200. *Id.* This state-sanctioned bounty system created a powerful economic incentive for violence against Sioux people, effectively turning them into targets. *Id.* It's difficult to imagine a more hostile environment for a Sioux half-breed lineal descendant to try to assert a legal claim to land in the Lake Pepin Reservation. *Id.* The Sioux half-breed lineal descendants' very act of stepping forward to sue the United States over the Lake Pepin Reservation would have made an easy target for bounty hunters. *Id.*

379.    In summary, while the 1864 Attorney General's opinion provided a legal basis for a land claim, the political, social, and physical reality on the ground in Minnesota in 1864 was such that Sioux half-breed lineal descendants suing as a group would have been incredibly dangerous, life-threatening, and likely unsuccessful. The United States and the State of Minnesota were engaged in a program of ethnic cleansing and extirpation of the Sioux. So, the legal protections afforded to white citizens were simply not extended to people of Sioux ancestry, such as the Sioux half-breed lineal descendants, regardless of their specific legal status or degree of blood quantum.

**The Sioux half-breed lineal descendants were completely dispossessed of their home—the Lake Pepin Reservation—as the invalid land patents issued under the 1854 Act were about 60% whites and about 40% Sioux half-breed lineal descendants, and the 40% initially retained by the Sioux half-breed lineal descendants ended up in whites' possession eventually.**

380. The attached exhibits shows the known land sales within the Lake Pepin Reservation to settlers. Ex. 28 (including a few example land patents).

381. The United States never put any land sales proceeds from the Lake Pepin Reservation lands into trust accounts for the Sioux half-breed lineal descendants. This amount could exceed $265,709. About one-third of the 320,000 acres in the Lake Pepin Reservation was distributed by Sioux scrip land patents totaling 107,432.5 acres. Ex. 17. The rest of the Lake Pepin Reservation, or 212,567.5 acres, sold or effectively sold at $1.25 per acre, would equal $265,709. *Id.*; Ex. 28.

382. The Plaintiffs estimate that initially 60% of the land patents were to whites and 40% Sioux scrip patents to Sioux half-breed lineal descendants.

383. However, the 40% Sioux scrip patents dwindled to nothing as whites obtained this property too until the Sioux half-breed lineal descendants were completely dispossessed of the Lake Pepin Reservation.

384. Consistently, the historians have generally agreed that the Sioux half-breed lineal descendants' Lake Pepin Reservation existed under the 1830 Treaty and then later, sometime after the 1854 and 1858 Laws, was administratively dispossessed. *See* "Treaties with the Indians" in *History of Wabasha County,* 137-146 (1884) (Ex. 29); Johnson, Frederick L, "Staking a Claim for a New Life—The Struggle for Goodhue County Land" in *Goodhue County: A Narrative History*, 51-60 (2000) (Ex. 30); Hancock, Joseph Woods, "The Half-Breed Tract" in *The History of Goodhue County: Past and Present by an Old Settler,* 119-124 (1883) (Ex. 31); Wedge, Curtis F., "Reign of the Indians", in *History of Wabasha County, Minnesota,* 16-22 (1920) (Ex. 32); Lake City Historical Society, "Half-Breed

Tract—A Reservation Created by Treaty in 1830" (2023) (Ex. 33); Bender, Allison, "Valuable People: The Rise and Fall of the Lake Pepin 'Half Breed Tract'" (2016) (Ex. 34); Barkwell, W., "Lake Pepin Half-Breed Tract," Louise Riel Institute (Ex. 35): Curtiss-Wedge, Franklin, *History of Goodhue County*, 132-138 (1909) (Ex. 36).

**The government was and is obligated to rent the Lake Pepin Reservation trust land for the benefit of the Sioux half-breed lineal descendants.**

385. The government was and is obligated to rent the Lake Pepin Reservation trust land for the benefit of the Sioux half-breed lineal descendants.

386. Notably, the government's historic practice of leasing Indian title lands with rents going to the Indian beneficiaries was codified in the General Allotment Act (Dawes Act) of 1887, but the framework that actively promoted leasing for tribal benefit solidified later, particularly after the Indian Reorganization Act of 1934 (IRA).

387. The Long-Term Leasing Act (25 U.S.C. § 415) in 1955 formally authorized the leasing of both individually owned and tribal trust lands (with Secretarial approval) for various purposes (public, religious, educational, residential, or business). This established the clear federal statute under which most trust land leasing operates today, ensuring rents and revenues go to the Indian owners.

388. The HEARTH Act of 2012 (Helping Expedite and Advance Responsible Tribal Homeownership) is the most recent major shift, granting federally recognized tribes the authority to directly approve surface leases (residential, business, agriculture, renewable energy, etc.) of their tribal trust lands under tribal law, without requiring approval from the Secretary of the Interior. This dramatically streamlined the process and boosted tribal self-determination and economic development.

389. In summary, the concept of the government controlling leases on trust land *with rents going to the tribe* has been in place since the Allotment Era (late 1800s). However, the modern, clear

legal framework that actively supports this as a core part of tribal economic development and is now increasingly controlled by the tribes themselves (especially with the HEARTH Act of 2012) has been in place for a much shorter time.

390.    The Palm Springs Reservation leases are a significant example of federally-approved land leasing in Indian Country, involving the Agua Caliente Band of Cahuilla Indians whose reservation was established in 1876.

> The Agua Caliente Indian Reservation encompasses approximately 28,000 of land in the western Coachella Valley, including portions of Palm Springs, Cathedral City, Rancho Mirage, and unincorporated areas of Riverside County. There are 1,175 commercial leases, 7,671 residential subleases and 11,118 time shares on Indian land leases under the jurisdiction of the Bureau of Indian Affairs - Palm Springs Agency.

See: https://www.bia.gov/regional-offices/pacific/palm-springs-agency.

391.    Similarly, the government had a fiduciary duty to lease the Lake Pepin Reservation for the benefit of the Sioux half-breed lineal descendant beneficiaries.

392.    Specifically, the government had a fiduciary duty, instead of issuing invalid land patents, to lease the Lake Pepin Reservation lands, parcel-by-parcel, to individuals for rent payments. These rent payments could have been made in cash or crops.

393.    The federal administration of Lake Pepin Reservation leases would be as involved as the Agua Caliente Indian Reservation which includes 1,175 commercial leases, 7,671 residential subleases and 11,118 time shares on Indian land leases under the jurisdiction of the Bureau of Indian Affairs - Palm Springs Agency. *Id.*

394.    Moreover, the location of the Lake Pepin Reservation in the 1860's and 1870's was ideal for leases to "bonanza" wheat farms feeding the great grain mills of the area. Bonanza farms were extremely large, industrial-scale agricultural operations that flourished in the American West, primarily in the State of Minnesota and Dakota Territory during the roughly 1870s to the 1890s and

early 1900s. Bonanza farms were generally from 3,000 acres to 75,000 acres. The Lake Pepin

Reservation was ideal for one to ten bonanza farm leases covering the 300,000-plus acres.

**Money-Mandating Duties**

395.    The government's comprehensive list of failures, under the 1830 Treaty, and the

1854 and 1858 Acts, and the laws themselves provide a legal foundation for the United States

breaching money-mandating duties.

396.    The U.S. Court of Federal Claims has jurisdiction over monetary claims against the

United States.

397.    For claims related to Indian trust responsibilities, the relevant statute is the Indian

Tucker Act, 28 U.S.C. § 1505.

398.    As established by the Supreme Court in cases like *United States v. Navajo Nation*, a

plaintiff must demonstrate two elements, among other elements, to bring a successful claim: a

"money-mandating" source of law for the duty must exist and there must be a breach of that duty.

