# In the United States Court of Federal Claims

THOMAS EUGENE SMITH, et al.,

        *Plaintiffs,*

v.

THE UNITED STATES,

        *Defendant.*

No. 25-1718
(Filed: July 10, 2026)

*Erick Gregg Kaardal*, Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, for Plaintiffs.

*Sara E. Costello*, Environment & Natural Resources Division, U.S. Department of Justice, Washington, D.C., for Defendant.

**OPINION AND ORDER**

**LERNER,** *Judge.*

This case is one of many arising from this country's "tragic history" of the treatment of Native Americans during its westward expansion. *United States v. Sioux Nation of Indians*, 448 U.S. 371, 374 (1980) (citation modified). In 1830, the United States signed the Treaty of Prairie du Chien ("1830 Treaty") with various Native American tribes, including the Sioux (Dakota) tribe. Compl. ¶ 44, ECF No. 1. Article IX of the 1830 Treaty established the Lake Pepin Reservation ("Reservation") in what is now principally Wabasha County, Minnesota. *Id.* ¶¶ 1, 44, 51. The Reservation was intended to be a reserved tract of land for Sioux half-breed lineal descendants, or "half-breeds."[1] *Id.* ¶¶ 77–81.

Plaintiffs describe themselves as "Sioux half-breed lineal descendants who are beneficiaries under the 1830 Treaty . . . regarding the Lake Pepin Reservation." *Id.* ¶ 3. They allege Defendant, *inter alia*, unlawfully dispossessed them of the Reservation and breached its obligation to hold the Lake Pepin Reservation in trust for their benefit. *Id.* ¶¶ 467–595.

---

[1] "Half-breed is a term used to denote the offspring of white and Indian parents." *Dennison v. Topeka Chambers Indus. Dev. Corp.*, 527 F. Supp. 611, 613 (D. Kan. 1981), *aff'd*, 724 F.2d 869 (10th Cir. 1984). This term is now acknowledged to be "dehumanizing and offensive," and the Court only uses it insofar as it is used by Plaintiffs and describes the allegations in Plaintiffs' Complaint. *See* Annabelle L. Atkin et. al., *Race Terminology in the Field of Psychology: Acknowledging the Growing Multiracial Population in the US*, Am. Psych. (March 7, 2022), (manuscript at 12), https://pmc.ncbi.nlm.nih.gov/articles/PMC9316411/pdf/nihms-1822822.pdf.

A "heavy cost was imposed — often unjustly — on [Native Americans] that inhabited the continent long before the formation of the United States." *Chemehuevi Indian Tribe v. United States*, 150 Fed. Cl. 181, 186 (2020), *aff'd in part, vacated in part*, 104 F.4th 1314 (Fed. Cir. 2024). Plaintiffs' Complaint details compelling allegations of mistreatment and wrongful conduct. But "Congress has empowered [this Court] to adjudicate monetary claims — and enter judgment against the United States — only where consistent with the laws it has duly enacted, binding precedent, [and] this Court's Rules." *Id.*

Currently pending is Defendant's Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6) of the Court of Federal Claims ("RCFC"). *See generally* Def.'s Mot. to Dismiss, ECF No. 9 ("Mot."). The Motion must be granted, as the Court lacks jurisdiction over Plaintiffs' claims. In sum and as explained below, Counts I-V of Plaintiffs' Complaint are barred by the statute of limitations because they accrued more than six years ago, and their accrual is not subject to equitable tolling. Second, regardless of whether the issue of tribal recognition is dispositive, Count VI fails under either the primary jurisdiction doctrine or the statute of limitations. Finally, Count VII seeks equitable relief that would not be incidental or collateral to any monetary relief. Accordingly, Defendant's Motion to Dismiss is **GRANTED**.

## I.    Background and Procedural History

### A.    Factual Background

Plaintiffs' Complaint provides detailed background and history on the events surrounding the Lake Pepin Reservation as summarized below. *See generally* Compl.

The Sioux (Dakota) Indians are Native Americans who historically occupied the upper Midwest, including Southeastern Minnesota and the Lake Pepin Reservation. *Id.* ¶ 33. The Lake Pepin Reservation consists of approximately 515 square miles (or 320,000 acres) of land located in Southeastern Minnesota along the west shore of the Mississippi River. *Id*. ¶ 73. Like many territories in the nineteenth century, Minnesota experienced a period of rapid settlement in the wake of land acquisition by the United States. *Id*. ¶¶ 37, 40 (noting the Lake Pepin Reservation was included in the Louisiana Purchase).

In an effort to settle ongoing disputes between certain Native American tribes as well as with the United States, representatives from ten Native American tribes signed the Fourth Treaty of Prairie du Chien on July 15, 1830. 7 Stat. 328 (1830); *see* Pls.' Ex. 1, ECF No. 1-2.[2] Article IX of the 1830 Treaty established a specific tract of land for "half breeds of the [Sioux] nation." Art. IX, 7 Stat. 330. After describing the tract of land (now known as the Lake Pepin Reservation), Article IX states "[t]he United States agree to suffer said half Breeds to occupy said tract of country; they holding by the same title, and in the same manner that other Indian

---

[2] The Treaty is labeled in the Congressional Record as the "Treaty with the Sauk and Foxes, etc., 1830." 7 Stat. 328 (1830).

Titles are held." *Id.* The Complaint states "[t]he key points of . . . Sioux leaders' intention and the context surrounding [this Treaty]" were "securing a permanent home; providing for their descendants; a form of trust; a reflection of changing times; and a desire for the Sioux cultural and religious traditions to follow through the bloodlines." Compl. ¶ 55 (citing Ex. 1). A map of the Reservation under the 1830 Treaty is below:



*Id.* ¶ 72.