399.    The following are money-mandating duties because they go beyond general bare

trust principles and identify specific, actionable failures by the government.

400.    The Plaintiffs make a Fifth Amendment just compensation claim. The Just

Compensation Clause is a money-mandating duty on its own.

401.    And, the 1830 Treaty, the 1854 Law, and the 1858 Law established an irrevocable

trust of the Lake Pepin Reservation—not a United States-grantor bare trust. The Lake Pepin

Reservation is in an irrevocable trust because the Sioux Bands gifted the Lake Pepin Reservation to

the Sioux half-breed lineal descendants as beneficiaries with the United States as trustee. When the

United States agrees in a treaty to act as a trustee of an irrevocable trust, consisting of a reservation,

for the benefit of a group of Indians, the United States creates a written, specific, and binding

contract with the beneficiaries. When the United States breaches a fiduciary duty under that treaty

contract by illegally dispossessing the trust corpus/reservation from the Indian beneficiaries, the remedy for that breach of fiduciary duty is monetary under the Just Compensation Clause. The Just Compensation Clause mandates United States to pay damages to beneficiaries for the legally-unauthorized dispossession of Indian reservations.

402.    The Just Compensation Clause applies to takings of statutorily-recognized Indian title and governmental interference with Indian title (i.e., dispossession of Indian title).

403.    Essentially, where the Congress by treaty or other agreement has declared that thereafter Indians were to hold the lands permanently (i.e., Indian title), compensation must be paid under the Just Compensation Clause for subsequent governmental takings of Indian title and for the government's legally-unauthorized dispossession of Indian title (e.g., dispossession).

404.    The government, without legal authorization, has dispossessed the Sioux half-breed lineal descendants of the Lake Pepin Reservation—which is a government breach of the money-mandating duty found in the Fifth Amendment's Just Compensation Clause.

405.    Accordingly, the government is required under the Fifth Amendment's Just Compensation Clause, a money-mandating duty, to pay just compensation (damages) to the Sioux half-breed lineal descendants for government's dispossession of the Lake Pepin Reservation until possession in the Lake Pepin Reservation is restored in trust for the Sioux half-breed lineal descendants as beneficiaries.

406.    Specifically, the 1830 Treaty, which created the irrevocable trust, and the 1854 and 1858 Laws, which codified the trust, contained additional protective provisions, and required additional benefit mechanisms, are specific congressional directives to the government, creating money-mandating duties for the government to manage, as trustee, the Lake Pepin Reservation for the benefit of the Sioux half-breed lineal descendants.

407.     The government's money-mandating duty is to manage the trust assets, the Lake Pepin Reservation, and any income therefrom, for the benefit of the Sioux half-breed lineal descendants.

408.     The government has money-mandating duties under the 1830 Treaty, 1854 Law and 1858 Law to prevent the transfer of the Lake Pepin Reservation and any income therefrom to non-beneficiaries.

409.     The government has money-mandating duties under the 1830 Treaty and 1854 and 1858 Laws to ensure Sioux scrip land patent and other land patents for Lake Pepin Reservation land had and have printed on them the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law.

410.     The government has money-mandating duties to clear Indian title after the certificates, scrip and patents were issued mistakenly without the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law.

411.     The government has money-mandating duties to put the proceeds from the public sale of lands in a trust account for the benefit of the Sioux half-breed lineal descendants.

412.     The government had and has money-mandating duties to lease the Lake Pepin Reservation for fair market rent to benefit the Sioux half-breed lineal descendants.

413.     As detailed herein, the government has breached all these money-mandating duties.

414.     Additional money-mandating duties and violations are detailed in Count VI below.

**Statute of Limitations–28 U.S.C. § 2501**

415.     The general statute of limitations for claims against the United States in the U.S. Court of Federal Claims is six years after the claim "first accrues." 28 U.S.C. § 2501. The statute of limitations period does not begin until the claim first accrues.

416.    In this particular case, there is a critical distinction between a United States grantor bare trust and an irrevocable trust. The legal difference is not just semantic; it dictates whether the government's actions are treated as a single, finite, compensable act (a typical taking) or an ongoing breach of a continuing duty (a continuing claim). The following chart lays out the critical distinction:

**United States Grantor Bare Trust vs. Irrevocable Trust**

| Argument | Government's Argument U.S. Grantor Bare Trust/SOL Applies | Plaintiffs' Argument-- Irrevocable Trust/SOL Does Not Apply |
|---|---|---|
| Trust Status | The U.S. was the *grantor* of land, reserving a bare trust interest (or fiduciary relationship). When the land was sold, the U.S. effectively terminated its bare trust obligation, making the taking final. | The U.S. agreed to be the *trustee* of an irrevocable trust created by the Sioux Bands, the grantor, for the benefit of the Sioux half-breed lineal descendants. The irrevocable trust containing Indian title is perpetual until lawfully terminated by consent of Sioux half-breed lineal descendants or Congress's clear, unequivocal abrogation of the 1830 Treaty Indian title. |
| "Taking" Accrual | The claim accrued (clock started) the moment the land was physically and permanently dispossessed through the issuance of patents (e.g., 1850s through 1870). This was a single, final act. | The claim is a continuing claim for breach of fiduciary duty. The trust corpus consisting of Indian title remains legally held by the U.S. trustee because the 1830 Treaty Indian title was never lawfully terminated by the grantor, the Sioux Bands, nor by Congress's clear, unequivocal abrogation of the 1830 Treaty Indian title. |
| Fiduciary Duty | The fiduciary duty ended when the U.S. took the property. The only remaining duty is the one-time duty to pay just compensation. | The fiduciary duty is continuous. The government's *ongoing failure* to restore or account for the Indian title trust corpus, and failure to clear Indian title, after the mistaken land patents which do not include the Indian title encumbrances, is a continuing, daily breach of trust, which prevents the statute of limitations from running under the continuing claims doctrine. |
| Role of Just Compensation | The claim under the Just Compensation Clause accrued when the land was taken, triggering the duty to pay and starting the six-year SOL clock. | The duty to pay just compensation does not begin until the Indian title is cleared or lawfully terminated. Until then, the government's fiduciary obligations include clearing Indian title from the mistaken land patents which do not |

| Argument | Government's Argument U.S. Grantor Bare Trust/SOL Applies | Plaintiffs' Argument-- Irrevocable Trust/SOL Does Not Apply |
|---|---|---|
| | | include the Indian title encumbrances. The SOL clock will not begin because the U.S. is perpetually failing in its continuing fiduciary duties by dispossessing the Sioux half-breed lineal descendants Lake Pepin Reservation and by failing in in its fiduciary duty to restore clear Indian title. |

417.    A continuing claim exception to the statute of limitations exists where Congress has not abrogated, repealed or repudiated prior treaties and laws recognizing Indian title and rights of occupancy and, when the government, based on an inaccurate representation of said treaties and laws, dispossesses, in a legally-unauthorized way, American Indians of their Indian title and right of occupancy to their Indian lands.

418.    In this matter, the beneficiaries relied, to their detriment, on the government's inaccurate representations that the 1830 Treaty, 1854 Law and 1858 Law lawfully dispossessed them of the Lake Pepin Reservation.

419.    Moreover, the government agencies intentionally misled the Sioux half-breed lineal descendants because the government agencies knew they themselves could not repudiate the 1830 Treaty, 1854 Law, 1858 Law, and the trust thereunder, because it is Congress's role to abrogate, terminate or repudiate treaties and laws affecting Indian groups, reservations and trusts—not the federal agencies' role.