In July 1854, Congress enacted a law ("1854 Act") directing the United States to survey the Lake Pepin Reservation lands and have them "exposed to public sale." § 3, 10 Stat. 304; *see* Compl. ¶¶ 142, 144. Under the 1854 Act, the United States issued certificates for land, or "scrip," to the "half-breeds or mixed-bloods of the Dacotah or Sioux nation of Indians" in exchange for "a full and complete relinquishment by them to the United States of all their right, title, and interest" to any other portion of the Reservation. § 1, 10 Stat. 304; Compl. ¶ 144. Each scrip could be located on any Reservation land not already occupied by settlers, subject to private sale, or reserved by the Government. § 1, 10 Stat. 304. The Act also authorized a census of the number of eligible "half-breed" descendants before certificates were issued. *Id.* § 2; Compl. ¶ 142. Finally, it provided "no transfer or conveyance of any of said certificates or scrip shall be valid." § 1, 10 Stat. 304.

Four years later, Congress amended the 1854 Act through the Act of May 19, 1858 ("1858 Act"). 11 Stat. 292 (1858); Pls.' Ex. 3, ECF No. 1-2. The 1858 Act validated white settler claims to Reservation land where those claims did not conflict with existing half-breed settlements. *Id.* § 1; *see* Compl. ¶ 335. It further granted settlers "the benefit of the preemption laws of the United States," notwithstanding any location of half-breed scrip on the same land after the date of the settlement. § 1, 11 Stat. 292. Land already occupied by "half-breeds" was excluded from the 1858 Act's provisions and could be conveyed only "by the 'certificates' or 'scrip' authorized to be issued by the [1854 Act] for the benefit of said Indians." § 2, 11 Stat. 292. Likewise, the Act did not extend to any land already encumbered by half-breed scrip. *Id.*

3

Despite the 1854 Act's prohibition on the transfer of land, according to the Complaint, "whites obtained this property too until the Sioux half-breed lineal descendants were completely dispossessed of the Lake Pepin Reservation." Compl. ¶ 383; *see* Pls.' Ex. 28, ECF No. 1-6, at 80–142 (depicting record of Lake Pepin Reservation land sales to settlers between 1857 and 1947). "[The] Lake Pepin Reservation [that] existed under the 1830 Treaty and then later, sometime after the 1854 and 1858 Acts, was administratively dispossessed." Compl. ¶ 384.

The 1862 U.S.–Sioux War created a "deeply hostile environment for anyone of Sioux ancestry." *Id.* ¶ 374. Mob violence and extrajudicial killings of Sioux people, "including mixed-race individuals, [were] not uncommon." *Id.* "The hanging of 38 Sioux men in Mankato on December 26, 1862, was the largest mass execution in U.S. history." *Id.* ¶ 375. Minnesota's state government also facilitated a "state-sanctioned bounty system" that offered financial incentives for violence against Sioux people. *Id.* ¶ 378. In early 1863, Congress passed acts "abrogat[ing] all treaties with the Sioux bands and order[ing] their forced removal from Minnesota." *Id.* ¶ 371. Although these acts did not affect the legal status of the Lake Pepin Reservation, many of those identified as Sioux were subject to exile from the state. *Id.*

The post-war period also saw the creation of "the Fort Snelling Concentration Camp." *Id.* ¶ 372. Soldiers built "a wooden stockade more than 12 feet high enclosing an area of two or three acres, on the river bottom. More than 1,600 Sioux people were moved inside." *Id.* Approximately 130 to 300 Sioux people died over the winter of 1862–63, primarily from measles, other diseases, and the harsh camp conditions. *Id.* The Army later transported the remaining captives to Crow Creek, Dakota Territory. *Id.*

In 1864, then-U.S. Attorney General Edward Bates issued an opinion holding, between the Sioux half-breed lineal descendants and the State of Minnesota, "that the Sioux title is the best" as to the Reservation. *Sioux Half-Breed Rsrv. in Minnesota*, 11 U.S. Op. Atty. Gen. 59, 62 (1864); Pls.' Ex. 19, ECF No. 1-5. Despite this opinion, "Sioux scrip patents dwindled to nothing." Compl. ¶ 383.

The Department of the Interior ("Interior"), through the Bureau of Indian Affairs ("BIA"), first developed a formal process for federal tribal recognition in 1978. 43 Fed. Reg. 39361 (Sept. 5, 1978). Prior to the 1970s, tribal recognition was determined on an ad-hoc basis. The "Sioux half-breeds" and their descendants have never appeared on Interior's list of federally recognized tribes. Compl. ¶¶ 574–75, 578.

### B.    Procedural History

Plaintiffs filed their Complaint on October 14, 2025. *See generally* Compl. It raises seven primary claims for relief: (I) land patents within the alleged Lake Pepin Reservation are invalid, *id*. ¶¶ 467–86; (II) breach of trustee obligations, *id*. ¶¶ 487–500; (III) breach of fiduciary duty and illegal conversion of land sale proceeds, *id*. ¶¶ 501–17; (IV) breach of fiduciary duty for failure to disclose encumbrances and clear Indian Title, *id*. ¶¶ 518–35; (V) dispossession of the Lake Pepin Reservation without just compensation, in violation of the Fifth Amendment, *id*. ¶¶ 536–67; (VI) breach of money-mandating duties under the State and Local Fiscal Assistance Act of 1972 ("Revenue Sharing Act" or "RSA"), Pub. L. No. 92-512, 86 Stat. 919, *id*. ¶¶ 568–

4

81; and (VII) a claim for equitable relief, including a complete accounting of Lake Pepin land sale proceeds, federal-tribal recognition, a complete modern-day census of the Reservation, and a correction of land patents to reflect Indian Title, *id*. ¶¶ 582–95.

Defendant sought an extension to answer or otherwise respond to the Complaint on December 5, 2025.  ECF No. 6.  Plaintiffs responded with a proposed schedule that accommodated this extension but allowed them to file Motions for Class Certification and Partial Summary Judgment shortly after Defendant's Response.  ECF No. 7.  The Court granted an extension of time, and Defendant filed a Motion to Dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) on March 16, 2026.  ECF No. 8; Mot.