420.    The government cannot claim a constructive repudiation of the 1830 Treaty, 1854 Law, 1858 Law and the trust thereunder based on the record in this case because the government claimed to be complying with the 1830 Treaty, 1854 Law and 1858 Law. *Westlands Water District v. United States*, 109 Fed.Cl. 177, 208 (2013) ("The repudiating party's refusal to perform its contractual

obligation must be made 'distinctly and unqualifiedly to the other party.' *Dow Chem. Co.,* 226 F.3d at 1334.").

421.    So, the government has no evidence that the government repudiated the 1830 Treaty, 1854 Law, 1858 Law and underlying trust, by law (de jure) or by fact (de facto).

422.    Therefore, the statute of limitations has not commenced to run on the claims of this complaint.

423.    The statute of limitations will only start running when Congress abrogates, terminates or repudiates the 1830 Treaty, the 1854 Law, the 1858 Law and the trust thereunder.

424.    Additionally, there is an Indian title mismanagement exception to the statute of limitations associated with administratively extinguishing Indian title before issuing land patents. This exception is based on the legal principle, explained above, that the United States cannot issue land patents for land that the government does not own. Doing so is Indian title mismanagement. The government's failure to properly extinguish Indian title before issuing land patents constitutes a continuing breach of the government's fiduciary duty. This isn't just a one-time event; it is an ongoing failure to protect the Indian title. The statute of limitations for such a claim would not begin to run until the beneficiaries, the Sioux half-breed lineal descendants, have a clear Indian Title for the Lake Pepin Reservation—which the government has not caused to happen yet.

425.    A continuing claim exception to the statute of limitations exists for the government's failure to enforce the 1830 Treaty Indian title, the 1854 Act non-transferability provisions and the 1858 Act's location, not disposition of title, provision. To be sure, the non-beneficiary acquisition of the scrip and the resulting loss of land occurred largely in the 1850s and 1860s. However, the government's failure is not a single event. The government has a continuing duty to protect the trust's assets. Each time a non-beneficiary transfer is allowed, and each time a new land deed is recorded to a purchaser, a new breach occurs. The government's failure to audit, investigate, and

correct the subsequent non-beneficiary deed transactions is an ongoing breach of fiduciary duty. The fiduciary duty is a continuous one, and the government's continued failure to fulfill that fiduciary duty is a "continuing claim."

426.     A continuing claim exception to the statute of limitations exists for the United States' continuing duty to clear Indian title after it mistakenly extinguishes it. In this specific case, the government's failure to print the encumbrance of the 1830 Treaty's Indian title and 1854 and 1858 Law's protective provisions on the original certificates, scrips, and land patents issued under the 1854 Act triggers a continuing fiduciary duty for the government to clear Indian title because it mistakenly extinguished it.  The government's fiduciary duty to clear Indian title, after it mistakenly extinguished Indian title, is not nullified by a simple statute of limitations, especially given the centuries-old and complex nature of the trust relationship.

427.     As to the Indian Trust Accounting Statute, from 1990 to 2014, Congress consistently included a provision in the Department of the Interior's appropriations acts that effectively tolls (pauses) the statute of limitations for claims concerning losses to or mismanagement of tribal trust funds. This provision states that the statute of limitations "shall not commence to run on any claim... until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss." Consolidated Appropriations Act, Pub. L. No. 113-76, 128 Stat. 5, 305–06 (Jan. 17, 2014).

428.     The federal courts have been supportive of this legal principle where it applies. In 2023, the Court recognized that Congress codified the common-law principle through various Interior Department Appropriations Acts, most recently in 2014, which states that the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected Indian tribe has been furnished with an accounting. *Winnemucca Indian Colony v. United States*, 167 Fed.Cl. 396, 416-417 (2023). Similarly, the D.C. Circuit in *Tanner-Brown v.*

*Haaland* acknowledged that the statute of limitations on claims concerning losses to or mismanagement of trust funds does not run until the affected tribe or individual Indian has been furnished with an accounting, referencing the 2014 Consolidated Appropriations Act. *Tanner-Brown v. Haaland*, 105 F.4th 437, 448-449 (2024).

429.    In this case, the United States received money proceeds from lands sales involving Lake Pepin Reservation lands. The government proceeded as if it was entitled to the proceeds, and converted the proceeds for its own profit, but Congress has never abrogated, terminated or repudiated the 1830 Treaty, 1854 Law and 1858 Law and the irrevocable trust thereunder. So, the land sales proceeds were legally required to go into a government trust account to benefit the Sioux half-breed lineal descendants.

430.    This amount could exceed $265,709. About one-third of the 320,000 acres in the Lake Pepin Reservation was distributed by Sioux scrip land patents totaling 107,432.5 acres. Ex. 17. The rest of the Lake Pepin Reservation, or 212,567.5 acres, sold or effectively sold at $1.25 per acre, which would equal $265,709. *Id.*

431.    The government's pocketing of the land sales proceeds is a breach of its fiduciary duties because the government failed to put those money proceeds in a trust account for the Sioux half-breed lineal descendants.

432.    Since the government has never provided the Sioux half-breed lineal descendants with an accounting of such funds from which a beneficiary can determine whether there has been a loss, the statute of limitations has not commenced on this claim.

433.    The statute of limitations has also not commenced because of fraudulent concealment and an inherently unknowable injury. Despite the jurisdictional nature of § 2501, courts recognize a narrow exception for fraudulent concealment and inherently unknowable injuries. As established in *Entines v. United States*, to toll the statute of limitations for filing a claim against the

government, plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date. *Entines v. U.S.,* 39 Fed.Cl. 673, 679-680 (1997). This exception requires active concealment by the government. In *Carr v. United States*, the court held that plaintiffs must produce evidence indicating that the government actively concealed its wrongdoing--a mere failure to reveal facts is insufficient. *Carr v. U.S.*, 61 Fed.Cl. 326, 331 (2004)

434.    The government concealed from the trust beneficiaries, after the enactment of the 1858 Law, that the government's dispossession of the Lake Pepin Resrevation is legally unauthorized.

435.    The government's misrepresentation of the 1830 Treaty, 1854 and 1858 Laws led the Sioux half-breed lineal descendants to believe the government's dispossession of the Lake Pepin Reservation is legally authorized.

436.    The government's serial misrepresentations to the Sioux half-breed lineal descendants are misrepresentations of fact.

437.    The following government actions are continuing misrepresentations of fact causing the statute of limitations not to commence because of fraudulent concealment and an inherently unknowable injury: (1) the government's denial that, currently, the government is the trustee of an irrevocable trust containing the Lake Pepin Reservation Indian title for the benefit of the Sioux half-breed lineal descendants; (2) the government's certificates, scrips and patents omitting the Indian title encumbrances under the 1830 Treaty and 1854 and 1858 Laws; (3) the relinquishment roll (Ex. 18); (4) the government pocketing the Lake Pepin Reservation land sale proceeds instead of putting them in a trust account for the Sioux half-breed lineal descendants; (5) the 1870 Commissioner's letter providing after-the-fact validity to the invalid land patents despite the 1864 Attorney General's opinion; (6) after the 1870 Commissioner's letter to the General Land Office, the General Land

Office administratively terminating federal supervision over Lake Pepin Reservation without legal notice to the Sioux half-breed lineal descendants; (7) the government's continuing denial of Lake Pepin Reservation as Indian Country under 18 U.S. Code § 1151; and (8) the government's denial of federal recognition of Sioux half-breed lineal descendants..

438.    The government misrepresents facts when, currently, it denies the government is the trustee of an irrevocable trust containing the Lake Pepin Reservation Indian title for the benefit of the Sioux half-breed lineal descendants.

439.    The government misrepresents facts when it claims validity for the invalid certificates, scrips and land patents omitting the Indian title encumbrances under the 1830 Treaty and 1854 and 1858 Laws.