On March 30, 2026, Plaintiff filed Motions for Class Certification and Partial Summary Judgment.  ECF Nos. 11, 12. The Court ordered a Joint Preliminary Status Report to determine the best path forward on briefing the parties' motions.  ECF No. 15.  After considering the parties' positions, the Court stayed further briefing on Plaintiffs' Motions and ordered continued briefing on Defendant's Motion to Dismiss.  Scheduling Order, *Smith et. al. v. United States*, No. 25-1718 (Fed. Cl. April 20, 2026).

Plaintiffs filed their Response to Defendant's Motion on April 13, 2026, and Defendant replied on May 1, 2026.  Pls.' Resp. ("Resp."), ECF No. 14; Def.'s Reply ("Reply"), ECF No. 16.  On May 5, 2026, Plaintiffs filed a Motion for Leave to File a Five-Page Surreply to Defendant's Motion to Dismiss, which the Court granted.  ECF Nos. 17, 18.  The Court also ordered supplemental briefing on (1) whether the doctrines of ripeness or primary jurisdiction required the dismissal of Count VI and (2) under what authority this Court can order federal tribal recognition.  ECF No. 18.  These supplemental briefs and Plaintiffs' Surreply were filed on May 20, 2026.  *See* Def.'s Suppl. Br., ECF No. 19; Pls.' Suppl. Br., ECF No. 20; Pls.' Surreply ("Surreply"), ECF No. 21.

Defendant's Motion to Dismiss is now ripe for review.

## II.     Discussion

### A.     Standard of Review: Motion to Dismiss Under Rule 12(b)(1)

Defendant moves to dismiss the Complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim.  Mot. at 1.  Because the Court resolves Defendant's Motion only on 12(b)(1) grounds, only the 12(b)(1) legal standard is applicable.[3]

"In determining jurisdiction [when evaluating a Rule 12(b)(1) motion], a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159,

---

[3] Because there is no "jurisdictional hierarchy" and this case may be fully dismissed on the grounds stated in this Opinion, the Court declines to address the other jurisdictional grounds for dismissal raised by Defendant.  *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1350 (Fed. Cir. 2015) (quoting *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 578 (1999)); *see, e.g.*, Mot. at 16–19 (alleging Plaintiffs lack standing).

1163 (Fed. Cir. 2011). Plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Id.* "Where a motion to dismiss challenges the complaint's jurisdictional allegations, the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true. In such a situation, the court may review evidence extrinsic to the pleadings." *van Leeuwen v. United States*, 176 Fed. Cl. 503, 508 (2025) (citation modified).

Specifically, when faced with a motion to dismiss based on the statute of limitations, a plaintiff must demonstrate "jurisdictional timeliness." *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). "Because plaintiff bears the burden of proof by a preponderance of the evidence, it must offer relevant, competent evidence to show that it filed suit within six years of the accrual of its claims." *Osage Nation v. United States*, 57 Fed. Cl. 392, 396 (2003). If the Court lacks jurisdiction over a claim, the claim must be dismissed. *See* RCFC 12(h)(3).

## B.     Jurisdiction

### 1.     The Indian Tucker Act and the Indian Claims Commission Act ("ICCA")

Because the United States is sovereign and possesses sovereign immunity, its consent to be sued "defines a court's jurisdiction to entertain a suit" against it. *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citation modified). "Until the passage of the [ICCA] in 1946, tribes could not litigate claims against the United States without specific Congressional permission." *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 364 F.3d 1339, 1343 (Fed. Cir. 2004) ("*Shoshone I*").

In 1946, Congress passed the ICCA, which gave the Indian Claims Commission exclusive jurisdiction over all legal, equitable, and moral claims of any "identifiable group of American Indians" against the United States that existed as of August 13, 1946. ICCA, Ch. 959, Pub. L. No. 79-726, § 2, 60 Stat. 1049, 1050 (1946) (repealed). The ICCA waived sovereign immunity and provided a cause of action for all Indian claims against the government that accrued before 1946, so long as they were filed within a five-year statute of limitations period. ICCA § 2, 12. "[N]o claim existing before [August 13, 1946] but not presented within such period may thereafter be submitted to any court or administrative agency for consideration." *Id.* "The chief purpose of the [ICCA was] to dispose of Indian claims with finality." *United States v. Dann*, 470 U.S. 39, 45 (1985) (citation modified).

The ICCA further provided that the Court of Claims would have jurisdiction to decide "any [Indian] claim against the United States accruing after the date of the approval of this Act." ICCA § 24. This Section of the ICCA (now known as the "Indian Tucker Act"), as amended, provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or

6

treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505.

"By enacting this statute, Congress plainly intended to give tribal claimants the same access to the Court of Claims provided to individuals by the Tucker Act." *United States v. Mitchell*, 445 U.S. 535, 539 (1980). A claim under the Indian Tucker Act "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).

### 2.   Statute of Limitations and Claim Accrual

"Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. "The 6-year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988) (citing cases). This includes equitable tolling of the statute of limitations. *Id.* at 1578.

Under § 2501, "a cause of action against the government has first accrued only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Id.* at 1577 (citation modified). The general rule for breach of trust claims is that "the statute of limitations does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship is terminated." *Id.* at 1578 (citation omitted). But a trustee does not have to expressly repudiate a trust. Repudiation can also take place when the trustee takes actions "inconsistent with [their] responsibilities as a trustee." *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012) ("*Shoshone II*").

The Federal Circuit has also "soundly rejected the contention that the filing of a lawsuit can be postponed until the full extent of the damage is known." *Chemehuevi*, 150 Fed. Cl. at 197–98 (citation modified).

### 3.   Counts I–V of the Complaint accrued more than six years before the filing of Plaintiffs' Complaint and, accordingly, are barred by the statute of limitations.