440.    The government misrepresents facts when it claims the relinquishment roll (Ex. 18) had an effect of terminating the Lake Pepin Reservation.

441.    The government misrepresents facts when it defends the government's pocketing of the Lake Pepin Reservation land sale proceeds instead of putting them in a trust account for the Sioux half-breed lineal descendants.

442.    The government misrepresents facts when it relies on the 1870 Commissioner's letter providing after-the-fact validity to the invalid land patents despite the 1864 Attorney General's opinion.

443.    The government misrepresents facts when it claims that. after the 1870 Commissioner's letter to the General Land Office, the General Land Office had legal authority to administratively terminate federal supervision over Lake Pepin Reservation without legal notice to the Sioux half-breed lineal descendants.

444.    The government misrepresents facts when the government continues to deny that the Lake Pepin Reservation is Indian Country under 18 U.S. Code § 1151.

445.     The government misrepresents facts when the government denies federal recognition of Sioux half-breed lineal descendants.

446.     In response to fraudulent concealment, the government may argue that the statute of limitations clock started when the Indians should have known about the taking—i.e., when they were dispossessed of the Lake Pepin Reservation in the late 1800's—i.e., "accrual by discovery."

447.     The problem with the government's discovery argument is that a taking can be *legal* (a valid exercise of eminent domain with compensation) or *illegal* (an unauthorized trespass).

448.     Here, the claim for compensation under the Fifth Amendment for dispossession of the 1830 Treaty Indian title in the Lake Pepin Reservation only exists if the dispossession was legally unauthorized and compensation was denied.

449.     The government's actions involving the certificates, scrips and land patents did not just dispossess the Indians, the government documents carried the color of legal authority. By issuing the land patents, the government was explicitly stating, "This land is legally cleared of Indian title." But, the government had no legal authority to do so because there was no consent of the Sioux half-breed lineal descendants and no Congressional abrogation of the 1830 Treaty Indian title.

450.     Under these circumstances, where the government is the trustee of an irrevocable trust, why would the Sioux half-breed lineal descendants suspect that the government's official, recorded, and published real estate documents are a *constitutional violation*? The government's actions effectively told them: "Your rights have been legally terminated," which would lead to detrimental reliance that barred them from seeking a constitutional remedy.

451.     The Sioux half-breed lineal descendants could not exercise reasonable diligence to discover a "claim" when the government, as trustee, actively and officially misrepresented facts about the *legality* of its actions.

452. To successfully toll the statute of limitations due to fraudulent concealment, the plaintiffs must demonstrate the government's concealment of a material fact, the government's affirmative acts of concealment and the plaintiffs' ignorance due to the government's concealment.

453. As to concealment of a material fact, the government concealed the fact that the dispossession of Lake Pepin Reservation was and is legally.-unauthorized: Indian title was still legally valid per the 1864 Attorney General Opinion because the 1830 Treaty provided recognized Indian title and the 1854 and 1858 laws had protective provision of that Indian title.

454. The government made these misrepresentations, and the others listed above, to support the government's current misrepresention that the irrevocable trust does not exist—when, in fact, the irrevocable trust continues to exist because the Indian title remains the trust corpus with the government as trustee and the Sioux lineal descendants as beneficiaries.

455. The following are examples of affirmative acts of concealment of the fact that the government's dispossession of Lake Pepin Reservation was and is legally-unauthorized: the issuance of the certificate-scrip-land patents without the 1830 Treaty Indian title encumbrances and without subsequently clearing Indian title; the government's 1870 Commissioner's letter to the local General Land Office in Minnesota (Ex. 38) ratifying the validity of the issuance of the invalid land patents when the issuance of the invalid land patents was invalid; the government's 1870 Commissioner's letter caused the General Land Office's removal of federal supervision over the Lake Pepin Reservation land patents causing the land patents to be recorded in the state/county recording system instead; and the government's provisions of certified copies of land patents to permit subsequent downstream recording of deeds for Lake Pepin Reservation lands through today without reference to the 1830 Treaty Indian title encumbrances. These are examples of the *affirmative acts* that gave the illegal dispossession the appearance of legality, thus actively misleading the beneficiaries.

456.     As to the Plaintiffs' ignorance due to the government's concealment that the government's dispossession of the Lake Pepin Reservation was and is legally-unauthorized, the Sioux half-breed lineal descendant beneficiaries were ignorant of their right to sue for compensation because the government's official actions led them to believe the Indian Tiles was dispose by law and legal administrative actions, not by a violation of the United States Constitution.

457.     In conclusion, the statute of limitations does not apply due to the government's fraudulent concealment that the government's dispossession of the Lake Pepin Reservation was and is legally unauthorized which caused the Plaintiffs' ignorance of their claims.

458.     The statute of limitations has also not commenced because of the government's failure to do a complete census under the 1854 Law. The government's failure of a complete census means that beneficiaries and their lineal descendants, the people that Congress intended to be notified, have not been notified by federal agencies of their beneficiary status under the 1830 Treaty, 1854 Law and 1858 Law. Exs. 1-3, 12-13. The government's failure to do a complete census under the 1854 Law means that the statute of limitations has not commenced because the trust beneficiaries, including the Sioux half-breed lineal descendants, are unaware of their trust beneficiary status. The statute of limitations will not commence until the government has published a complete census for all Sioux half-breed lineal descendant beneficiaries as Congress required under the 1854 Law.

459.     The statute of limitations has also not commenced because of the government's failure to deliver a complete accounting of the Lake Pepin Reservation, including the market rent value and land sales proceeds received, under the 1830 Treaty, 1854 Law and 1858 Law to the Sioux half-breed lineal descendant beneficiaries.

**Damages Caused by Dispossession of Lake Pepin Reservation**

460.    The government's dispossession of the Lake Pepin Reservation caused damages to the Sioux half-breed lineal descendants.

461.    The government's breach of the money-mandating duties found in the Fifth Amendment's Just Compensation Clause causes the loss of land sales proceeds, loss of fair market value rent on land within the Lake Pepin Reservation and loss of 4% compounding interest since 1857.

462.    The government's breach of its money-mandating duties to enforce the 1830 Treaty Indian title, 1854 Act non-transferability and the 1858 Act location, not disposition, provisions causes the loss of fair market value rent on land within the Lake Pepin Reservation and 4% compounding interest since 1857.

463.    The government's breach of its money-mandating duties to print on its Sioux scrip patents and other land patents the Indian title encumbrances causes the loss of fair market value rent on land within the Lake Pepin Reservation and 4% compounding interest since 1857.

464.    The government's breach of its money-mandating duties to clear Indian title after the certificates, scrip and patent mistakenly omitted the 1830 Treaty Indian title encumbrances causes the loss of fair market value rent on land within the Lake Pepin Reservation and 4% compounding interest since 1857.

465.    The government's breach of its money-mandating duty to put the proceeds from the public sale of lands in a trust account for the Sioux half-breed lineal descendant beneficiaries causes the loss of land sales proceeds and 4% compounding interest since 1857. This amount could exceed $265,709. About one-third of the 320,000 acres in the Lake Pepin Reservation was distributed by Sioux scrip land patents totaling 107,432.5 acres. Ex. 17. The rest of the Lake Pepin Reservation, or 212,567.5 acres, sold or effectively sold at $1.25 per acre, would equal $265,709. *Id.*

466.    Additional damages claims are detailed in Count VI below.

## Count I

### The government's patents within the Lake Pepin Reservation are invalid because the government cannot annul a previous land grant and cannot convey what it does not own.