Plaintiffs filed their Complaint on October 14, 2025. Compl. Under this Court's six-year statute of limitations, Plaintiffs' claims are barred to the extent they accrued prior to October 14, 2019. *See* 28 U.S.C. § 2501. The events giving rise to Counts I–V occurred in the nineteenth and twentieth centuries, well outside this period. *See generally* Compl.

Plaintiffs appear to acknowledge that the timeliness of Counts I–V rises and falls with the applicability of certain exceptions to the statute of limitations, rather than the timing of the events themselves. *See, e.g.*, Compl. ¶¶ 415–59 (discussing exceptions to the statute of limitations); Resp. at 7–13 (responding to Defendant's statute of limitations arguments that Plaintiffs' claims are timely based on "*established exceptions* to accrual" (emphasis added)). Before reaching the exceptions-based arguments at the core of Plaintiffs' statute of limitations position, however, the Court first addresses the threshold timeliness of each claim below.

In Count I, Plaintiffs allege that because the United States was only the trustee of the Reservation, it lacked the power to convey portions of the land that it "did not own in the first place." Compl. ¶¶ 471–72. The alleged injury to Plaintiffs occurred when the Government conveyed the land by issuing patents. *See Voisin v. United States*, 80 Fed. Cl. 164, 170 (2008) (holding government's issuance of land patents for plaintiffs' land and subsequent sale of land pursuant to legislation marked date of accrual of takings claim). Neither the Complaint nor the attached Exhibits include examples of land patents from later than the 1880s or land sales after 1949. *See, e.g.*, Pls.' Ex. 28, ECF No. 1-6 (including copies of land patents from the 1850s through the 1880s and listing land sales from 1857 to 1949).

Counts II, III, and IV allege breaches of trust and fiduciary duty based on Defendant's conveyance of Reservation land, failure to disclose encumbrances, and to clear "Indian title" from the land. Compl. ¶¶ 487–535. These claims accrued at the time of Defendant's actions, all of which took place in the 1800s and 1900s, because the trust beneficiaries "knew or should have known of the breach." *Jones v. United States,* 801 F.2d 1334, 1335 (Fed. Cir. 1986); *see also* Mot. at 8–9. This is an objective test. *See San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1350–51 (Fed. Cir. 2011). The United States' actions were "inconsistent with [its] responsibilities as a trustee" and, under the objective standard established in *San Carlos Apache Tribe*, the beneficiaries were on notice as to the breach. *Shoshone II*, 672 F.3d at 1030 (citation omitted).

Count V alleges the United States' conveyance of the Reservation was a "taking" compensable under the Just Compensation Clause of the Fifth Amendment. Compl. ¶¶ 537–67. But similar to the previous Counts, any takings claim accrued when the land was conveyed. *See Voisin*, 80 Fed. Cl. at 170–71.

Additionally, because the Government's actions were "open and notorious," Plaintiffs were objectively on notice as to the facts underlying their claims and their possible injury prior to October 14, 2019. *Ingrum v. United States*, 560 F.3d 1311, 1314–15 (Fed. Cir. 2009) ("[A] plaintiff's ignorance of a claim that he should have been aware of is not enough to suspend the accrual of a claim."). For example, prior public litigation on behalf of the Mdewakanton Band of Sioux in February 2019 sought a writ of mandamus to require Interior to designate the Mdewakanton Band as a federally recognized tribe. *Mdewakanton Band of Sioux in Minnesota v. Bernhardt*, 464 F. Supp. 3d 316, 318 (D.D.C. 2020), *aff'd sub nom. Mdewakanton Band of Sioux in Minnesota v. Haaland*, 848 F. App'x 439 (D.C. Cir. 2021). The Complaint in *Mdewakanton* discusses the Lake Pepin Reservation, the 1830 Treaty, the 1854 Act, and the issuance of scrips to Sioux half-breeds. Compl. ¶¶ 80–92, *Mdewakanton Band of Sioux*, 464 F.

Supp. 3d 316 (No. 19-402).  This indicates the information was public knowledge in 2019, more than six years prior to this suit.

The lack of an exact accrual date for Plaintiffs' claims is not dispositive because Plaintiffs have failed to meet their burden to demonstrate their claims accrued within this Court's statute of limitations.  But to the extent Plaintiffs' claims accrued prior to August 13, 1946 (as many of them appear to have), they are also barred by the ICCA.  ICCA § 12; *see* Mot. at 15–16.

Plaintiffs make several arguments that the accrual of their claims should be tolled. Compl. ¶¶ 427–32 (alleging the Indian Trust Accounting Statute ("ITAS") tolls the statute of limitations); *id.* ¶¶ 433–53 (alleging fraudulent concealment tolls the statute of limitations); Resp. at 7–11, 19.  These arguments are not persuasive.

> **a)    The continuing claims doctrine does not apply to Counts I–V because Plaintiffs' injuries trace back to events outside the statute of limitations.**

Plaintiffs argue their "Indian Title-based claims are preserved by the continuing claim[s] doctrine" because "breach of a continuing duty generates a series of independent, distinct wrongs, each accruing separately."  Resp. at 11–12 (citing 28 U.S.C. § 2501).  In their view, "the government has an ongoing, daily duty to manage and protect the reservation's trust corpus and to maintain accurate records of its 1830 Treaty and 1858 Act encumbrances.  Each day the government maintains . . . federal and county property records [that do not reflect Indian title], it commits a renewed breach of its fiduciary duties."  *Id.* at 12 (citation modified).

"When a plaintiff pleads a series of distinct events—each of which gives rise to a separate cause of action—as a single continuing event, the continuing claims doctrine operates to save the later-arising claims even if the limitations period lapsed for the earlier-arising claims." *Winnemucca Indian Colony v. United States*, 167 Fed. Cl. 396, 417 (2023) (citation modified), *aff'd*, 156 F.4th 1339 (Fed. Cir. 2025).  "In order for the continuing claim[s] doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."  *Id.* at 418 (citation modified).  "On the other hand, if there was only a single alleged wrong, even though the wrong caused later adverse effects, the continuing claim doctrine is not applicable."  *Id.* (citation modified).