467.    The above paragraphs are incorporated herein by reference.

468.    The United States in opening the Lake Pepin Reservation for settlement, chose a path that was expedient but legally and ethically indefensible.

469.    The certificates, scrip, and patents were all instruments of a process that, under property law, was built on a foundation of a non-existent title.

470.    The Land Grant: The 1830 Treaty was a grant of land from the Sioux Bands to the "half-breed" lineal descendants. The United States was a party to the treaty, but it did not "own" the land in fee simple. It was the Sioux Nation that had "Indian title" or aboriginal title to the land, which is a recognized legal right of occupancy.

471.    The U.S. as a "Transferee" of Indian Title: The U.S. government's role as fiduciary or trustee was and is to receive the Lake Pepin Reservation in trust and protect and manage it for the benefit of the Sioux half-breed beneficiaries.

472.    Under property law, the United States could not then turn around and "convey," issue unencumbered land patents, or sell the Lake Pepin Reservation to white settlers because the United States did not own the land in the first place.

473.    The government, under the 1830 Treaty, holds the Lake Pepin Reservation subject to Indian title and right of occupancy, not in fee simple absolute.

474.    Any attempt by the U.S. to "patent" the land, via the certificate-scrip--patent scheme was, under the legal principle that the government cannot convey what it does not own, is an invalid act.

98

475.	Indian Title and Right to Occupancy Were Never Extinguished:  Indian title and right to occupancy can only be extinguished by a specific, explicit, and unambiguous act of Congress or by consensual treaty.

476.	The 1830 Treaty did not extinguish Indian title; the 1830 Treaty transferred the Lake Pepin Reservation from the Sioux Bands to the Sioux half-breed lineal descendants as beneficiaries and the government as trustee.

477.	The 1854 and 1858 Acts were not acts of extinguishment. They were acts of administration and management. The fact that the 1858 Act explicitly stated that scrip was for location, not disposition is a direct and powerful refutation of the idea that the government was extinguishing the Indian title and converting it to a standard private property title for white settlers. Congress, in enacting the 1854 and 1858 Laws, was preserving the Indian title, not destroying it.

478.	The government's certificate-scrip-patent scheme was a breach of fiduciary and trustee duties because the government, as trustee, had a fiduciary duty to act in the best interests of the Sioux half-breed lineal descendant beneficiaries.

479.	The certificate-scrip-patent scheme, in practice, did the exact opposite. It was a government-sponsored mechanism that allowed for the unlawful dispossession of the Sioux half-breed lineal descendants' Lake Pepin Reservation.

480.	The legal principle—that the sovereign cannot convey what it does not own and cannot annul a grant—is the perfect lens through which to view this historical injustice.

481.	The U.S. government, as trustee, was supposed to protect and manage the Indian title, not facilitate its unlawful transfer to third parties.

482.	The land patents the United States printed and issued were legally invalid because the government had no right to grant those patents in the first place because the land was subject to the

Indian title encumbrances of the 1830 Treaty and the protective provisions of the 1854 and 1858 Laws.

483.    As detailed above, money-mandating duties exist and were breached by the United States.

484.    As detailed above, the statute of limitations does not apply.

485.    As detailed above, the United States' breaches of its money-mandating duties have damaged the Plaintiffs.

486.    The Plaintiffs seek damages against the United States as detailed herein and in the prayer for relief and in an amount to be determined at trial.

## Count II
## Breach of Trustee Obligations

487.    The above paragraphs are incorporated herein by reference.

488.    Under Supreme Court precedent in *United States v. Mitchell*, the government owes trustee duties when statutes and regulations clearly give the Government full responsibility to manage Indian land and resources for the Indians' benefit. 463 U.S. 206, 225 (1983). The Court held that "all of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)." *Id.*

489.    Moreover, here all the necessary elements of a common-law irrevocable trust are present: a third-party grantor (the Sioux Bands), a trustee (the United States), a beneficiary (the Sioux half-breed lienal descendants), and a trust corpus (the Lake Pepin Reservation).

490.    As to a form of trust, the 1830 Treaty, Article IX, provided that the land gifted by the Sioux Bands to the Sioux half-breed lineal descendants would be held "in the same manner" as other Indian titles were held, meaning it was an irrevocable trust for the lineal descendants.

491.     Such an irrevocable trust where the United States agrees to be trustee for a gift of a reservation, including Indian title, from a tribe to a group of lineal descendants is not a bare trust, but a comprehensive fiduciary relationship that requires the government to protect and preserve the property.

492.     Therefore, the United States has comprehensive trustee obligations under the 1830 Treaty.

493.     The United States' comprehensive trustee obligations under the 1830 Treaty were codified by the 1854 Law and 1858 Law which constituted an additional benefit mechanism for the Sioux half-breed lineal descendants, creating fiduciary duties on the governmental trustee to implement, and did not abrogate, terminate or repudiate beneficiary rights under the 1830 Treaty.

494.     The United States' failure to put the land sales proceeds in trust for the lineal descendants and failure to put the 1830 Treaty Indian title encumbrances on the 1854 Act certificates, scrip and patents constitutes breaches of money-mandating duties as detailed above.

495.     When funds are derived from land sales that should have been held in trust, those proceeds automatically acquire trust fund status under federal law, triggering statutory investment duties under 25 U.S.C. §§ 161a and 162a. *Chippewa Cree Tribe of the Rocky Boy's Reservation v. U.S.*, 69 Fed.Cl. 639, 656 (2006).

496.     When the government omits treaty and statutory encumbrances on government-issued land certificates, scrips and patents, mistakenly dispossessing Indian title, the government has a continuing fiduciary duty to clear Indian title by correcting the land patents by indicating in writing on the land patents that the Indian title encumbrances apply.

497.     As detailed above, money-mandating duties exist and were breached by the United States.

498.     As detailed above, the statute of limitations does not apply.

499. As detailed above, the United States' breaches of its money-mandating duties have damaged the Plaintiffs.

500. The Plaintiffs seek damages against the United States as detailed herein and in the prayer for relief and in an amount to be determined at trial.

## Count III
### Breach of fiduciary duty and illegal conversion of land sale proceeds.

501. The above paragraphs are incorporated herein by reference.

502. The government's retention of sale proceeds constitute a breach of fiduciary duty, as fiduciaries have an absolute obligation to preserve trust property and cannot convert trust assets for their own use.

503. When the United States sold trust lands under the 1854 and 1858 laws and retained the proceeds, this constituted illegal conversion of trust property.

504. This amount could exceed $265,709. About one-third of the 320,000 acres in the Lake Pepin Reservation was distributed by Sioux scrip land patents totaling 107,432.5 acres. Ex. 17. The rest of the Lake Pepin Reservation, or 212,567.5 acres, sold or effectively sold at $1.25 per acre, would equal $265,709. *Id.*

505. The irrevocable nature of the trust is critical because once a settlor (the Sioux bands) transfers property to a trustee (the United States) for specific beneficiaries (half breed lineal descendants), the trustee cannot unilaterally terminate the trust or convert trust assets for its own benefit.

506. All the necessary elements of a common-law irrevocable trust are present: a third-party grantor (the Sioux Bands), a trustee (the United States), a beneficiary (the Sioux half-breed lienal descendants), and a trust corpus (the Lake Pepin Reservation). *U.S. v. Mitchell*, 463 U.S. 206 (1983).

507. As to a form of trust, the 1830 Treaty, Article IX, provided that the land gifted by the Sioux Bands to the Sioux half-breed lineal descendants would be held "in the same manner" as other Indian titles were held, meaning it was an irrevocable trust for the lineal descendants.

508. Such an irrevocable trust where the United States agrees to be trustee of a reservation, including Indian title, from a tribe to a group of lineal descendants is not a bare trust, but a comprehensive fiduciary relationship that requires the government to protect and preserve the property.