The Government contends that "Plaintiffs' claims are not 'inherently susceptible to being broken down into a series of independent and distinct events or wrongs.'  Rather, the alleged harms here all relate back to the alleged failures to protect Plaintiffs' alleged interests in the Lake Pepin Reservation in the mid-1800s."  Mot. at 13 (quoting *Brown Park Estates-Fairfield Dev. Co. v. U.S.*, 127 F.3d 1449, 1456 (Fed. Cir. 1997)).

Defendant is correct.  Plaintiffs' theory rests on the premise the United States failed, beginning in the nineteenth century, to protect the Lake Pepin Reservation from unlawful conveyances.  Any ongoing failure to "manage and protect the reservation's trust corpus," Resp.

9

at 12, arises from its original, allegedly unlawful conveyances of the Lake Pepin Reservation in the nineteenth and twentieth centuries.

This Court addressed analogous circumstances in *Winnemucca*, where the plaintiff alleged ongoing harm stemming from the presence of trespassers.  167 Fed. Cl. 396.  The Court rejected the continuing claims theory because "such harm is the continued effect of the BIA's original decision to convey the housing to the alleged trespassers." *Id.* at 418.  Additionally, the Complaint here makes no reference to conveyances later than 1947, further demonstrating the alleged wrongs occurred prior to that date. *See* Pls.' Ex. 28, ECF No. 1-6.

Plaintiffs invoke several cases arising out of the forest management context for the proposition that the continuing claims doctrine "has been applied with particular force to ongoing trust management obligations."  Resp. at 12; *see Mitchell v. United States*, 10 Cl. Ct. 787, 788 (1986) (finding a continuing duty to regenerate Indian forest land where federal statute required Interior to manage forests to "make possible continuous production and a perpetual forest business" under 25 C.F.R. § 163.3 (1986)); *Confederated Tribes of the Colville Rsrv. v. United States*, 171 Fed. Cl. 622, 642 (2024) (finding the government's forest management obligations were recurring and prospective in nature, as governed by statute); *Confederated Tribes & Bands of the Yakama Nation v. United States*, 171 Fed. Cl. 692, 712–13 (2024) (finding the same).

But no comparable statute or treaty provision imposing a recurring duty exist here. Unlike a duty to replant trees for "continuous production," a duty not to unlawfully convey land does not regenerate each day the records remain unchanged. *Cf. Harvest Inst. Freedman Fed'n v. United States*, 80 Fed. Cl. 197, 201 (2008) (finding, in the context of a claim the United States breached its trust duty by failing to ensure land conveyances occurred, that "[i]f the Government breached an obligation . . . it did so at the turn of the century in a single discrete act"), *aff'd*, 324 F. App'x 923 (Fed. Cir. 2009).

Historic trust mismanagement claims like Plaintiffs' have consistently been treated as distinct breaches rather than continuing obligations that have yet to accrue.  *See, e.g.*, *Chemehuevi*, 150 Fed. Cl. at 215; *Winnemucca*, 167 Fed. Cl. at 417–19.  Accordingly, the continuing claims doctrine does not apply.

> **b)  Plaintiffs cannot prevail on a theory of "fraudulent concealment" because they were on notice as to the basis of their claims.**

While this Court's statute of limitations cannot be equitably tolled once a claim has accrued, the accrual of a claim can be.  *See Hopland Band,* 855 F.2d at 1578 (describing the tolling of the accrual of a claim as "routinely [] allowed").  Accrual can be tolled where, for example, "the government fraudulently or deliberately conceals material facts relevant to a plaintiff's claim so that the plaintiff was unaware of their existence and could not have discovered the basis of [their] claim." *Id*. at 1577.

However, "[w]here the facts giving rise to a cause of action were known to a plaintiff more than six years prior to the filing of a suit . . . the Federal Circuit has rejected tolling to delay a claim's accrual." *Chemehuevi*, 150 Fed. Cl. at 197; *see also Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1572 (Fed. Cir. 1993) ("[A]ll the relevant *facts* were known.  It was the meaning of the law that was misunderstood.").  "Where the actions of the government are open and notorious, we have pointed out that plaintiff is on inquiry as to its possible injury." *Coastal Petroleum Co. v. United States,* 228 Ct. Cl. 864, 867 (1981).

Plaintiffs argue the United States' "concealment" of its trust violations tolls the accrual of their injuries.  Compl. ¶ 437; Resp. at 7–11.  Specifically, they assert Defendant made the allegedly unlawful conduct "inherently unknowable," rendering Plaintiffs' claims regarding that conduct timely.  Resp. at 11.  This theory fails for two reasons: first, the law does not recognize concealment of legal rights as a basis for tolling; second, the underlying facts were objectively available to Plaintiffs outside the limitations period.

The Government played a role in obscuring the title to certain records, including an 1864 Attorney General opinion that supported the superiority of Indian title.  *Sioux Half-Breed Rsrv. in Minnesota*, 11 U.S. Op. Atty. Gen. at 59–62.  Plaintiffs claim there was a "double-blind documentary façade of federal and county property records."  Resp. at 10.  But even if true, "[e]verything needed to provide Plaintiffs or their ancestors with notice of the material facts underlying their claims was public record that was legally available and constructively known," including the 1830 Treaty and 1858 Act.  Reply at 5.  And, it is well-settled that "misinformation and omission" regarding Plaintiffs' legal rights do not toll the accrual of a claim or the statute of limitations.  *Shoshone II*, 672 F.3d at 1031–32; *see, e.g.*, *Chemehuevi*, 150 Fed. Cl. at 214 (applying this rule).