509. Therefore, the government has comprehensive fiduciary obligations under the 1830 Treaty which were codified in the 1854 law and in the 1858 Law.

510. As a fiduciary, the government, in a legally-unauthorized way, cannot convert the trust corpus, principal or income, into government property.

511. The government's comprehensive fiduciary obligations under the 1830 Treaty were codified by the 1854 Law and the 1858 Law which constituted an additional benefit mechanism for the Sioux half-breed lineal descendants, creating fiduciary duties on the governmental trustee to implement, and did not abrogate, terminate or repudiate beneficiary rights under the 1830 Treaty.

512. The government's failure to put the land sales proceeds in trust for the Sioux half-breed lineal descendants constitutes a breach of a money-mandating duty as detailed above.

513. When funds are derived from land sales that should have been held in trust, those proceeds automatically acquire trust fund status under federal law, triggering statutory investment duties under 25 U.S.C. §§ 161a and 162a. *Chippewa Cree Tribe of the Rocky Boy's Reservation v. U.S.*, 69 Fed.Cl. 639 (2006).

514. As detailed above, money-mandating duties existed and were breached by the United States.

515. As detailed above, the statute of limitations does not apply.

516. As detailed above, the United States' breaches of its money-mandating duties have damaged the Plaintiffs.

517. The Plaintiffs seek damages against the United States as detailed herein and in the prayer for relief and in an amount to be determined at trial.

## Count IV
### Breach of fiduciary duty for failure to disclose encumbrances on land certificates, scrip and patents and, subsequently, to clear Indian Title.

518. The above paragraphs are incorporated herein by reference.

519. The government's fiduciary duty to print known 1830 Treaty and 1854 Law and 1858 Law encumbrances on land certificates, scrip and patents is a money-mandating duty arising under the comprehensive fiduciary relationship established by the 1830 Treaty.

520. The 1864 Attorney General opinion and the Department administrative decision on Minnesota's claim (1863) provides contemporaneous interpretation of the 1830 Treaty, 1854 Law and 1858 Law, concluding that as between the claimants, the Indian title is the best.

521. The Attorney General's reasoning relied on a fundamental property law principle. The government, like an individual, has no power to withdraw or annul its grants of land. The first lawful grant must stand. The government, in a legally-unauthorized way, cannot issue a land patent on Indian title lands.

522. When the government acts as a fiduciary for Indian beneficiaries, the government assumes the fiduciary obligations, which include the duty to protect and manage trust assets and provide beneficiaries with material information affecting their interests. *Cobell v. Norton*, 240 F.3d 1081 (2001).

523. Given the government's trust obligations and the Attorney General's recognition of superior Sioux title, the government's land certificates, scrip and patents issued under the 1854 Act should have included appropriate written notation to alert recipients and subsequent purchasers that

the granted lands remained subject to the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law for the benefit of Sioux half-breed lineal descendants.

524.     All the necessary elements of a common-law irrevocable trust are present: a third-party grantor (the Sioux Bands), a trustee (the United States), a beneficiary (the Sioux half-breed lienal descendants), and a trust corpus (the Lake Pepin Reservation). *U.S. v. Mitchell*, 463 U.S. 206 (1983).

525.     As to a form of trust, the 1830 Treaty, Article IX, provided that the land gifted by the Sioux Bands to the Sioux half-breed lineal descendants would be held "in the same manner" as other Indian titles were held, meaning it was an irrevocable trust for the lineal descendants.

526.     Such an irrevocable trust where the United States agrees to be trustee of a reservation, including Indian title, from a tribe to a group of lineal descendants is not a bare trust, but a comprehensive fiduciary relationship that requires the government to protect and preserve the property.

527.     Therefore, the United States has comprehensive fiduciary obligations under the 1830 Treaty which were codified in the 1854 law and in the 1858 Law.

528.     As a fiduciary, the United States cannot convert the trust corpus, principal or income, into United States' property.

529.     The United States' comprehensive fiduciary obligations under the 1830 Treaty were codified by the 1854 Law and 1858 Law which constituted an additional benefit mechanism for the Sioux half-breed lineal descendants, creating fiduciary duties on the governmental trustee to implement, and did not abrogate, terminate or repudiate beneficiary rights under the 1830 Treaty.

530.     In breach of money-mandating duties, the government failed to print the 1830 Treaty, 1854 Law and 1858 Law Indian Title encumbrances on the land certificates, scrip and patents relating to the Lake Pepin Reservation. By not noting the Indian title on the land patents

issued at public sale, the government gave a clear signal that the land was free and clear of any prior claims. This made the land more attractive to buyers and made it much more difficult for the beneficiaries to ever reclaim it.

531.     Additionally, in breach of money-mandating duties, after the government's mistaken dispossession of the Sioux half-breed lineal descendants' Lake Pepin Reservation, the government failed and continues to fail to clear Indian title for the Sioux half-breed lineal descendants so that they can make the Lake Pepin Reservation their permanent home again.

532.     As detailed above, money-mandating duties existed and were breached by the United States.

533.     As detailed above, the statute of limitations does not apply.

534.     As detailed above, the United States' breaches of its money-mandating duties have damaged the Plaintiffs.

535.     The Plaintiffs seek damages against the United States as detailed herein and in the prayer for relief and in an amount to be determined at trial.

## Count V
## Legally-unauthorized dispossession of Lake Pepin Reservation without just compensation, a money-mandating duty (Fifth Amendment)

536.     The above paragraphs are incorporated herein by reference.

537.     The 1830 Treaty, 1854 Law and 1858 Law created Indian title, which is title to Indian lands that has been recognized by federal treaty or statute. *Seneca Nation of Indians v. New York*, 206 F.Supp.2d 448 (2002).

538.     The government, in a legally-unauthorized way, subsequently dispossessed the lineal descendants of their interests in the reservation lands without just compensation, as required by the Fifth Amendment.

539.     The 1854 Law authorized the President to issue certificates or scrip to eligible half-breed Sioux Indians in return for a relinquishment of rights to other portions of the Lake Pepin Reservation, but it contained no language abrogating, terminating or repudiating the 1830 Treaty and the related Indian Title thereunder.

540.     Well-established federal Indian law principles mandate that treaty reservation abrogation, termination and repudiation cannot occur without express congressional intent.

541.     The 1854 Act fails this test entirely, as it lacks clear evidence that Congress actually considered the conflict between its intended action and Indian treaty rights and chose to resolve that conflict by abrogating the treaty. *Swinomish Indian Tribal Community v. BNSF Railway Co.*, 951 F.3d 1142 (2020).

542.     Based on these facts, the Sioux half-breed lineal descendants assert a Just Compensation Clause claim based on the government's legally-unauthorized dispossession of the Sioux half-breed lineal descendants Lake Pepin Reservation.

543.     The Just Compensation Clause, part of the Fifth Amendment to the U.S. Constitution, mandates that the government must pay just compensation, meaning fair market value, to property owners when it dispossesses property for public use, a process known as eminent domain. The Just Compensation Clause ensures that property owners are made whole after their property is dispossessed by the government, receiving the full equivalent of its market value.

544.     The Just Compensation Clause is an express money-mandating duty found in the Fifth Amendment of the United States Constitution.

545.     The Just Compensation Clause applies to Indian title when the government dispossesses Indian title in a legally-unauthorized way. Essentially, where the Congress by treaty or other agreement has declared that thereafter Indians were to hold the lands permanently,

compensation must be paid under the Just Compensation Clause when the government dispossesses the Indian title in a legally-unauthorized way.