The Federal Circuit's decision in *Catawba* is instructive: even where the Government made inaccurate representations about the law, the court held that only the objective meaning of the relevant Act determined when the limitations period began to run.  982 F.2d at 1570–71.  The tribe's misunderstanding of the law, even if premised on the Government's advice, could not change that objective meaning.  *Id*.  The same principle applies here.  The "government's denial" that it serves as a "trustee" for the Reservation is not a concealment of fact; rather, it is a legal position, and it cannot support a theory of concealment.  Compl. ¶ 437.

Plaintiffs also knew or should have known of the facts giving rise to their claims around the time the Government first took actions allegedly in contravention of their right to title.  The Plaintiffs' detailed Complaint and exhibits themselves demonstrate the availability of the relevant records.  Mot. at 12; *see, e.g.*, Pls.' Exs. 17, 28, ECF Nos. 1-3, 1-4, 1-6.  Because the scrip land patents reflecting the Government's conveyances were recorded in publicly available land records at the time of execution, Plaintiffs cannot show the acts were inherently unknowable.  *See* Compl. ¶ 356 (explaining that "when a Sioux half-breed lineal descendant used scrip to claim a parcel, the resulting Sioux scrip land patent failed to acknowledge the Indian title encumbrances from the 1830 Treaty, the 1854 [Act], and the 1858 [Act]"); *see also Duncan v. United States*, 98 Fed. Cl. 318, 326 (2011) (finding publicly available land records made it impossible for claims to be "inherently unknowable").  Plaintiffs do not allege these records only

11

became available to them within the relevant six-year statute of limitations.  *See Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984) (finding facts of alleged forest mismanagement were not inherently unknowable where facts were available through inquiry); *see also Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("[A] plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue.").

Plaintiffs also argue the accrual of their claims should be suspended because "the government, including the State of Minnesota, fostered a lethal environment during the 1862–1870 period that functioned as a jurisdictional blockade to notice."  Resp. at 10.  But because Plaintiffs do not allege such an environment persisted into the six-year period preceding the filing of this Complaint, it cannot serve as a basis for finding Plaintiffs' claims timely.  *See* Compl.

Further, by their own factual allegations, the physical environment should have been sufficient to notify Plaintiffs of the alleged breach once the private land sales began.  As Plaintiffs explain, "[t]he government proceeded with public sales and homesteading on portions of the reservation, even though its own legal opinion stated that the Indian title and right to occupancy remained.  This created legal conflicts and confusion, which further benefited speculators who could acquire the land at low cost with no regard for the rightful beneficiaries."  Compl. ¶ 319 (internal citation omitted).  If speculators and homesteaders were purchasing, occupying, or living on the Lake Pepin Reservation land, that reality was observable and sufficient to put Plaintiffs on notice of their potential claims.  *See Winnemucca*, 156 F.4th at 1349 (finding the tribe "failed to explain why the physical presence of encroachments would not be objectively sufficient to notify the Tribe of the alleged breaches" (citation modified)).

Taking their undisputed allegations as true and because they have failed to demonstrate either that legal misinformation qualifies as fraudulent concealment or that the underlying facts were inherently unknowable, Plaintiffs cannot proceed on a "fraudulent concealment" theory.

### c)      The ITAS does not apply to Plaintiffs' claims.

Finally, statutory provisions may "impact when [Plaintiffs'] claims accrued so as to preclude the application of the statute of limitations to bar [their] claims."  *Chemehuevi*, 150 Fed. Cl. at 198.  The ITAS is one such Act wherein Congress "waived its sovereign immunity and deferred the accrual of the Tribes' cause of action until an accounting is provided."  *Shoshone I*, 364 F.3d at 1346; *see* Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5 at 305–06.

Under the ITAS, the statute of limitations "concerning losses to or mismanagement of trust funds" involving affected Indian tribes or individual Indians is tolled "until an accounting has been completed that reveals whether a loss has been suffered."  Consolidated Appropriations Act, 128 Stat. at 305–06; *Shoshone I*, 364 F.3d at 1347.  However, this tolling provision only covers claims concerning losses to trust *funds*, not assets.  *Shoshone I*, 364 F.3d at 1350.  Nor does this provision cover claims that involve trust funds where the underlying wrongs involve non-monetary trust assets.  *Id.*  ("While it is true that a failure to obtain a maximum benefit from

a mineral asset is an example of an action that will result in a loss to the trust, the Act's language does not on its face apply to claims involving trust *assets*.").

Plaintiffs allege the ITAS tolls the accrual of its claims because the Government never provided the mandated accounting for trust funds.  Compl. ¶¶ 427–28; Resp. at 19.  The ITAS tolling provision was not renewed after 2014.  Mot. at 14 (citing *Wyandot Nation of Kansas v. United States*, 124 Fed. Cl. 601, 605–06 (2016), *aff'd*, 858 F.3d 1392 (Fed. Cir. 2017)).  It is therefore not currently in effect and cannot be relied upon by Plaintiffs.  Because § 2501 is jurisdictional, any tolling provision that expired before the Complaint was filed leaves this Court without jurisdiction.  *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008) (holding that 28 U.S.C. § 2501 is a jurisdictional statute of limitations that cannot be waived or tolled equitably, and a claim filed outside the six-year window must be dismissed for lack of jurisdiction).

However, even if Plaintiffs could rely on this provision, their theory fails for two reasons.  First, an accounting is not necessary to put Plaintiffs on notice of a breach.  *See Winnemucca*, 167 Fed. Cl. 396 at 416–17.  Second, the ITAS tolling provision applies to trust funds as opposed to non-monetary assets, the latter of which are the bases of Plaintiffs' alleged injuries.  *See Shoshone I*, 364 F.3d at 1348–50.