546. As detailed above, the government's dispossession of Indian title is legally unauthorized because the government's dispossession of Indian title is in violation of the Indian title provision under the 1830 Treaty and under the 1854 and 1858 Laws' protective provisions.

547. To maintain a Just Compensation Clause claim here, Sioux half-breed lineal descendants allege the following.

548. The government, after the 1854 Law and 1858 Law, administratively dispossessed the Sioux half-breed lineal descendants' right of occupancy and Indian title in the Lake Pepin Reservation in a legally-unauthorized way.

549. The government failed to provide fair market rent value for Sioux half-breed lineal descendants' right of occupancy and Indian title in the Lake Pepin Reservation, which is the amount a willing tenant would pay for to a willing landlord.

550. The government pocketed land sales proceeds which should have been placed in a trust account to benefit the Sioux half-breed lineal descendants.

551. This amount could exceed $265,709. About one-third of the 320,000 acres in the Lake Pepin Reservation was distributed by Sioux scrip land patents totaling 107,432.5 acres. Ex. 17. The rest of the Lake Pepin Reservation, or 212,567.5 acres, sold or effectively sold at $1.25 per acre, would equal $265,709. *Id.*

552. The Sioux half-breed lineal descendants suffered damages, including relocation and other related expenses.

553. All of these claims are detailed above.

554. The Sioux half-breed lineal descendants claim that the text of the 1830 treaty is substantive law creating Just-Compensation-Clause compensable property rights for Sioux half-

breed lineal descendants in its Lake Pepin Reservation, its reservation boundaries, in its right of occupancy and in its Indian title:

> The United States agrees to suffer said half Breeds to occupy said tract of country; they holding by the same title, and in the same manner that other Indian Titles are had.

7 Stat. 330, art. IX.

555. The United States in the 1830 Treaty, which was ratified by the U.S. Senate, agreed that the Sioux Bands' transfer of Just-Compensation-Clause compensable property rights to the Sioux half-breed lineal descendants to "occupy said tract of country; they holding by the same title, and in the same manner that other Indian titles are held."

556. The United States in 1849 and 1851 agreed to treaty provisions to purchase the Sioux half-breed lineal descendants' Just-Compensation-Clause-compensable property rights in the Lake Pepin Reservation, but none of these treaty provisions were ratified by the U.S. Senate, as detailed above.

557. The 1854 law, as amended by the 1858 law, did not abrogate, terminate or repudiate the 1830 treaty, the Sioux half-breed lineal descendants' property rights, the Sioux half-breed lineal descendants' Lake Pepin Reservation and its boundaries, their right of occupancy, and their Indian title.

558. Accordingly, after enactment of the 1854 law, the Sioux half-breed lineal descendants continued to have their Just-Compensation-Clause-compensable property rights to "occupy said tract of country; they holding by the same title, and in the same manner that other Indian titles are held."

559. Since the United States had not purchased the Sioux half-breed lineal descendants' right of occupancy and Indian Title to the Lake Pepin Reservation under the 1849 treaty for $200,000, and the Sioux half-breed lineal descendants had not ceded the lands between 1849 and

1854 to the United States, the United States under the 1854 law did not successfully convey Sioux half-breed lineal descendants' property rights, right of occupancy and Indian title, through Lake Pepin Reservation land patents to third parties.

560. The legal principle that the government cannot convey what it does not own, detailed above, applies here.

561. Instead, after the 1854 law, the property rights of occupancy and Indian Title remained reserved for the Sioux half-breed lineal descendants under the 1830 treaty.

562. Since the 1854 Act, the government is administratively dispossessing the Sioux half-breed lineal descendants' Lake Pepin Reservation, Indian title, right of occupancy, fair market value rents, and land sales proceeds.

563. The government's administrative dispossession was and is accomplished through the land patents omitting Sioux half-breed lineal descendants' right of occupancy and Indian title, as detailed above.

564. The Just Compensation Clause is money-mandating requiring just compensation for legally unauthorized administrative dispossessions of property and property rights—which occurred here with the government's administrative dispossession of the Sioux half-breed lineal descendants' right of occupancy and Indian title to the Lake Pepin Reservation.

565. Because of the government's breaches of money-mandating duties, the Sioux half-breed lineal descendants have not received constitutionally-required just compensation for legally-unauthorized dispossession and has been damaged, incurring relocation and other related expenses.

566. The government's breaches of the money-mandating duties of the Just Compensation Clause have damaged and are damaging the Plaintiffs, including lost profits, lost rents, lost sales proceeds, other monetary losses, relocation costs and related expenses.

567.     The Plaintiffs seek damages against the United States as detailed herein and in the prayer for relief and in an amount to be determined at trial.

## Count VI

### Breach of Money-Mandating Duties of the Revenue Sharing Act

568.     The above paragraphs are incorporated herein by reference.

569.     Sioux half-breed lineal descendants bring this claim against United States under Tucker Act and Indian Tucker Act to recover compensation for benefits it would have received under Tribal Priority Allocation (TPA) system and Indian Health Service (IHS) funding process but for Department of Interior's (DOI) improper omission of Sioux half-breed lineal descendants from the list of federally recognized tribes.

570.     The State and Local Fiscal Assistance Act of 1972, which distributed federal funds to state and local governments, including Indian tribes and Alaskan native villages, is a money-mandating source of substantive law.

571.     The court's ability to provide a monetary remedy under the State and Local Fiscal Assistance Act of 1972 ("Revenue Sharing Act") is not limited by operation of the Anti–Deficiency Act, 31 U.S.C. § 1341.

572.     But for the Department's administrative termination of the Sioux half-breed lineal descendants and its reservation—which included slander of title, misconduct and wrongful concealment—the Sioux half-breed lineal descendants would have been federally recognized to secure statutory benefits as a tribe.

573.     Before 1978, the Department of the Interior ("Department") through the Bureau of Indian Affairs ("BIA") accorded tribes federal recognition on an ad hoc basis.

574.     In 1966, the BIA created an unofficial list of tribes recognized by the United States. According to the BIA, the 1966 list was not intended "to be a list of federally recognized tribes as

such" and was derived from its unofficial files. The list did not distinguish between tribes based on their treaty recognition status because, at that time, the BIA lacked the legal basis to determine which tribes were treaty recognized. The Sioux half-breed lineal descendants and the Lake Pepin Reservation were not included on the list.

575.    In 1969, the BIA created another unofficial list restricted to tribes with a "formal organization" approved by the BIA. The Sioux half-breed lineal descendants and the Lake Pepin Reservation did not appear on that list due to an arbitrary omission by the BIA.

576.    Although the BIA created the list, it lacked the legal authority to determine which tribal groups would be accorded federal recognition. The 1969 list nonetheless became the basis for the BIA's classification of tribes in the future. According to the BIA employee who prepared the list, the BIA's relevant records from 1969 have been lost.

577.    In the early 1970s, Congress began conditioning federal benefits to the tribes and their members on formal federal recognition as determined by the Department. The final regulation establishing the formal procedure for federal recognition of the tribes was published by the Department in 1978. *See* Procedures for Establishing that an American Indian Group Exists as an Indian Tribe, 43 Fed.Reg. 39,361 (Sept. 5, 1978) (codified at 25 C.F.R. Pt. 54 (1979)). As the most recent version of that regulation makes clear, federal acknowledgment does "not create immediate access to existing programs." 25 C.F.R. § 83.12(c) (2011). A tribe may participate only "after it meets the specific program requirements, if any, and upon appropriation of funds by Congress."

578.    Because the Department illegally omitted Sioux half-breed lineal descendants and the Lake Pepin Reservation from the list of recognized tribes, the Sioux half-breed lineal descendants never received the federal benefits under the Revenue Sharing Act that Sioux half-breed lineal descendants were entitled to.