The ITAS tolls the statute of limitations "only [for] claims . . . for which an accounting would be necessary to determine *whether* there has been a loss."  *Winnemucca*, 167 Fed. Cl. 396 at 416 (quoting Consolidated Appropriations Act, 128 Stat. at 305–06).  Plaintiffs allege the government "never provided . . . an accounting of such funds from which a beneficiary can determine whether there has been a loss."  Compl. ¶ 432.  But this assertion is contradicted by the detailed allegations throughout the Complaint, which demonstrate Plaintiffs possessed sufficient factual information to identify and plead with specificity multiple breach claims.  *See supra* Section II.B.3.b.

The Federal Circuit has made clear a claim accrues when a plaintiff has sufficient notice of a breach, not when it has calculated the precise quantum of damages.  *See Wolfchild v. United States*, 731 F.3d 1280, 1291 (Fed. Cir. 2013) ("[E]ven if the funds at issue were trust assets, the claim made here would not be the sort of claim for which a final accounting would be necessary to put a plaintiff on notice of a claim, because claimants knew or should have known that the money was publicly distributed in 1981 and 1982.").  And as this Court held in *Chemehuevi*, if a tribe "is on notice of a breach of the government's trust obligations sufficient to state a claim— and simply is uncertain of the quantum of damages—the claim already has accrued and the statute of limitations has begun to run."  150 Fed. Cl. at 202.  Plaintiffs cannot invoke ITAS tolling by claiming uncertainty about the existence of a breach while simultaneously pleading the facts that establish their awareness of one.

*Shoshone I* involved claims of mismanagement of tribal trust funds, where a beneficiary would not have been aware that a breach of fiduciary duty had occurred until an accounting had been provided.  *See* 364 F.3d at 1339.  However, "that principle does not apply where, as here, a final accounting is unnecessary to put [Plaintiffs] on notice of the accrual of its claim."

*Winnemucca*, 156 F.4th at 1349. As discussed above, the facts establishing the Government's liability were apparent on their face at the time the alleged wrongs occurred. *See supra* Section II.B.3.b. Because Plaintiffs had, or should have had, notice of their claims without any accounting, the ITAS provides no tolling relief.

Further, Plaintiffs' claims do not concern "trust funds" within the meaning of the ITAS. The Federal Circuit in *Shoshone I* rejected the trial court's view that the ITAS could be extended to "claims that the Government did not receive the best possible price for the leases negotiated," reasoning that, "[w]hile it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the [ITAS] language does not on its face apply to claims involving trust assets." 364 F.3d at 1349–50. Counts I, II, and IV of Plaintiff's Complaint concern non-monetary land assets, meaning the ITAS does not apply to these claims.

Plaintiffs argue Count III qualifies as a trust *funds* mismanagement claim because "the government pocketed up to $265,709 in land sale proceeds" from the sale of trust assets. Resp. at 19. However, for this claim to fall within the scope of the ITAS, Plaintiffs would need to identify a specific trust duty governing those funds. They have not done so.

Plaintiffs invoke 25 U.S.C. §§ 161a & 162a as the source of the Government's obligation to manage and invest the funds at issue. *Id*. But those provisions apply only to funds already held in trust by the United States. *See Wolfchild*, 731 F.3d at 1291. While Plaintiffs allege "the government pocketed up to $265,709 in land sale proceeds," Resp. at 19, they do not allege those proceeds were ever received into trust or that the government assumed trust obligations with respect to those specific funds. *See Shoshone I,* 364 F.3d at 1347–50 (explaining that claims regarding trust funds apply to a trustee's duty to collect and manage specific funds and payments, but do not apply to assets held in trust). Absent an allegation that these proceeds were accepted into trust, or must have been accepted into trust under statute, there is no "trust fund" to which the ITAS's tolling provision can attach. *See Wolfchild*, 731 F.3d at 1291. Therefore, Plaintiffs cannot rely on the ITAS to toll Count III.

Plaintiffs' claims accrued outside the six-year statute of limitations and no exception applies to toll their claims. Accordingly, Counts I through V of Plaintiffs' Complaint are time-barred and dismissed for lack of subject-matter jurisdiction.

### 4. Count VI fails under the primary jurisdiction doctrine, or, alternatively, is barred by the statute of limitations.

The doctrine of primary jurisdiction provides "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far E. Conf. v. United State*s, 342 U.S. 570, 574 (1952). "The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 63 (1956).

14

"[T]he threshold question" of whether a particular group "is a federally recognized Indian tribe is within the primary jurisdiction of Interior." *Wyandot Nation of Kansas*, 858 F.3d at 1400. As such, "tribal recognition is not justiciable." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1370 (Fed. Cir. 2005).

Congress created the Federal Revenue Sharing program in 1972 to provide fiscal assistance to state and local governments. *See* RSA, 86 Stat. 919. Indian Tribes were among the units of local government covered by the program: "If there is an Indian tribe which has a recognized governing body which performs substantial governmental functions, then there shall be allocated to such tribe a portion of the amount allocated." *Id.* § 108(b)(4), 86 Stat. at 925 (citation modified).

Plaintiffs assert "the Sioux half-breed lineal descendants would have been federally recognized to secure statutory benefits as a tribe" under the RSA "[b]ut for the Department's administrative termination of the Sioux half-breed lineal descendants and its reservation." Compl. ¶¶ 571–72. As discussed below, Count VI must be dismissed either on primary jurisdiction grounds or, alternatively, as time-barred.

To the extent the Revenue Sharing Act requires recognition through the BIA process, Count VI must be dismissed under the primary jurisdiction doctrine. The Complaint alleges the Sioux half-breed lineal descendants were illegally omitted from Interior's list of recognized tribes and, as a result, never received federal benefits to which they were entitled under the RSA. Compl. ¶ 578. But if RSA benefits are predicated on formal tribal recognition by the BIA, as Plaintiffs assert, then Plaintiffs must first seek recognition through Interior's process.[4] Whether a group qualifies as a federally recognized tribe is a non-justiciable political question beyond this Court's authority to resolve. *Wyandot Nation of Kansas*, 858 F.3d at 1400.