579.     The Sioux half-breed lineal descendants are damaged by the Department's violations of its money-mandating duties under the Revenue Sharing Act.

580.     The government's continuing breaches of its money-mandating duties have caused and are causing damages to Sioux half-breed lineal descendants.

581.     The Plaintiffs seek damages against the United States as detailed herein and in the prayer for relief and in an amount to be determined at trial.

## Count VII
### Claims for narrow equitable relief

582.     The Plaintiff re-alleges all paragraphs above as is fully set forth herein.

583.     28 U.S.C. § 1491 (a)(2) provides, if judgment is awarded to plaintiff, that the Court can issue orders to officials of the United States for accountings and correct applicable records.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing … correction of applicable records, and such orders may be issued to any appropriate official of the United States.

584.     The Plaintiffs requests the Court to issue orders, allowed under 28 U.S.C. § 1491 (a)(2), directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to conduct, complete and publish a complete accounting regarding Lake Pepin Reservation which is held in trust by the United States for the Sioux half-breed lineal descendant beneficiaries—including the land sale proceeds kept by the government. Such an accounting will be an aid to the Court's jurisdiction in determining damages.

585.     The Sioux half-breed lineal descendants seek the following narrow equitable relief to restore the legal status of the Lake Pepin Reservation and their federally-recognized tribal status.

586.     As the Supreme Court has opined:

The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise. See *United States v.*

*Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 94-95, 54 L.Ed. 195 (1909). Diminishment, moreover, will not be lightly inferred. Our analysis of surplus land acts requires that Congress clearly evince an "intent to change boundaries" before diminishment will be found. *Rosebud v. Kneip, supra,* 430 U.S., at 615, 97 S.Ct., at 1377.

*Solem v. Bartlett*, 465 U.S. 463, 470 (1984).

587.    Because neither the 1854 Law nor the 1858 Law divested the 1830 Treaty reservation nor diminished the reservation boundaries, the Court should order narrow equitable relief to restore the legal status of the Lake Pepin Reservation as follows.

588.    The Plaintiffs requests the Court to issue orders, allowed under 28 U.S.C. § 1491 (a)(2), directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to correct all Lake Pepin Reservation land patents to include the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law in favor of the Sioux half-breed lineal descendants:

> This land patent is subject to the 1830 Treaty, 1854 Law and 1858 Law Indian Title encumbrances which establish a permanent reservation for the Sioux half-breed lineal descendants who as Indian beneficiaries retain ownership of the Lake Pepin Reservation, its boundaries, Indian title, right of occupancy and income therefrom.

589.    The Plaintiffs requests the Court to issue orders, allowed under 28 U.S.C. § 1491 (a)(2), directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to incorporate all Lake Pepin Reservation land patents, as corrected to include the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law in favor of the Sioux half-breed lineal descendants, into the federal property recording system and to ensure the Lake Pepin Reservation are "Indian Country" under 18 U.S. Code § 1151.

590.    The Plaintiffs requests the Court to issue orders, allowed under 28 U.S.C. § 1491 (a)(2), directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to conduct, complete and publish a modern-day census of the Sioux half-breed lineal descendants who are the beneficiary class of the 1830 Treaty, 1854 Law and 1858 Law. Such a

census will be an aid to the Court's jurisdiction in apportioning damages among the beneficiary class members.

591.    Finally, the Sioux Half-Breed lineal descendants respectfully request that this Court, issue an order compelling the Secretary of the Interior to recognize the Sioux half-breed lineal descendants as a federally-recognized tribe. Such relief is allowable under the Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103–454, title I, §103, Nov. 2, 1994, 108 Stat. 4791, providing that: "The Congress finds that— …'(3) Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated 'Procedures for Establishing that an American Indian Group Exists as an Indian Tribe; or by a decision of a United States court." (Emphasis added).

592.    The equitable relief is warranted by the unique and compelling circumstances of this case, wherein the historical injustices and the prolonged failure of the United States to fulfill its fiduciary and trust obligations have resulted in the continued deprivation of the Sioux half-breed lineal descendants' Indian title to their permanent home.

593.    A mere monetary award, while necessary, is insufficient to remedy the profound harm suffered, which includes the loss of sovereignty, a reservation, a cultural identity, and access to essential federal programs and services.

594.    The Court's exercise of its narrow equitable powers to order tribal recognition is the only complete and just remedy that can immediately restore the descendants to their rightful status and finally conclude this long-standing claim.

595.    Such an order would not only honor the United States' solemn treaty commitments but also provide a path for the Sioux half-breed lineal descendants to rebuild their community and preserve their heritage for the next seven generations.

# PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court:

1.      Certify the proposed class as defined herein;

2.      Enter judgment against the United States;

3.      Award the class members nominal, compensatory, general and special damages, with interest;

4.      Issue orders directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to conduct, complete and publish a complete accounting regarding Lake Pepin Reservation which is held in trust by the United States for the Sioux half-breed lineal descendant beneficiaries—including the land sale proceeds kept by the government;

5.      Issue orders allowed under 28 U.S.C. § 1491 (a)(2) directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to correct all Lake Pepin Reservation land patents to include the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law in favor of the Sioux half-breed lineal descendants –"This land patent is subject to the 1830 Treaty, 1854 Law and 1858 Law which establish a permanent reservation for the Sioux half-breed lineal descendants who as beneficiaries retain the Lake Pepin Reservation, its boundaries, Indian title, right of occupancy and income therefrom";

6.      Issue orders allowed under 28 U.S.C. § 1491 (a)(2) directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to incorporate all Lake Pepin Reservation land patents, as corrected to include the Indian title encumbrances of the 1830 Treaty, 1854 Law and 1858 Law in favor of the Sioux half-breed lineal descendants, into the federal property recording system to ensure that the Lake Pepin Reservation and its boundaries are "Indian Country" under 18 U.S. Code § 1151.

7.     Issue orders, allowed under 28 U.S.C. § 1491 (a)(2), directing the President, executive branch officials, the Secretary of the Interior, the Attorney General and others, to conduct, complete and publish a modern-day census of the Sioux half-breed lineal descendants who are the beneficiaries of the 1830 Treaty, the 1854 Law and the 1858 Law.

8.     Issue orders compelling the Secretary of the Interior to recognize the "Sioux half-breed lineal descendants" as a federally-recognized tribe under the Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103–454, title I, §103, Nov. 2, 1994, 108 Stat. 4791.

9.     Award attorney fees, expenses, costs and disbursements under the federal Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A);

10.     Award costs and disbursements to the Plaintiffs; and

11.     Grant whatever additional relief the Court finds allowable, just and equitable.


**MOHRMAN, KAARDAL & ERICKSON, P.A.**

DATED: October 13, 2025.          /s/Erick G. Kaardal
                                   Erick G. Kaardal (MN 229647)
                                   Gregory M. Erickson (MN 276522)
                                   Vincent J. Fahnlander (MN 19220X)
                                   Elizabeth A. Nielsen (MN 0403696)
                                   Peter D. Linder (MN 0505474)
                                   Maxwell D. Becker (MN 0505693)
                                   Mohrman, Kaardal & Erickson, P.A.
                                   150 South Fifth Street, Suite 3100
                                   Minneapolis, Minnesota 55402
                                   Telephone: (612) 341-1074
                                   Email: kaardal@mklaw.com
                                   Email: erickson@mklaw.com
                                   Email: fahnlander@mklaw.com
                                   Email: nielsen@mklaw.com
                                   Email: linder@mklaw.com
                                   Email: becker@mklaw.com
                                   *Attorneys for Plaintiffs*