The Government is correct that "[u]ntil Plaintiffs seek and obtain a final decision from Interior on the question of its recognition, the political question doctrine precludes any challenge based on federal recognition." Def.'s Suppl. Br. at 5–6. Because Count VI presents a nonjusticiable political question, it must be dismissed.

Even if the Court could determine eligibility under the RSA independent of BIA recognition, Count VI is barred by the statute of limitations. In their Supplemental Brief, Plaintiffs retreat from their earlier position that BIA recognition is a prerequisite to benefit eligibility. *See* Pls.' Suppl. Br. They now contend "the Revenue Sharing Act operates completely independent of BIA's tribal recognition process and list" and instead rests with the U.S. Department of Housing and Urban Development ("HUD"). *Id.* at 8. Under HUD's more lenient standard, Indian groups not included in official BIA or HUD lists may qualify. *Id.* at 6–8; *see Leelanau Indians, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 502 F. Supp. 741, 742 (W.D. Mich. 1980) (finding Congress intended to broaden the eligibility standards for the Revenue Sharing Act and contemplated the potential for qualifying "off the lists"). Plaintiffs argue the

---

[4] Unrecognized Indian groups may petition Interior to achieve federal "acknowledgment" as Indian Tribes pursuant to 25 C.F.R. § 83.

Court may determine RSA eligibility by "recognizing a statutory beneficiary class for the sole purpose of remedying the government's retrospective monetary damage claims." Pls.' Suppl. Br. at 4.

Plaintiffs' argument explicitly framed Count VI in terms of tribal recognition. *See, e.g.*, Compl. ¶ 569 (arguing Plaintiffs would have received benefits "but for [Interior's] improper omission of Sioux half-breed lineal descendants from the list of federally recognized tribes"); *id.* ¶ 578 (arguing Plaintiffs never received benefits "[b]ecause [Interior] illegally omitted Sioux half-breed lineal descendants and the Lake Pepin Reservation from the list of recognized tribes"). "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *Sergent's Mech. Sys., Inc. v. United States*, 157 Fed. Cl. 41, 55–56 (2021) (citation omitted); *id.* (collecting cases). The Court nonetheless addresses the argument, raised for the first time in Plaintiffs' Supplemental Brief, as if properly presented.

While Plaintiffs' reframing attempts to resolve the primary jurisdiction problem, it does so at the cost of exposing the claim as untimely. If eligibility never depended on BIA recognition, Plaintiffs knew or should have known of their entitlement to benefits under the RSA no later than six years after the program's implementation in 1972. Plaintiffs' tolling, continuing claims, and fraudulent concealment arguments raised to save Counts I–V are equally unavailing here.

Count VI thus fails on both available grounds: if BIA recognition is required, the claim presents a nonjusticiable political question; if it is not, the claim is time-barred. Either way, dismissal is required.

### 5.    Because the Court lacks jurisdiction over Plaintiffs' monetary claims, Count VII seeks impermissible equitable relief.

Count VII of the Complaint requests the Court order the United States to take certain actions that would "restore the legal status of the Lake Pepin Reservation and their federally-recognized tribal status." Compl. ¶ 585. Plaintiffs request this relief pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(2), which authorizes this Court to issue equitable relief "ancillary to claims for monetary relief over which [the Court] has jurisdiction." *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) ("*NATCA*"); *see* Compl. ¶ 583.

The Tucker Act's language defining this Court's jurisdiction requires that a plaintiff limit their claims to "actual, presently due money damages from the United States." *United States v. King,* 395 U.S. 1, 3 (1969); *see* 28 U.S.C. § 1491(a). Accordingly, "there is no provision giving the Court of Federal Claims jurisdiction to grant equitable relief when it is unrelated to a claim for monetary relief pending before the court." *NATCA*, 160 F.3d at 716; *see* 28 U.S.C. § 1491(a)(2) (allowing for equitable relief when such relief is "incident of and collateral to" a money judgment).

When this Court lacks jurisdiction over a plaintiff's monetary claims, any related equitable claims should be dismissed. *See Winnemucca*, 167 Fed. Cl. 396 at 421–22 ("Because the Court lacks jurisdiction to entertain Plaintiff's claims, there are no damages to be assessed

and therefore no accounting that would be an incident of and collateral to a money judgment."
(citation modified)).

Since the Court has dismissed the rest of Plaintiffs' Complaint, a request for equitable
relief is therefore not "incident of and collateral to" a money judgment. 28 U.S.C. § 1491(a)(2).
Much of the equitable relief requested by Plaintiffs is also likely outside of this Court's authority
even under § 1491(a)(2). *See* Mot. at 28. For example, "Congress plainly gave the Court of
Federal Claims no role in the [tribal] recognition process, and [this Court] has no inherent
authority to take part in it." *Samish Indian Nation*, 419 F.3d at 1373. Count VII must therefore
also be dismissed.

### III.    Conclusion

The Court recognizes the serious and well-documented history of injustices inflicted on
Native Americans by the United States government. *See United States v. Erickson*, 436 F. Supp.
3d 1242, 1259–72 (D.S.D. 2020) (outlining the history of Native Americans and tribal law in the
United States), *aff'd*, 999 F.3d 622 (8th Cir. 2021). Plaintiffs' allegations that the Government
illegally deprived them and their ancestors of land to which they were rightfully entitled fit
within this troubling historical pattern. Nonetheless, this Court is one of limited jurisdiction, and
it cannot grant Plaintiffs the relief they seek.

Defendant's Motion to Dismiss for lack of subject-matter jurisdiction under RCFC
12(b)(1) is **GRANTED**. ECF No. 9. Plaintiffs' Motions for Class Certification and Partial
Summary Judgment, ECF Nos. 11 & 12, are **DENIED AS MOOT**. The Clerk is directed to
enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge